**TRANSAMERICA CORPORATION for itself and for all members of the Affiliated Group**

v.

**The UNITED STATES.**

**Nos. 90–79T, 91–79T.**

United States Claims Court.

Aug. 31, 1988.

As Amended Sept. 1, 1988.

Cameron W. Wolfe, Jr., San Francisco, Cal., for plaintiff; Robert J. Favole, Jane B. Kroesche, and Orrick, Herrington & Sutcliffe, of counsel.

Gilbert W. Rubloff, Washington, D.C., with whom was Acting Asst. Atty. Gen. Michael C. Durney, of record for defendant; Mildred L. Seidman, and Michael J. Dennis, of counsel.

## CONTENTS

| Issues | Page |
|---|---|
| (1) I.R.C. § 51 Tax Surcharge | 425 |
| (2) I.R.C. § 421(b) Deduction | 425 |
| (3) Air Craft Leases | 425 |
| (4) I.R.C. §§ 921, 922 (WHTC) | 425 |
| (5) Bad Debt Deduction (SCORE) | 425 |
| (6) Investment Tax Credits for Films | 425 |
| (7) Computational Adjustments | 426 |
| (8) Title Plant Leases | 426 |
| Facts | 427 |
| Disposition | 436 |
| Conclusion | 443 |
| (9) Charitable Contributions | 443 |
| Facts | 444 |
| Property Involved | 444 |
| UA Business | 448 |
| American Film Institute | 449 |
| Library of Congress | 450 |
| University of Wisconsin | 451 |
| Negotiations for Conveyances | 451 |
| Gift Instruments | 455 |
| Valuations | 458 |
| Depreciation Recapture | 463 |
| Disposition | 464 |
| Final Positions | 464 |
| Library Property | 467 |
| Date of Conveyance | 474 |
| Conclusion | 474 |
| University Property | 475 |
| Ziv–TV Original 35mm Negatives | 480 |
| Date of Completion | 480 |
| Valuation of Witnesses | 481 |
| Valuation of Categories | 484 |
| Markets | 486 |
| Conclusions | 489 |
| Summary | 491 |
| (10) Order on All Claims | 491 |

## OPINION

HARKINS, Senior Judge:

Transamerica Corporation, plaintiff, a Delaware corporation with principal offices in San Francisco, California, in tax years 1968 and 1969 filed consolidated federal income tax returns as the common parent of an affiliated group of corporations. In 1968, the affiliated group consisted of plaintiff and 228 includable subsidiaries; in 1969, the affiliated group consisted of plaintiff and 258 includable subsidiaries.

On March 9, 1979, plaintiff filed two complaints in the United States Court of Claims, relative to the taxable years ending December 31, 1968, and December 31, 1969, respectively. On September 28, 1979, the two cases were consolidated for all purposes, except computation and entry of

judgment. Both complaints were amended in June 1980. As amended, each complaint challenged IRS determinations on eight substantive issues.

The cases initially were assigned to Judge Miller. During pretrial preparation, the issues were bifurcated, with the question of liability on each issue to be resolved first, and computation of damages on all issues to be deferred until entry of final judgment. Appeals of the various decisions on all liability and damages issues would follow final judgment on the entire case. On September 18, 1986, prior to determination of liability on two of the contested issues, the cases were reassigned to this court.

In a joint stipulation dated December 18, 1986, the parties agreed to waive their rights to retrial of the liability issues that had been resolved by Judge Miller. The stipulation applies to the following matters:

1. IRC § 51 Tax Surcharge Issue: On July 5, 1984, on cross-motions for summary judgment, defendant's motion for partial summary judgment was allowed. *See* opinion in 5 Cl.Ct. 477 (1984).*

2. IRC § 421(b) Deduction (Stock Option Issue): Trial of this issue was held in January 1984 in San Francisco, California. On December 18, 1984, an opinion was filed that concluded plaintiff was not entitled to the deductions involved and that this claim would be dismissed. *See* opinion in 7 Cl.Ct. 119 (1984).

3. Aircraft Leases Issue: This issue concerns recapture of depreciation and investment credit on leases of certain aircraft. Trial of this issue was held in January 1984 in San Francisco, California. On February 22, 1985, an opinion was filed that concluded the leases in fact were conditional sale contracts and that plaintiff's claims with respect to the aircraft leasing issue would be dismissed. *See* opinion in 7 Cl.Ct. 441 (1985).

4. IRC §§ 921, 922—Western Hemisphere Trade Corporation (WHTC) Deduction: For years 1968 and 1969, plain-

tiff took certain deductions for members of the affiliated group that qualified as Western Hemisphere trade corporations. After plaintiff and the IRS agreed upon adjustments for each year, certain deductions claimed by plaintiff remained in dispute. On March 31, 1982, plaintiff filed a motion for partial summary judgment, and on April 7, 1983, defendant filed a response in which it did not contest the motion as to either year. By order dated June 14, 1983, plaintiff's motion for partial summary judgment was allowed.

5. Bad Debt Deduction: In 1969, a subsidiary of plaintiff entered an agreement with stockholders of Scientific Commercial Research Services Limited (SCORE) to purchase shares of and lend money to SCORE. After a default settlement, debt remained outstanding and plaintiff deducted the outstanding notes as bad debt, which the IRS disallowed. This same issue, with respect to later years, was pending in Federal District Court for the Northern District of California. In a memorandum and order dated November 14, 1984, Judge Miller accepted the parties' stipulation that the SCORE issue in this court would be bound by the decision of the District Court on the same issue. On January 24, 1986, the parties to the District Court proceeding agreed to a settlement of the SCORE issue. In accordance with the November 14, 1984, order, the stipulation of the parties in the District Court proceedings is binding in this court, and no further proceedings remain in this court on this issue, other than calculations pursuant to the terms of the settlement agreement.

6. Investment Tax Credits for Films: In its determination of allowable investment tax credits for films for tax years 1968 and 1969, the IRS did not account for certain carryover credits for the years 1962 through 1966, certain credits earned in 1968 and 1969, and certain carryover credits for 1967. Plaintiff's

---

* Unless otherwise noted, all references to the I.R.C. are to the Internal Revenue Code of 1954, as amended, codified at 26 U.S.C. _____ (1982).

claims on these issues were settled by the parties' agreement that the Government would withdraw its objections to the allowance of a claim for refund based on the restricted interest calculation attributable to investment tax credits for films, and that such investment tax credits plus interest could carry forward and associated net operating loss claimed in 1970 could carryback. This agreement was reported to Judge Miller at a pretrial conference on July 8, 1982. In the December 18, 1986, stipulation, which is accepted by the Court, the parties agree that the previous agreement is binding and that this issue is settled.

7. Certain computational issues, such as the propriety of and calculations for interest in assessed deficiency for tax year 1969, and carryback adjustments, remain. These remaining issues will be calculated and resolved by mutual agreement after final decisions on the underlying substantive issues.

The two remaining liablity questions that were transferred to this court on September 18, 1986, involved the IRS recharacterization of certain title plant leases, and the IRS disallowance of deductions for claimed charitable contributions of film property to the Library of Congress and the University of Wisconsin. Liability as to the title plant leases was determined in an opinion filed on March 8, 1988. Trial of the charitable contributions issue was completed on June 22, 1987, and posttrial briefing was completed on December 18, 1987.

The March 8, 1988, opinion on the title plant leases, which was not reported when filed, is included in this opinion. Resolution of the charitable contributions issue follows.

TITLE PLANT LEASES

Transamerica's involvement in the title plant leases issue is a result of the acquisition of Title Guaranty Company (Title Guaranty), a Colorado corporation doing business in the Denver metropolitan area. The acquisition occurred during the period October 10, 1962, through December 20, 1962, by means of an exchange of common stock. By December 20, 1962, Trans-

america had acquired 100 percent of the issued outstanding stock of Title Guaranty.

When it was acquired, Title Guaranty had lease arrangements that involved two title plants, one in Boulder County, and one in Mesa County, Colorado. The Boulder County lease, effective on January 1, 1961, had as parties the Boulder County Abstract of Title Company and members of the Hickman families. Title Guaranty, effective February 3, 1961, merged with the Boulder County Abstract of Title Company, with Title Guaranty as the surviving corporation. The lease transaction involving Mesa County was made December 28, 1961, effective January 1, 1962. The parties were Title Guaranty and a partnership composed of Richard B. Williams and G. Dale Williams doing business as the Mesa County Abstract Company.

In 1966, Transamerica transferred all of the stock of Title Guaranty to Transamerica Title Insurance Company, a California corporation that was a wholly owned subsidiary of Transamerica. In 1966, Title Guaranty changed its name to Transamerica Title Insurance Company of Colorado. On November 30, 1967, Transamerica Title Insurance Company of Colorado was liquidated into Transamerica Title Insurance Company. Transamerica Title Insurance Company succeeded to all of the rights and obligations of Transamerica Title Insurance Company of Colorado, including its rights and obligations under the Boulder and Mesa leases.

At all times material, Title Guaranty and its successors, for financial reporting purposes, treated the Boulder lease and the Mesa lease as leases. The title plants were not included as assets on its balance sheets, and rents paid were expensed on its income statements. For federal income tax purposes, the rents paid were deducted.

On its consolidated federal income tax returns, under IRC § 162(a)(3), plaintiff deducted $22,000 in payments in 1968 and 1969 on the Boulder lease. On the Mesa lease, the deduction was $6,600 for 1968 and $6,745 for 1969. On audit, the rental deductions were disallowed because the

IRS recharacterized the leases as installment purchase contracts.

Trial of the title plant leases issue was held in Washington, D.C. on February 27–29, 1984. The parties have filed extensive stipulations of fact, proposed findings of fact, and posttrial briefs during the period December 2, 1983, and April 8, 1987.

The issue to be determined is whether defendant properly recharacterized, as conditional sales contracts rather than leases, the agreements under which Title Guaranty gained access to the Boulder County and Mesa County title plants.

### FACTS

Most of the essential facts have been stipulated by the parties. The parties' differences arise from the conclusions to be drawn from the undisputed facts, and the precedent applicable to those facts and conclusions.

The title plant leases issue involves (1) the business of preparing and selling abstracts of title, and (2) the title insurance business.

An abstract of title consists of a chronological list and description of all recorded documents affecting the title to a particular parcel of real property. In general, the title abstracting business consists of preparing abstracts of title for a fee. In the usual situation, such abstracts are requested by an attorney who has been engaged by a prospective vendee or mortgagee of property to render an opinion on the state of the vendor's or mortgagor's title. The attorney's opinion is based largely on the facts disclosed in the abstract of title.

One of the principal assets of a title abstracting business is its "title plant." A title plant consists of a specialized set of books, records, maps, charts, plats, indices, film and related materials (also referred to as "abstracting materials") covering all transactions involving real property located within a particular county. Such transactions are indexed according to parcels of property. This is in contrast with the governmental indexing system maintained by the County Recorders in the various coun-

ties in Colorado (and most other states), which index real property transactions by the names of the grantor and the grantee, mortgagor and mortgagee, etc.

A title plant is established and maintained by employees of the title company making a record (or "abstract") of every document filed with a county recorder on a daily basis, briefly noting the vital information involved (such as the particular parcel, the nature of the document, the persons involved, and other relevant information), which information is then transcribed onto the books maintained by the title company. Information is also gathered from other official sources, including but not limited to judgments and bankruptcy records that may affect title to real property and that are recorded by the clerks of various courts.

The "books" of a title plant consist of two types, tract books and abstract books. The tract books consist of the daily tract indices of recorded documents affecting real property. The abstract books consist of the transcribed abstracts of recorded title documents. The "maps" of a title plant are also of two types, subdivision maps and arbitrary maps. Subdivision maps are copies of recorded maps subdividing larger parcels of real property. Arbitrary maps are unofficial subdivision maps prepared by the title company for its own internal use in searching titles. "Plats" is an alternate term for official subdivision maps; "charts" is an alternate term for arbitrary maps. The term "indices" is an alternate term for tract books. The term "records" refers to all of the records described above, plus miscellaneous records such as judgment and bankruptcy records and microfilm records.

A title plant may have an indefinite useful life because its records will always be useful to some extent unless, of course, they are somehow rendered obsolete by a change in the law or some advance in technology. It is good business practice in the title insurance industry and, especially, in the title abstracting business to maintain a complete title plant back to the date that patent was issued. Nevertheless, the actu-

al use and resulting value of older title plant records becomes less frequent because, each time an abstract or insurance policy is issued for a piece of property, the general practice is to review the title plant records only for transactions that have occurred since the issuance of the last abstract or insurance policy. The proportion of times requiring recourse to the older records would still be less overall even if the volume of real estate transactions increase as a given county prospers.

The title insurance business consists of selling policies of insurance guarantying a particular state of title with respect to a parcel of property. A title insurance policy is also based upon an abstract of title, usually prepared from the insurance company's title plant records. From the title abstracting-insurance company's viewpoint, the principal differences between title abstracting and title insurance are (i) the basis of the fee charged (the premium for a title insurance policy is based upon the insured value of the property whereas the fee charged for an abstract of title is based upon the number of documents in the chain of title since the last abstract was certified), (ii) the nature of the risk assumed by the company (errors and omissions in an abstract of title give rise to a cause of action, if any, based upon negligence, whereas an insurance company is absolutely liable for loss, up to the face amount of the policy, resulting from defects of title not excepted in the policy), and (iii) the elimination of the attorney's opinion of title (although attorneys employed by the company examine the abstracts when necessary).

*Title Guaranty*

Title Guaranty's primary business from 1911 until at least 1962 was preparing and selling abstracts of title with respect to real property. Until 1961, Title Guaranty's title abstracting business was limited to the Denver, Colorado metropolitan area, consisting of Denver County, Adams County, Arapahoe County, and Jefferson County. From its inception, Title Guaranty had engaged in the title insurance business.

Before 1948, the title plant records were maintained in handwritten or typewritten form. Beginning in 1948, Title Guaranty and other title companies in Colorado began to make photographic copies on microfilm of the full text of recorded title documents and to make microfilm duplicates of their records. In some cases, Title Guaranty and its successors also made microfilm copies of all of their pre–1948 handwritten or typewritten records to an arbitrarily selected prior date. These duplicate records were created and have been maintained both for more efficient operation of abstracting titles and to provide security to the title company in the event that its primary abstracting materials are destroyed. These microfilm records are the "film" referred to as part of the abstracting materials of a title plant.

Colorado has for many years maintained a system of licensing title abstractors. Colorado Rev.Stat. § 12–1–101, et seq. Among the statutory requirements for obtaining a license are that the applicant own or have access to a reasonably complete title plant and, in a county already having a licensed abstractor, that another licensed abstractor is needed, based upon current or anticipated business.

Beginning in the mid–1950's Title Guaranty was anxious to expand its title insurance business as rapidly and as extensively as circumstances permitted. Among the obstacles faced by Title Guaranty in the mid–1950's to expanding its title insurance business throughout Colorado were a lack of staff and facilities in counties outside the four-county Denver area, a reluctance on the part of the community at large to accept title insurance as true insurance and in lieu of the traditional attorney's opinion of title, and the fact that Title Guaranty would have to compete with local businessmen (including abstractors and attorneys) who were securely established in the title business in the various counties of Colorado.

As a first step to solving its lack of staff and facilities outside the four-county Denver area, Title Guaranty established agency relationships with the owners of indepen-

dent title abstracting businesses in other counties (although some agency relationships had been established as early as 1942). Through such independent agents, Title Guaranty was able to sell title insurance in counties where it had no staff or facilities.

Title Guaranty's independent insurance agents were generally selected on the basis of their reputations as title abstractors. Most such agents were the only licensed abstractors and the owners of the only complete abstracting plants within their respective counties. In general, these persons were very prominent in the business communities of their respective counties and were regarded as the most important persons in such counties for purposes of securing title insurance business.

For many years prior to 1961, Title Guaranty's major Colorado-based competitor in the title abstracting business in the four-county Denver area and for title insurance business throughout Colorado was Record Abstract and Title Insurance Company (Record Abstract). In the mid–1950's, Title Guaranty's competition for title insurance business from Record Abstract and larger non-Colorado-based national companies intensified. In the mid–1950's four national title insurance companies formed a cooperative type company to establish a title plant in the four-county Denver area so that each could compete more effectively with Title Guaranty and Record Abstract for title insurance business in that area. Such competition also included attempts by Record Abstract and other companies to establish insurance agency relationships with the same persons with whom Title Guaranty had established agency relationships. In the late 1950's and early 1960's, Title Guaranty determined that it would be desirable to establish more permanent relationships with its independent agents in order that such agents would not be lost to Title Guaranty's competitors.

In approximately 1959, the management of Record Abstract changed, and Lloyd Hughes (hereinafter referred to as Hughes) became President of and gained effective control over that company. Prior to 1959, Hughes and Donald Graham (an officer of Title Guaranty, hereinafter referred to as Graham) had informal discussions regarding a merger of Title Guaranty and Record Abstract. It was thought that a merger would be advantageous to both parties, and that they could compete more effectively with the larger non-Colorado based national title insurance companies.

Hughes was apprehensive of a simple merger of Record Abstract into Title Guaranty because Title Guaranty was a larger company and a consolidated board of directors would be dominated by former Title Guaranty directors. For this reason, and because Boulder County was a natural area of expansion for both companies (the City of Boulder being regarded in some respects as a suburb of the Denver metropolitan area), Hughes negotiated with Aksel Nielsen (hereinafter referred to as Nielsen), President of Title Guaranty, to make the Boulder Corporation a party to the proposed merger. Nielsen accepted Hughes' demand that, as a condition to Record Abstract's merger into Title Guaranty, the Boulder Corporation be made a party to the merger.

*Boulder County*

The Boulder County Abstract Company (hereinafter referred to as the Boulder Company) was formed in 1871. H.C. Hickman purchased an interest in the Boulder Company in 1922, increased his interest to a controlling interest in the Boulder Company in 1933, and soon thereafter became the sole owner of the Boulder Company. At all times material hereto, H.C. Hickman's ownership interest in the Boulder Company was shared equally with his wife, Laurena O. Hickman.

In approximately 1945, H.C. Hickman's son, James O. Hickman (hereinafter referred to as Hickman), began to work for the Boulder Company. In the early 1950's, H.C. Hickman gave to Hickman a 50 percent ownership interest in the Boulder Company. At all times material hereto, Hickman's ownership interest in the Boulder Company was shared equally with his wife, Patricia J. Hickman.

At or about the time of its formation in 1871, the Boulder Company established and began to maintain and update a complete title plant with respect to real property titles in Boulder County, Colorado. The Boulder Company's title plant records date from 1865. Records predating 1876, at which time Colorado became a state, include geographically posted Territorial Commission records. The Boulder Company's title plant contains approximately 660,-000 documents from the period 1876 through 1961. At all times material hereto, the Boulder Company's title plant, as maintained and updated by its successors, has been the only complete title plant in Boulder County, Colorado.

From the time of its formation in 1871 until some time in the mid–1950's, the principal business of the Boulder Company was preparing and selling abstracts of title with respect to real property located in Boulder County, Colorado. In the early 1940's, the Boulder Company began to sell policies of title insurance with respect to property located in Boulder County, Colorado, in addition to conducting its title abstracting business. For this purpose, it entered into agreements with both Title Guaranty and with Record Abstract to act as an agent for selling policies of title insurance on behalf of such companies.

During the 1940's, the Boulder Company's title abstracting business constituted approximately 90 percent of its total business, and its title insurance business constituted approximately 10 percent. By 1962, title insurance business accounted for approximately 85 percent of the total business of the Boulder Company and its successor, and title abstracting business was only 15 percent of the total business.

For the period 1945 through approximately 1959, the Boulder Company was organized as a general partnership. The partners, after the early 1950's, were H.C. Hickman, Laurena O. Hickman, Hickman, and Patricia J. Hickman. In approximately 1958, the members of the Hickman family decided to incorporate the Boulder Company. The Boulder County Abstract of Title Company (hereinafter referred to as the Boulder Corporation) was organized as a Colorado corporation in approximately 1959.

To implement its desire to limit exposure to liability, the only assets transferred by the Boulder Company to the Boulder Corporation consisted of accounts receivable, furniture and equipment, and goodwill (including its title abstracting and title insurance agency businesses), the book value of which, in the aggregate, was $20,000. The Boulder Company also arranged to have its errors and omission liability insurance coverage reissued in the name of the Boulder Corporation. Neither the Boulder Company's title plant nor the building in which it conducted its business were transferred to the Boulder Corporation. At the time of the transfer of the business of the Boulder Company to the Boulder Corporation, there was no specific expectation or anticipation of a subsequent acquisition of the Corporation by Title Guaranty or by any other company.

The Boulder Company retained ownership of its title plant. The title plant was leased to the Boulder Corporation for rents determined by reference to the gross receipts of the Boulder Corporation.

The building in which the Boulder Company and subsequently the Boulder Corporation conducted its business was owned by The Hickman Company, a corporation all of the stock of which was owned by Hickman and Patricia J. Hickman. This building was also leased to the Boulder Corporation.

In July or August 1960, representatives of Title Guaranty approached Hickman with a proposal that the Boulder Corporation be merged into Title Guaranty at the same time as Record Abstract was to be merged, and the parties commenced negotiating the terms of the proposed merger at that time. The Hickmans did not consider selling the Boulder Company's title plant to the Boulder Corporation. Rather, the Hickmans felt it was to their benefit to consider the package arrangement: (i) the lease; (ii) employment contract for Hickman, Sr. that ran for his life as well as his wife's life; (iii) employment contract for

Hickman, Jr.; and (iv) stock from Title Guaranty.

Title Guaranty did not have the funds to make an outright, lump-sum purchase of the abstracting materials owned by the Boulder Company. Even if it could have borrowed the money, it would then have been required to schedule the debt on its books and records and this, in turn, would have seriously impaired its ability to sell title insurance. Title Guaranty regarded this balance sheet distinction as important at a time when title insurance was not generally regarded as true insurance in Colorado and it, Title Guaranty, was attempting to enhance its image and expand its penetration into the business of title insurance.

In the course of the negotiations between representatives of Title Guaranty and the Boulder Corporation, it was understood that Title Guaranty would need to use the title plant then under lease to the Boulder Corporation. Graham, and subsequently Nielsen insisted that the title plant lease had to be renegotiated and a new agreement executed prior to approval of the merger because the rights and obligations of the Boulder Corporation with respect to the title plant lease (which was negotiated by the Hickmans in approximately 1959 between the Boulder Company and the Boulder Corporation) were to be assumed by Title Guaranty in the proposed merger. While technically the renegotiation was between the Boulder Corporation and the Boulder Company, in practical effect the negotiations for a new agreement covering the title plant were between the Hickman family interest, represented by Hickman, and Title Guaranty, represented by Nielsen.

On January 1, 1961, H.C. Hickman, Laurena O. Hickman, Hickman, and Patricia J. Hickman, as partners, and the Boulder Corporation executed a Lease Agreement and Option (the Boulder Lease) to become effective on that date. In negotiating the amount to be paid under the new title plant agreement, Hickman insisted on setting forth minimum payments and Nielsen insisted upon setting forth maximum payments.

The Boulder Lease recited that, inter alia:

(a) The lessors were to lease to the Boulder Corporation all of their abstracting materials, including books, records, maps, charts, plats, indices, and film theretofore used by them in the conduct of their business of abstracting titles to real property in Boulder County for a period of 30 years beginning January 1, 1961, through January 1, 1991. The Boulder Corporation was to pay amounts designated as annual rent for the use of the abstracting materials as follows: $20,000 for the first 5–year period; $22,000 for the second 5–year period; $24,000 for the third 5–year period; 5 percent of gross income but not less than $24,000 nor more than $40,000 for the fourth 5–year period; and 5 percent of gross income but not less than $24,000 nor more than $35,000 for the final 10–year period. No portion of the payments designated as rentals were designated as interest. One-half of each monthly payment was to be paid to H.C. Hickman and Laurena O. Hickman, and one-half of each monthly payment was to be paid to Hickman and Patricia J. Hickman.

(b) The Boulder Corporation was granted the right at the end of the Lease term to exercise an option to purchase the abstracting materials for $25,000. No payments designated as rentals were to be credited toward the option price.

(c) The abstracting materials were to remain the sole and exclusive property of the Lessors for the duration of the Lease, subject to the Boulder Corporation's right to use such materials. All additions subsequent to January 1, 1961, to the abstracting materials were the sole and exclusive property of the Boulder Corporation.

(d) The Boulder Corporation was required to maintain fire and hazard insurance with respect to the abstracting materials of at least $100,000 and to maintain errors and omissions liability insurance in an amount not less than $100,000. If, during the period of the Lease, the abstracting materials were destroyed or substantially

damaged, the Boulder Corporation was to replace all materials within a reasonable time at its own expense.

Negotiations between Hickman, Graham and Nielsen regarding the proposed merger of the Boulder Corporation into Title Guaranty also covered a new employment contract regarding H.C. Hickman. The employment agreement dated January 1, 1961, between H.C. Hickman and the Boulder Corporation recited, inter alia, that H.C. Hickman would perform consulting services on an irregular basis for the Boulder Corporation. The Boulder Corporation was required to pay H.C. Hickman $10,000 per year from 1961 through August 15, 1967, and $5,000 per year thereafter for the remainder of H.C. Hickman's life. In the event of H.C. Hickman's death, the Boulder Corporation was required to pay $5,000 per year to Laurena O. Hickman for the remainder of her life.

The negotiations between Hickman and Nielsen regarding the proposed merger of the Boulder Corporation into Title Guaranty included a renegotiation of the building lease between The Hickman Company and the Boulder Corporation. On or about January 1, 1961, The Hickman Company as lessor and the Boulder Corporation as lessee entered into a lease agreement whereby, inter alia, The Hickman Company agreed to lease to the Boulder Corporation the building in which the Boulder Corporation conducted its abstract and guaranty title insurance business for a 5–year period commencing January 1, 1961, through January 1, 1966. The Boulder Corporation was required to pay rents in the amount of $800 per month. This building lease agreement was renewed on substantially identical terms for the period January 1, 1966, through January 1, 1971.

A final Plan of Merger for the merger of Record Abstract and the Boulder Corporation into Title Guaranty was approved by the Board of Directors of Title Guaranty on January 20, 1961, and by the shareholders of Title Guaranty on January 30, 1961. The Plan of Merger for the merger of Record Abstract and the Boulder Corporation into Title Guaranty recited, inter alia:

Title Guaranty was designated as the surviving corporation. Upon the effective date of the merger, all rights, privileges, property, debts due, and all and every other interest of or belonging to Record Abstract and the Boulder Corporation became vested in Title Guaranty, and all rights of creditors, liens, debts, liabilities, and duties of Record Abstract and the Boulder Corporation became enforceable against Title Guaranty. Pursuant to this paragraph of the Plan of Merger, Title Guaranty succeeded to the rights and obligations of the Boulder Corporation regarding the Boulder lease, the building lease with The Hickman Company and the H.C. Hickman employment agreement. The Plan of Merger explicitly stated that the assets of the Boulder Corporation did not include the abstracting materials owned by the Boulder Company, nor the building owned by The Hickman Company, but that Title Guaranty would succeed to the Boulder Corporation's Lease agreements with respect thereto. The merger of Record Abstract and the Boulder Corporation into Title Guaranty was effective on February 3, 1961.

Shortly after the effective date of the merger, and as negotiated among Nielsen, Hickman, Hughes, and two others, Title Guaranty entered into employment contracts with Nielsen, Hughes, Hickman, and two former Title Guaranty directors and employees, Fred Klein and Andrew Dyatt. Pursuant to these employment agreements, each of the aforementioned individuals was to be employed by Title Guaranty for 5 years at specified salaries, plus an annual bonus, each such person was to be a member of the Title Guaranty Board of Directors, and each such person was to be a member of the executive committee of such board. Hickman was actively employed by Title Guaranty and its successors from February 3, 1961, until he left the company in 1971.

All amounts received from Title Guaranty and its successors under the Boulder Lease were reported as ordinary income by H.C. Hickman and Laurena O. Hickman on their joint federal income tax returns and by Hickman and Patricia J. Hickman on their joint federal income tax returns.

*Mesa County*

The Williams family had established the Independent Abstract Company, a title abstracting business, in 1905. Richard B. Williams (Williams) entered into the title abstracting business in Grand Junction, Mesa County, Colorado, in June 1936. Williams purchased the Independent Abstract Company from his father before 1940, purchased in 1951 the only remaining title abstracting business in Mesa County, and operated his business under the name The Mesa County Abstract Company. In the mid–1950's, Williams' son, G. Dale Williams, began to work for him in the title abstracting business. Thereafter, Williams gave to G. Dale Williams a 30 percent share of the business. Williams and G. Dale Williams continued to operate the title abstracting business as a partnership, under the name The Mesa County Abstract Company (hereinafter referred to as the Mesa Company). In approximately 1956, Nielsen persuaded Williams to become a title insurance sales agent for Title Guaranty.

By 1940, Williams had acquired or established, and thereafter maintained and updated, a complete title plant with respect to real property titles in Mesa County, Colorado. The Mesa Company's title plant records date from 1883, at which time Mesa County was partitioned out of Gunnison County. The Mesa Company's title plant contains approximately 500,000 documents from the period 1883 through 1961. At all times material hereto, Williams was the only licensed title abstractor in Mesa County and the abstracting materials that were the subject of the Mesa Lease constituted the only complete title abstracting plant in Mesa County.

In 1961, Nielsen and Hickman approached Williams for the purpose of employing Williams and securing Mesa Company's title plant by Title Guaranty. After approximately two months of discussions, Williams was persuaded to enter into an agreement. Williams was not in favor of what he termed an "outright" sale. Williams was interested in staying in the business, and in providing an employment

opportunity for his son. He preferred that his payments be "spread over a period of time" rather than "getting any sizable amount of money at one time." ·

Title Guaranty did not have the funds to make an outright, lump-sum purchase of the abstracting materials owned by Williams and G. Dale Williams. Even if it could have borrowed the money, it would have then been required to schedule the debt on its books and records and this, in turn, would have seriously impaired its ability to sell title insurance. Title Guaranty regarded this balance sheet distinction as important at the time when title insurance was not generally regarded as true insurance in Colorado and it, Title Guaranty, was attempting to enhance its image and expand its penetration into the business of title insurance.

In the meetings on the negotiations underway with the Mesa Company for Title Guaranty to lease the abstracting materials of Mesa, there was no discussion regarding a lump-sum purchase of the Mesa Company's abstracting materials. Nor were Title Guaranty's officers authorized to negotiate or enter into such an agreement.

On December 28, 1961, Williams and G. Dale Williams and Title Guaranty executed a Lease Agreement and Option (the Mesa Lease), to become effective January 1, 1962. The Mesa Lease recited that, inter alia:

(a) The lessors were to lease to Title Guaranty all of their abstracting materials including charts, plants, indices, and film previously used by the lessors in the conduct of their title abstracting business for a 30–year period beginning January 1, 1962, through January 1, 1992. Title Guaranty was required to pay amounts designated as annual rent for the use of the abstracting materials of the greater of $6,600 or 5 percent of Title Guaranty's gross receipts with respect to title business in Mesa County. No portion of these payments was designated as interest. Seventy percent of each monthly payment was to be paid to Williams, and 30 percent of each monthly payment was to be paid to G. Dale Williams.

(b) Title Guaranty was granted the right at the end of 17–1/2 years or at any time thereafter during the lease term to exercise an option to purchase the abstracting materials for $25,000. No payments designated as rentals were to be credited toward the option price.

(c) The abstracting materials were to remain the sole and exclusive property of the lessors for the duration of the Lease, subject to Title Guaranty's right to use such materials. All subsequent additions to the abstracting materials were the sole and exclusive property of Title Guaranty.

(d) Title Guaranty would employ both Williams and G. Dale Williams and each agreed not to compete with Title Guaranty.

(e) Title Guaranty was required to maintain fire and hazard insurance with respect to the abstracting materials of at least $80,000 and to maintain errors and omissions liability insurance in an amount not less than $100,000. If, during the period of the Lease, the abstracting materials were destroyed or substantially damaged, Title Guaranty was to replace all materials within a reasonable time at its own expense without regard to the amount already paid.

By letter dated January 1, 1962, from Title Guaranty to Williams and signed and approved by Williams, Williams was employed by Title Guaranty at a salary of $500 per month. By letter dated January 1, 1962, from Title Guaranty to G. Dale Williams, approved and signed by G. Dale Williams, G. Dale Williams became an employee of Title Guaranty and manager of the Title Guaranty Mesa County Branch. G. Dale Williams' salary was $7,500 per year plus 10 percent of yearly gross receipts in excess of $100,000.

On or shortly after January 22, 1962, Williams purchased 65 shares of previously unissued capital stock of Title Guaranty. On February 1, 1962, Title Guaranty entered into an agreement with G. Dale Williams whereby G. Dale Williams was granted an option to purchase 65 shares of unissued capital stock of Title Guaranty from Title Guaranty at an option price of $194 per share. The agreement recited that the stock option was to provide an incentive to G. Dale Williams to devote his best efforts in managing the Mesa County Branch and that the stock option was intended to qualify under Section 421 of the Internal Revenue Code of 1954. G. Dale Williams exercised such option at some time during 1962 or early 1963.

A lease agreement dated as of January 1, 1962, was executed by Williams and Title Guaranty which provided, inter alia, that Williams would lease to Title Guaranty the building he was using to conduct his abstract and guaranty title insurance business.

G. Dale Williams was employed by Title Guaranty as the manager of its Mesa County Branch under the direction of Williams. In May 1963 he terminated his employment for personal reasons. Williams was actively employed at the Mesa County Branch from January 1, 1962, and became manager of that Branch upon the termination of G. Dale Williams. Williams continued as manager of the Mesa County Branch as an employee of Title Guaranty and its successors until September 1, 1976, at which time he retired. Before Williams' retirement, Title Guaranty's successor's share of the market for title insurance business in Mesa County was approximately 85 percent; shortly after his retirement, its market share dropped to approximately 40 percent.

The Mesa Lease transaction provided for a minimum payment of $6,600 per annum for a 30–year period. The Mesa Lease transaction also provided Title Guaranty an option to purchase when any time after 17–1/2 years Title Guaranty could pay the $25,000 option price. In 1979, Transamerica, as Title Guaranty's successor, did exercise its option to purchase the Mesa Company. Transamerica Title Insurance Company exercised its option to acquire legal title to the abstracting materials that were the subject of the Mesa Lease transaction on June 14, 1979, and has paid the $25,000 option price with respect thereto. Williams reported the rental payments received from Title Guaranty on the Lease Agreement as rental income on its income tax returns.

In the mid–1960's, G. Dale Williams sold his interest in the Lease Agreement between The Mesa County Abstract Company and Transamerica Title Insurance Company, successor to Title Guaranty, to his father. After graduating from law school in 1966, G. Dale Williams was employed as a trust officer with First National Bank in Grand Junction, Mesa County, Colorado. Two years later, G. Dale Williams left that position to practice law full-time in Grand Junction. G. Dale Williams tooks no part in the transaction between The Mesa County Abstract Company and Transamerica Title Insurance Company when the latter in 1979 exercised its option to purchase the title plant for Mesa County.

In November 1984, James L. Roffe (Roffe) representing Transamerica Title Insurance Company, approached G. Dale Williams about selling Transamerica's interest in the title business in Mesa County. G. Dale Williams resolved to proceed and actively pursued negotiations to purchase the Mesa County title business. All of the negotiations were between G. Dale Williams and Roffe. G. Dale Williams entered into an Agreement of Sale with Roffe on December 31, 1984, to take effect on January 1, 1985. The sale price was $160,000. Included were: (1) the complete title plant dating from 1883 to the present; (2) the physical assets of the business including furniture and fixtures; (3) "Work in Process", comprised of Transamerica's outstanding contracts; (4) two building leases, both to run through December 31, 1987; and (5) the goodwill of the existing business. Also as a part of the transaction, G. Dale Williams entered into an Agency Agreement with Transamerica Title Insurance Company on December 31, 1984, in which he agreed to act exclusively as its agent in Mesa County.

In making his purchase, G. Dale Williams was advised by James Grisier (Grisier), a certified public accountant in Grand Junction since 1972 who has represented a number of clients in buying and selling businesses and who has made many appraisals in conjunction with various transactions in Mesa County. Grisier has been G. Dale Williams' and his father's personal accountant since 1981.

On or about February 26, 1985, G. Dale Williams sent a letter to Transamerica Title Insurance Company's Los Angeles office setting forth his final allocation of the purchase price for the Mesa County title business. The letter indicated that G. Dale Williams would conclude that the allocation was acceptable if he did not hear to the contrary. G. Dale Williams did not hear to the contrary, concluded that Transamerica Title Insurance Company accepted his allocation and so proceeded to use that allocation in both his financial records and tax returns.

The purchase price allocation as set forth in the February 26, 1985, letter and G. Dale Williams' and Grisier's bases therefor are as follows:

| | |
|---|---:|
| Furniture and Fixtures | $ 63,780.00 |
| Title Records | 46,485.00 |
| Goodwill | 15,494.00 |
| Work in Process | 19,503.00 |
| Building Leases | 14,738.00 |
| TOTAL | $160,000.00 |

The basis for the allocation as to title records and goodwill, was: After deducting the values allocated to the furniture and fixtures, the work in process, and the building leases from the total price paid for the business ($160,000), 75 percent of the remaining balance was allocated to the title records and 25 percent to goodwill. The value of the title plant itself, which included both the original 1883–1961 plant and the subsequent additions, was based on G. Dale Williams' experience and knowledge and Grisier's estimations of its future value. Accordingly, G. Dale Williams believed that the original, pre–1962 records had a value of less than 50 percent of the $46,485 for all title records.

G. Dale Williams is now President and General Manager of Abstract & Title Company of Mesa County, Inc., the privately held corporation he formed to purchase the title business. He personally oversees the company's entire operations, spending approximately 80 percent of his time with the business. Both of G. Dale Williams' sons

are full-time employees and officers of the company.

## DISPOSITION

Plaintiff's challenge to the IRS recharacterization of the Boulder and Mesa leases rests on compliance with the requirements of section 162(a)(3) of the Internal Revenue Code of 1954. 26 U.S.C. § 162(a)(3) (1982). That section provides the ordinary and necessary expenses in carrying on a business are deductible if the payments are for the "continued use or possession" of property to which the "taxpayer has not taken or is not taking title or in which he has no equity."

The parties disagree as to the analysis to be applied in the determination of whether the agreements properly may be characterized as leases or as conditional sales. Plaintiff's argument concentrates on the intent of the parties in entering the transactions. Business realities at the time, the terms and form of the agreements, and the conduct of the parties are emphasized as evidence of the intent to make and satisfy the traditional concepts of a leasehold transaction. Defendant emphasizes elements in the transactions that indicate an intent to acquire title to and to use "uniquely irreplaceable" assets for an indefinite future period. Defendant's argument concentrates on the significance of the options, the expectation of the parties that the options would be exercised, and the characteristics of the option prices that bear upon the likelihood or guarantee they would be exercised.

■ Numerous cases have considered whether an agreement, which was in form a lease, was in substance a sale for purposes of determining whether income should be reported by a taxpayer as rental receipts or income from the sale of property. The burden is on the taxpayer to prove that the IRS characterization of the transaction as a conditional sale was erroneous. *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed.2d 293 (1932); *Dysart v. United States,* 169 Ct.Cl. 276, 340 F.2d 624 (1965). The labels employed by the parties to a transaction are not controlling; the

substance of the transaction, rather than its form, is determinative. *Helvering v. Lazarus & Co.,* 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939). The focus is on the practical effect of the transaction, not its technical effect. *Northwest Acceptance Corp. v. Commissioner,* 58 T.C. 836 (1972), aff'd, 500 F.2d 1222 (9th Cir.1974). In determining whether a transaction is a lease or a purchase, its effect on both parties to the transaction must be analyzed and the business involved must be examined. *Lockhart Leasing Co. v. Commissioner,* 446 F.2d 269, 272 (10th Cir.1971). In *Oesterreich v. Commissioner,* 226 F.2d 798, 801–02 (9th Cir.1955), the court stated:

> If the parties enter into a transaction which they honestly believe to be a lease but which in actuality has all the elements of a contract of sale, it is a contract of sale and not a lease no matter what they call it nor how they treat it on their books.

■ There is no single criterion that shows the essence of a commercial deal negotiated between businessmen with differing interests. All of the aspects of the arrangement must be examined to form a judgment as to whether the parties intent was to negotiate for the use of property or for the transfer of ownership.

> In fact, since most transactions exhibit a variety of circumstances which point in opposite directions, the cases have been decided on the basis of all of the facts and circumstances there presented.

*Kansas City So. Ry. Co. v. Commissioner,* 76 T.C. 1067, 1094 (1981).

■ It is necessary to examine the economic nature of the payments. Rental is a payment merely for the use of property, and it contemplates return of the rented property at the termination of the lease. On the other hand, if payments, though denominated rental, are required to be made in amounts that actually cover the full economic value of the property, and ownership ultimately will be transferred, they are a payment for ownership. If the user of the property in fact acquires an economic equity in the property by virtue of the payments, and the property will be

worth substantially more than the price to be paid upon exercise of the so-called option to purchase, then the user will have been building up a true economic interest in the property. *Universal Drilling Co. v. United States,* 412 F.Supp. 1231 (E.D.La. 1976).

Plaintiff relies heavily on *Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) as a change in the law and a significant reordering of the factors to be considered. Plaintiff argues that the United States Supreme Court's decision in *Frank Lyon* holds that where the transaction is the result of bonafide negotiations conducted at arms-length, and where the transaction form is encouraged or compelled by legitimate business or regulatory realities, the taxpayer will only have to' demonstrate that it has retained *some* of the traditional attributes of a lessor. Plaintiff articulates the change in the scope of examination that is to be made when a recharacterization of a lease has been challenged. As to intent, plaintiff argues: The determination of objective intent, however, is inextricably linked to the parties' subjective intent. Where the facts and circumstances present at the time the transaction was consummated indicate that the lease was the product of economic realities and arms-length negotiations, the courts will more readily accept the parties' agreement and will find a lease for tax purposes if only *some* of the attributes of the traditional lessor status are present.

Plaintiff relies upon the Supreme Court's concluding paragraph in *Frank Lyon:*

In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. Expressed another way, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax

purposes. What those attributes are in any particular case will necessarily depend upon its facts. It suffices to say that, as here, a sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions. 435 U.S. at 583–84, 98 S.Ct. at 1303–04.

Plaintiff's focus on the summation paragraph in *Frank Lyon* is misdirected, and plaintiff's analysis is too broad as to the meaning and scope of that decision. In *Frank Lyon,* the Court was concerned with a sale-and-leaseback transaction, which is different in nature from the question of the proper characterization of a transaction as a lease or as a conditional sale. *Frank Lyon,* essentially, embraces the "traditional" substance over form analysis. The Court's reasoning in *Frank Lyon* is a combing of all of the facts. Indeed, the Court states: "[t]here is no simple device available to peel away the form of this transaction and to reveal its substance," and then proceeds to examine the transaction fact by fact. 435 U.S. at 576, 98 S.Ct. at 1299–1300.

The post-*Frank Lyon* precedent establishes that *Frank Lyon* is another gloss on the traditional analysis which long has been applied to the conditional sale versus lease issue. In *Illinois Valley Paving Co. v. Commissioner,* 42 T.C.M. (CCH) 909 (1981) (a conditional sale/lease situation where the lessee rented concrete paving equipment for a trial period), the court cited *Frank Lyon* and numerous other cases decided before *Frank Lyon.* The court held that the parties had entered into a bonafide lease with an option to purchase after a consideration of: (1) substance and form; (2) intent of the parties at the time the agreement was made as shown by the facts and circumstances and economic realities existing at that time; (3) the terms of the agreement; (4) the likelihood that the option would be exercised; and (5) the parties' treatment of the transactions on their books.

In *Swift Dodge v. Commissioner,* 692 F.2d 651 (9th Cir.1982), the court found that the two party "leasing" arrangement

was in fact a conditional sale. The court cited *Frank Lyon* and noted that the characterization of the transaction is controlled by the substantive provisions of the agreement and the parties' conduct. *Id.* at 652. The court in *Swift Dodge* makes frequent reference to *Frank Lyon*. It is clear, however, that the court does not consider itself confronted by the narrow interpretation plaintiff asserts. Rather, the court, as did the court in *Illinois Paving*, incorporates *Frank Lyon* into an existing analytic framework. *See also Kansas City So. Ry. Co. v. Commissioner*, 76 T.C. 1067 (a transaction's effect on both parties must be analyzed as well as the general business of the lessor and the manner in which it is conducted).

In sum, the post-*Frank Lyon* cases point out that *Frank Lyon* has left open the door to objective inquiry into substance over form, which necessitates a review of all the facts. Such a review requires examination of the facts and circumstances present at the time the transaction was entered, and a consideration of how those facts conform with a variety of relevant factors.

Defendant's analysis rests on the decision made on February 22, 1985, in this case on the aircraft dispositions issue. *Transamerica Corp. v. United States*, 7 Cl.Ct. 441 (1985). The aircraft dispositions issue also involved a two-party lease versus a conditional sale recharacterization. Defendant contends the aircraft dispositions decision is dispositive on the title plant leases issue. Defendant, however, does not recognize that in the aircraft leases the facts in significant respects have a clarity that is not present in the title plant leases. The facts of the aircraft leases included: monthly payments by the lessor successively reduced pro rata the option price; when the agreements were made, any failure to exercise the option was remote; during the lease terms, the lessee was charged interest on the unpaid balance of the option prices; necessary spare parts for the aircraft were sold concurrently with execution of the leases; and, on their financial records, the parties treated the transactions differently.

Resolution of the title plant leases issue requires application of the analyses in both *Frank Lyon* and the aircraft dispositions decision. *Frank Lyon* offers two specific guidelines: (1) look at substance over form, and (2) look to see if the lessor has retained significant and genuine attributes of the traditional lessor status, and the lessee has not acquired an equity. These guidelines are supplemented by the methodology followed in the aircraft dispositions decision to examine the facts.

Isolation of the business purpose in the Boulder and the Mesa transactions that the IRS recharacterized is complicated by differences in the two transactions and by the chronology of events. The Boulder agreement was a product of Title Guaranty's and Record Abstract's expansion program. The Mesa agreement subsequently was consummated separately. The record is not clear whether the Mesa transaction was part of a program to expand Title Guaranty's title abstract and insurance business, or whether it was part of a package put together to attract the subsequent acquisition of Title Guaranty by plaintiff.

In the negotiations of both the Boulder and Mesa agreements, the parties did not discuss during the negotiations the possible tax consequences of the transactions. The record is barren of documentation relative to any internal discussions or analysis either party may have undertaken independently. As prudent businessmen, however, the parties presumably were mindful of tax and other practical consequences. The record also is barren as to analysis or consideration, if any, plaintiff gave to tax consequences of the lease agreements when it acquired Title Guaranty.

The property that was the subject of the leases was the title plant materials that covered the period 1865–1961 for the Boulder Company, and the period 1883 through 1961 for the Mesa Company. At all times during the lease terms, the lessors retained legal title to the leased property. All additions to the title plant materials during the period of the leases were the sole and exclusive property of the lessees.

In form, the challenged transactions had the traditional attributes of leases: the instruments identified the parties as lessee and lessor, designated a fixed term, designated the money payments as rents, provided title to the pre–1961 abstracting materials remained exclusively in the lessor, gave lessor a right of inspection, obligated the lessee to preserve the property and return it in good condition, obligated lessee to replace damaged property with no abatement of rent for destruction or damage to the property, and obligated the lessee to pay for fire and hazard insurance, and for errors and omissions liability insurance. The option to purchase in the Boulder lease was provided separately from the rental obligations, and was subject to exercise after the term without adjustment for previous rental payments. The option to purchase in the Mesa lease was a part of the section on rents, and it could be exercised after 17–1/2 years into the 30–year term, without adjustment for previous rental payments.

Defendant contends that the economic substance of the transactions requires the form to be disregarded and the transactions to be deemed immediate sales on an installment basis. In a conditional sale, the seller retains legal title for security purposes. The buyer has possession with the right to use during the installment term, during which he accumulates equitable title through payments based upon full economic value of the property, plus an interest component to compensate for deferred payments during the installment term.

When Title Guaranty sought to enter into the Boulder and Mesa County markets, it recognized it would have to secure for extended periods the use of the only complete title plants in each county. The title plants were indispensable to Title Guaranty's ability to conduct its title insurance business. This requirement could be satisfied by a long term lease, with or without an option to purchase, or by a conditional sale. Either type of transaction would secure for Title Guaranty the right to use the title plants.

In 1961 and 1962 there were no appraisal services available through which the parties could obtain a valuation of the Boulder and Mesa title plants. In 1962, it would have cost approximately $250,000 to recreate the Mesa title plant. Plaintiff estimates, since the Boulder plant was earning more than twice as much as the Mesa title plant, that the Boulder title plant in 1961 would have been worth approximately $500,000. Plaintiff presented no evidence that anyone involved in the transactions attempted to make estimates of the current or prospective values of the title plants separate from other features of the transactions.

The business objectives of the parties could be achieved through a lease with an option to purchase more readily than through the use of an installment sale. Title Guaranty wanted to maintain its balance sheet in a manner sufficiently conservative to assure potential title insurance customers of its ability to pay in the event of a loss. Title Guaranty did not have the funds to make an outright lump sum purchase of abstracting materials owned either by the Boulder Company or by Williams and G. Dale Williams. If Title Guaranty borrowed the money, it would have been required to schedule the debt on its books, and this in turn, would have impaired seriously its ability to sell title insurance. In 1961, long term lease obligations did not have to be capitalized. *See Frank Lyon v. United States*, 435 U.S. at 577, n. 14, 98 S.Ct. at 1300, n. 14 (until 1968 a long term lease did not impact a lessee's balance sheet).

Title Guaranty's expansion throughout Colorado depended upon its ability to identify itself with local leaders in the title insurance business. For a continuation of local contacts, Title Guaranty needed to establish a relationship that would encourage the Hickmans and the Williams to maintain an active interest in the title plants.

The Hickman family interests agreed to renegotiate the 1959 Boulder title plant lease in order to satisfy the merger conditions imposed by Title Guaranty and

Record Abstract. During the negotiations, the Hickmans did not consider selling the Boulder Company's title plant. The Hickmans felt it was to their benefit to consider a package arrangement that included: (1) a lease; (2) a lifetime employment contract for Hickman, Sr., and payments for life to his wife; (3) an employment contract for Hickman, Jr.; and (4) stock from Title Guaranty.

In the Mesa transaction, Williams was not interested in a sale of the title plant. Williams wanted to stay in the business and to provide an employment opportunity for his son. Further he preferred that payments be spread over a period of time rather than getting any sizable amount of money at one time.

■ Other features of the transactions support the conclusion that the parties entered a lease relationship. The parties consistently treated the transactions as leases for both financial and tax reporting purposes. Where the parties execute a lease and treat the transaction as a lease on their books and records, this method of reporting is a factor that supports the conclusion that a lease actually was intended. *See Benton v. Commissioner*, 197 F.2d 745 (5th Cir.1952); *Illinois Valley Paving Co. v. Commissioner*, 42 T.C.M. (CCH) 909, 914 (1981); *T. Wayne Davis v. Commissioner*, 37 T.C.M. (CCH) 1441, 1446 (1978).

In both transactions, the rental payments were based upon a percentage of gross receipts, and the rental payments had no direct connection with the amounts to be paid if the purchase options were exercised. In the Mesa transaction, Title Guaranty was obligated to pay rent in an amount equal to the greater of $6,600 per annum or 5 percent of its gross receipts. Between 1962 and 1972, under the Mesa lease the average rent per year was $7,264, the average gross income was $123,255, and the approximate average net profit before taxes was $43,957. Under the Mesa lease, Title Guaranty paid rentals that totaled $220,006 before it exercised its purchase option after 17–1/2 years.

The Boulder lease required annual rentals of from $20,000 to $24,000 during the period January 1, 1961—December 31, 1975, and thereafter at 5 percent of the lessee's gross income, but not less than $24,000 nor more than $40,000 during the period January 1, 1976—December 31, 1980, and not less than $24,000 nor more than $35,000 during the period January 1, 1981—January 1, 1991. Between 1961 and 1972, under the Boulder lease the average rent per year was $21,500. The average gross income for the years 1962 through 1972 was $370,144, and the approximate average net profit before taxes from 1962 through 1972 was $99,354. By 1979, payments made under the Boulder lease totaled $448,509.

A lease that has payments based upon a percentage of gross receipts makes the lessee's liability open-ended. Such a provision is consistent with the concept that the lessee is paying for the use of the property involved. The provision also is inconsistent with a concept that a firm selling price had been established and agreed upon.

In both transactions, no portion of the amounts designated as rental payments or option prices was specifically designated by the parties to represent interest. The payment of interest normally is a factor in a sale to compensate the seller for deferred payment during the installment period.

In both transactions, the option price was $25,000. This sum is not nominal. *See Oesterreich v. Commissioner*, 226 F.2d 798 (9th Cir.1955) (purchase option $10—building worth $350,000); *Watson v. Commissioner*, 62 F.2d 35, 36 (9th Cir.1932) (additional sum of $1, a mere formality in a transaction involving $109,900). The payment of rentals did not build up an equity that was reflected in reductions in the option prices, nor did such payments amount to an equity in the pre–1961 title plant materials.

Defendant interprets the facts as showing arrangements where the Boulder and Mesa owners each effectively agreed to permanently dispose of their title plants. According to defendant, this was an instance where it was to everyone's advantage to formulate an agreement under which Title Guaranty would buy out two

family businesses, title plants included, through an installment plan. The annual installment payments, although they were denominated as rentals and the final installment was termed an option price, defendant argues that, in fact, the yearly payments were not meant to (and did not) represent fair rental values, and the last optional payment was not meant to (and did not) represent the properties' anticipated fair market values.

Defendant emphasizes that the title plants were indispensable elements to Title Guaranty's proposed expansion. Further, Title Guaranty expected to continue to operate indefinitely in Boulder and Mesa Counties and would have a continuous need to use the title plants.

Defendant's view of the facts has support in the record. With respect to plaintiff's contention that it was uncertain at the time the transactions were entered whether the options would be exercised, the testimony shows that at the time the leases were executed, Title Guaranty's officials did not foresee any circumstances or conditions that might arise which would cause it not to exercise the purchase options. Mr. Fred Klein, a former Transamerica/Title Guaranty executive, testified that he believed the Mesa option was included in the transaction because he felt that Title Guaranty would exercise the option "everything remaining equal." Mr. Klein also testified that he felt Title Guaranty had a moral obligation to exercise the options even though he recognized that there was no legal obligation to do so. Williams testified that he believed, at the time he entered the transaction, that Title Guaranty would exercise the option. Although he felt that Title Guaranty had a moral obligation to exercise the option, he did not feel that the moral obligation would be violated if the option were not exercised. Williams acknowledged that he did understand that, at the end of either 17–1/2 or 30 years, he could get his company back. Hickman, Jr. stated that at the time he entered the transaction he anticipated that Title Guaranty would exercise the option.

Defendant points to anomalies in the $25,000 option prices and contends that the option price could not have been intended to represent a true sales price based upon fair market values at the time the options were eligible to be exercised. Defendant emphasizes that no testimony or other evidence indicates that any attempt was made to estimate the future value of the title plants when the option prices were negotiated and established. Identical option prices for the two properties are said to be unreasonable in view of the difference in values at the beginning of the lease periods. Further, it seems strange to value the Mesa property at $25,000 in 17–1/2 years, while the Boulder property would take 30 years to decrease to the same value.

Defendant notes that under the Boulder lease agreement, the minimum annual payments increased to $24,000 per annum for the last 10 years of the contact, plus additional amounts payable based upon gross receipts. If the value of the property had fallen to the option price, defendant claims it would be unreasonable to pay $24,000 per year to rent a $25,000 asset. In the Mesa transaction, the option could be exercised after 17–1/2 years by making a single $25,000 payment. Defendant asks how could the value of the Mesa title plant drop to $25,000 in 17–1/2 years and have the same value at the end of the 30th year? Further, in the event the option was not exercised at the end of 17–1/2 years, the lessee would have to make annual payments for the next 12–1/2 years that would total at least $82,500. Defendant argues that this provision made it absolutely certain that Title Guaranty would exercise the option rather than remain liable for $82,500. In fact, Title Guaranty in June 1979 exercised its option at the earliest possible date, and paid the $25,000.

Defendant's analysis of the facts as establishing an installment sale has superficial appeal. In a balance of all factors, however, defendant's analysis does not give effect to the substance and economic realities of the transactions.

In their arguments, both parties lost sight of the limitation on the title plant materials that actually were the subject of the leases. At the beginning of the leases in 1961, the materials that were leased comprised complete title plants. This condition of completeness would not exist at the end of the lease terms, and would not be the situation at any time during the lease period. All additions to the title plants became the property of the lessee; and the property to be returned in each lease would be only the pre–1961 materials. These materials covered roughly equivalent periods of time, and the allocation of equivalent values for these volumes of materials is not unreasonable. The trial testimony shows that the parties actually believed that $25,000 was a fair estimation of what the leased materials would be worth at the time the options could be subject to exercise.

The pre–1961 title plant materials have a useful life that may extend for indeterminate periods, unless supplanted by legislation that render such materials irrelevant. The value of the pre–1961 title plant materials would decline during the terms of the leases as new title plant materials were added by the lessees. As time went on, there would be fewer occasions when reference to the pre–1961 records would be necessary. At the end of the lease term, the lessors would have partial title plants, and would be faced with the substantial expense of updating the records. Both of these factors would contribute to a decline in value of the leased materials.

It was not a certainty in 1961 that the options ever would be exercised. Prudence required Title Guaranty to have an extended term to support its expansion into the new territories. This it accomplished in the leases. Whether the expansion would prosper, however, depended on events that were unforeseeable. The nature of business and human experience dictates a future that includes possibilities for technological advances that requires changes in old patterns. The fact that the parties expected the options to be exercised is not inconsistent with an intent to enter a lease transaction. Whether the options would be exercised, in the light of future vagaries, was a speculative matter in 1961.

*Mesa Repurchase*

On March 21, 1986, the parties filed a Joint Stipulation of Facts Based on Newly Discovered Evidence with Respect to the Title Plant Leases Issue. The new evidence establishes that on December 31, 1984, G. Dale Williams purchased Title Guaranty's Mesa County business for $160,000. Afterwards, Williams allocated $46,485 of the lump-sum purchase to all the title plant records, and indicated that less than one-half of that amount was attributable to the pre–1962 records. Plaintiff argues that this allocation is evidence that the $25,000 option price reflects fair market value of the property in the Mesa lease, and that a similar deduction can be made about Boulder pre–1961 title plant materials. Plaintiff argues that the repurchase transaction provides "factual justification" for the option prices in the Mesa and Boulder transactions.

Defendant asserts that plaintiff's deduction from the repurchase transaction is based on a false premise. Defendant points out that the ultimate question is not the fairness of the option price, but rather whether the $25,000 was meant to be a bonafide option price, and that there is no way to determine from plaintiff's "new evidence" what the 1984 fair market value of the Mesa title plant was, much less that of the Boulder title plant. Defendant summarizes its argument as follows: (1) G. Dale Williams did not actually value or appraise the title records; he only determined an amount allocable to them on the basis of what remained after valuing the other assets; (2) the aggregate value of the assets which G. Dale Williams received may well have been worth more than $160,000 since that amount represented book value, not fair market value; (3) it was in G. Dale Williams' interest to allocate as much of the $160,000 to the assets he valued, and as little as possible to the title records and goodwill, because the cost of the former could be written off for tax purposes much faster than that for the latter.

Defendant's argument is persuasive. The repurchase transaction is without probative value.

*Jefferson County Transaction*

On December 18, 1986, the parties filed a Joint Stipulation to supplement the record with respect to the title plant leases issue. The stipulation, as to which defendant expressly reserved the right to object to admissibility of the facts stated, was concerned with a lease with the Jefferson County Abstract Company, Jefferson County, Colorado.

The Jefferson transaction involves an agreement between Title Guaranty and Jefferson County Abstract Company. The parties entered a 15–year lease, commencing March 15, 1951. The rental payments were $45,000 per year, plus 2 percent of the gross income. The option price was set at $20,000 which was exercised in 1966.

The IRS initially proposed to treat the agreement as a sale rather than a lease. Plaintiff protested and the Appellate Division of the IRS sustained the protest and allowed the rental deductions.

Plaintiff claims that the Jefferson County lease was identical to the Mesa and Boulder transactions in all pertinent aspects. However, plaintiff does not provide any of the facts or circumstances surrounding the Jefferson transaction. The Supreme Court, in *Frank Lyon* stated that a plaintiff must show that a lessor has retained significant and genuine attributes of the traditional lessor status. The Court went on to state that "what those attributes are in any particular case will necessarily depend upon its facts." 435 U.S. at 584. Whether a transaction is a sale or a lease is essentially a factual issue. *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), *aff'd*, 500 F.2d 1222 (9th Cir.1974).

The Jefferson transaction was not tried in this case. This court therefore is without any knowledge as to the substance of the transaction. Judge Miller ruled testimony regarding the Jefferson transaction inadmissible. The parties' arguments as to the correctness of the ruling, in the light of the lack of a complete record on the Jefferson transaction, are not relevant.

CONCLUSION

■ On the basis of the foregoing, it is concluded that the Boulder and Mesa transactions were in substance and in form leases with options to purchase. The transactions were not installment sales. Transamerica is therefore entitled to the rental deductions it has taken for tax years 1968 and 1969 pursuant to Section 162 since it has at no time acquired an equity interest in the Boulder or Mesa title plants as a result of its rental payments.

CHARITABLE CONTRIBUTIONS

Plaintiff's involvement in the charitable contributions issue stems from its ownership in 1969 of United Artists Corporation (UA). In that year, UA conveyed certain film and motion picture property, described below, to the University of Wisconsin and to the Library of Congress.

UA was a distributor of independently produced motion pictures which had been organized in 1919 by Charlie Chaplin, Mary Pickford, D.W. Griffith and Douglas Fairbanks, Sr. In 1951 UA was in financial difficulties, and management was transferred to Arthur Krim, Robert Benjamin and Arnold Picker. In 1956, Arthur Krim and Robert Benjamin became owners of UA. In 1957, UA's stock was publicly offered and listed on the New York Stock Exchange. In 1967, Transamerica acquired 87.5 percent of UA's stock, and by 1970 it had become its sole stockholder. In 1981, Transamerica sold UA to Metro–Goldwyn–Mayer Film Company.

In its 1969 consolidated federal income tax return, plaintiff claimed charitable contributions in the aggregate amount of $27,744,328 as the fair market value of certain motion picture property UA conveyed to the United States of America for inclusion in the collection of the Library of Congress (Library Property) and of different motion picture property conveyed to the University of Wisconsin (University Property) under IRC § 170(a). The entire deduction and carryforward relating to these conveyances

were disallowed by the IRS. A statutory notice of deficiency reflecting an asserted underpayment of tax for the year 1969, based in part on the disallowance of deductions for plaintiff's claimed charitable contributions, was issued on January 31, 1978. The deficiency has been paid and a timely claim for a refund has been disallowed. In its March 9, 1979, complaints, plaintiff claimed charitable contributions in aggregate amount of $27,744,328. During these proceedings, plaintiff has modified its claim and now asserts the fair market value of the property conveyed amounts to $15,873,431.

Trial of the charitable contributions issue was protracted, and required 36 trial days from commencement on June 25, 1984, to final session on May 19, 1987. Trial sessions were held in Madison, Wisconsin (4 days in 1984), New York, New York (3 days in 1984), Pasadena, California (5 days in 1986), and Washington, D.C. (13 days in 1984 and 11 days in 1987). Posttrial briefing was completed December 18, 1987.

## FACTS

The parties are in agreement as to a majority of the facts essential to the charitable contributions issue. A stipulation filed on June 20, 1984, lists 128 separately numbered facts in 11 categories. An additional 15 facts were listed in a stipulation filed October 1, 1984, and a stipulation filed April 14, 1987, added 11 more. The facts stipulated by the parties, although not duplicated in this opinion, are adopted as findings of the court. For purposes of continuity, some of the materials the parties have stipulated is repeated in the narrative that follows. Findings of fact in the narrative that supplement or add to the parties' stipulations are based upon testimony and documentary evidence in the trial record.

*Property Involved*

The property conveyed to the Library of Congress and to the University of Wisconsin consisted of various items of tangible personal property that together constitute the basic physical structure for the commercial interests in the motion picture industry. Items of tangible personal property that were conveyed included preprint materials (original 35mm negatives or other 35mm preprint material, 35mm and 16mm printing intermediates), 16mm exhibition prints, photographs (still negatives and prints), scripts, press books and production files.

The production of a motion picture involves the manufacture of several categories of film materials in the course of several stages of film production, from the filming of the subject (and, in the case of sound productions, the recording of the sound), through the manufacture of viewable exhibition prints. At each stage subsequent to the initial filming and recording, the image embodied on the film material that had been produced in the previous stage is replicated on another piece of film material. Usually, if the image is in negative form on the film material that had been manufactured in the previous stage of production, it is transposed into a positive image, and vice versa. This sequence is altered somewhat in the Technicolor wet dye printing process and in the color reversal intermediate (CRI) process.

The categories of film material that are manufactured in the stages leading up to the striking of viewable exhibition prints are generally called "preprint material". All preprint material, with the exception of protection prints, is on film stock having sharper resolution and different emulsion sensitivity characteristics than exhibition prints. Protection prints have the same physical characteristics as exhibition prints but can be considered preprint material because they are used in the manufacture of exhibition prints when other preprint material is unavailable. The type of preprint material that is produced at each stage of production depends on the manufacturing process used.

Film materials conveyed to the Library and the University consist of a clear strip of plastic, which is either nitrate-base film or acetate-base film. To this plastic base, a photo-sensitive emulsion is bonded chemically. This emulsion embodies either a positive or a negative image of the matter that was filmed or if sound, recorded.

With minor exceptions all original negatives and nearly all other film material manufactured before 1951 for professionally produced motion pictures was on nitrate-base film stock. Film material manufactured after 1951 is on acetate-base film stock.

Nitrate-base film stock is highly flammable, potentially explosive and subject to shrinkage, decomposition and ultimately to disintegration. Nitrate-base film decomposes with the passage of time and eventually will be unuseable and must be discarded. Unless the image is transferred to safety film or preserved in some other manner it will eventually be lost when the nitrate-base decomposes. Acetate-base film stock (safety film) is less flammable, not potentially explosive and more stable, but unless properly cared for is subject to shrinkage, fading and brittleness.

Among experts, it is generally believed that more than half of the motion pictures produced in the United States during the 20th Century have disappeared. The American Film Institute estimates that only about 50 percent of the 25,000 feature films produced in the United States between 1900 and 1950 survive in any form. Most films have disappeared due to deterioration of the nitrate. Even in the case of those that survive in some form, they are often of a poor quality print on which the images or sound may have been, altered, cut, or rearranged.

Motion picture companies, because they thought the films had no further commercial value, frequently made little or no effort to save nitrate-base films. Even among companies that continued to exploit their old motion pictures, it was often felt that the cost and dangers involved in keeping the nitrate film was too great to justify retention, and that commercial exploitation of the motion picture could continue using other safety stock preprint materials. Some companies were anxious to get rid of their nitrate film; some simply discarded their nitrate films. MGM informed an archive that it would destroy its nitrate films unless the archive took them off its hands. In the 1960's, interested segments of the public, the film industry, and the United States Government became increasingly aware of the need to preserve as a historical and scholarly heritage those motion pictures recorded on nitrate film that still existed.

The film materials conveyed to the Library and the University were manufactured under one of four processes: (1) black and white motion picture films; (2) technicolor process for nonanimated color films; (3) technicolor process for animated color cartoons; and (4) Eastman color process, which in 1951 began to replace the Technicolor process.

The steps in the production of film materials for black-and-white motion pictures is illustrative of the complexities and the interdependent nature of film industry commercial practice. The first category of film material created is the "original negative". For silent films in black-and-white, this consists of the "original picture negative" that was in the motion picture camera at the time of filming, as subsequently developed through a chemical process, cut and edited for release, and added to for titles, subtitles, credits and optical effects. With respect to sound films in black-and-white there is an original picture negative that is the same as the original negative for a silent film, as well as a separate "optical sound track negative" that was manufactured by mixing music, effects and dialogue. The original picture negative and, in the case of sound films, the corresponding optical sound track negative, are on 35mm film. Pre–1951 productions are on film with a nitrate base, post–1951 productions are on film with an acetate base.

The image on the original negative is copied onto 35mm duplicating fine-grain film stock (containing either a nitrate or an acetate base), thereby creating a "fine-grain master positive" of the motion picture film. In the case of sound films, this positive print combines onto one strip of film the images contained on the original picture negative and on the original sound track negative. It is therefore referred to as a "composite fine-grain master positive."

The fine-grain master positive and the composite fine-grain master positive are used to manufacture one or more "duplicate negatives". A duplicate negative is a 16mm or 35mm film on a nitrate or acetate base, in which the picture and sound are either combined or separated on separate strips of film. In either case the sound component consists of a re-recorded sound track negative.

"Exhibition prints" (also known as release prints), on either 16mm or 35mm film stock, are commonly manufactured from a duplicate negative, and are distributed for viewing by audiences and for broadcasting on television. "Protection prints", which essentially are physically indistinguishable from exhibition prints, are also manufactured from a duplicate negative. They may be used to manufacture additional duplicate negatives if the original negative or a fine-grain master positive is unavailable, although the resulting duplicating negative is of inferior quality. It is also possible to manufacture exhibition and protection prints directly from the original negative, but this is rarely done because of the risk of damage to the original negative.

Except for original negatives and re-recorded sound track negatives and except for the original Technicolor imbibition process, the film materials are manufactured by putting the strip of film whose images are being copied through laboratory printing machines and then chemically developing the raw film stock that was printed. A contact printer is used to manufacture 35mm film material from 35mm film material and from 16mm film material from 16mm film material, and a laboratory reduction printer is used to manufacture 16mm film material from 35mm film material. If the film material that was manufactured is a picture negative (other than an original negative), it is standard practice to manufacture immediately from that picture negative a single positive print, called an "answer print", to ascertain whether the negative was printed properly. A re-recorded sound track negative is manufactured in a sound studio by playing the positive through electronic means and re-

recording the sound onto negative raw stock, which is then chemically developed.

A reel of 35mm motion picture film is generally approximately 1,000 feet in length and a reel of 16mm motion picture film is generally approximately 400 feet in length. Generally, at least 10 percent of each reel is not utilized. The running time of a 35mm film is 90 feet per minute, and of a 16mm film, 36 feet per minute. An exhibition print can be damaged in the course of its use. Even if properly handled and cared for, it will eventually wear out as it is used. A film negative can be damaged in the printing process, and it will eventually wear out if repeatedly used. Consequently, archives generally try to avoid using original negatives to make prints. While prints can be struck directly from the original picture negative or earliest available preprint material, this is not the usual practice in the industry and is rarely, if ever, done by UA.

Duplicate negatives are regularly and commonly used to manufacture exhibition prints. At the time UA conveyed the original negatives or earliest available preprint materials to the Library and the University, it possessed or believed it possessed one or more duplicate negatives for each of the motion pictures involved. UA generally owned at least one 16mm duplicate negative for each of its motion pictures that it expected to exploit commercially. Normally, it also possessed additional preprint material (*e.g.*, fine-grain master positives) for such movies from which replacement duplicate negatives could be made. Because of the availability of these articles, recourse to any of its original 35mm nitrate negatives was rare, occurring in the aggregate approximately 10 to 12 times per year.

Nonfilm materials conveyed to the University were integral to the commercial structure of the motion picture industry. These nonfilm materials included:

—*still photographs* (stills): individual positive print photographs that are taken by a unit photographer, during the filming of a motion picture, of the key scenes, settings, background, cast and filming activity. Such photographs com-

monly provide materials for publicizing and promoting the motion picture following its completion.

—*still negatives:* a negative of a still photograph from which positive prints are prepared.

—*still books:* a bound book containing linen-backed copies of the still photographs with respect to a motion picture (also called a "linen book").

—*key books:* a bound book, containing copies of the representative still photographs with respect to a motion picture, that is used for promotional purposes.

—*starheads:* still photographs of an individual actor or actress, taken in a studio or other photographic setting unrelated to any given motion picture film, that is ordinarily used for promotional purposes. Generally, the actor or actress photographed in the starhead was under a long term or multiple picture contract with the studio or the motion picture producer.

—*pressbooks:* books that are distributed to a prospective exhibitor of a motion picture film containing suggestions as to ways to promote the film, including forms of newspaper advertising, layouts, forms of press releases, synopses, and other promotional suggestions.

—*production legal files:* files customarily maintained with respect to each motion picture containing contracts for performers, contracts for rights to the story and to the screenplay, and any copyrights or permissions (as, for example, to a song used in the picture).

—*production files:* files that may include some or all of the following:

—*story outline or synopsis:* an outline of the basic plot element, usually fewer than 25 pages in length and not using cinematic terms.

—*treatment:* an early rendition of the motion picture that includes a longer outline of the plot, begins to break down the story into scenes, and may include dialogue and shot descriptions.

—*screenplay:* is a complete breakdown of the film into scenes and shots.

—*shooting script* (temporary, revised temporary, final, revised final): a script containing dialogue as well as a description of the scene and instructions for the actors and the cameramen. It is the script used in the filming of the film and may contain thereon notations of changes made during filming.

—*dialogue* (also "dialogue transcript" or "continuity"): a script containing the complete dialogue in the finished film, shot by shot, with the shots numbered consecutively and the separation from reel to reel being indicated, that is prepared after the film has been edited into its final version. It is used for foreign language dubbing purposes and to accommodate censorship cuts.

—*title list* (also "title sheet for superimposed version"): (a) complete cast and crew credits for each title, (b) a 1–2 page synopsis of each title, (c) shot numbers for each of the shots in the picture, sequentially and consecutively numbered, with beginning and ending footage and frame counts for each shot, and an inclusive total footage and frame count for each shot. The lines of dialogue provided here are not complete—they are intended merely as a sampling of dialogue appearing in the film.

—*spotting sheet:* (a) a complete breakdown of the finished film, (b) a brief description of each shot as it appears on the screen (but not the accompanying dialogue), (c) the footage of each shot, rounded off to feet (but no frame counts), and (d) a complete description of each title which appears in the film, including a description of the point in the film at which each of these titles appear and disappear. Additional information indicates whether each of the shots is an interior or exterior shot.

—*trailer title list:* a title list for a short preview film that is used to advertise the motion picture.

—*music cue sheet:* an index of music used in a film, indicating title, composer, copyright owner, type of use and duration of each musical composition.

Still photographs and starheads were created for promotion and advertising purposes with respect to films distributed by UA and its predecessors in title, and to that end, were provided without specific charge to persons to whom publication rights had been granted and were either provided without specific charge or sold to exhibitors (including television stations) to utilize for publicity purposes when related to a film being exhibited. Starheads were also sent to members of the public, usually without charge, upon request. Pressbooks were provided without specific charge to prospective exhibitors when related to a film being exhibited. Television stations were provided without specific charge music cue sheets for royalty purposes when related to a film being exhibited.

In the production of a film there are generally several generations of scripts. Early generations, such as synopses and treatments, are used in planning the film. Shooting scripts are used for the actual filming and later generations, such as continuities, are used in the post-filming production processes. It is customary in making a film to produce several copies of a script for the use of the actors and others in producing the film. Accordingly, before 1951, scripts were typically produced by the mimeograph or ditto processes. Some number of the early generation scripts conveyed by UA to the University are either typewritten or carbon copies. Most of the later generation scripts were either mimeographed or dittoed. Some number of the early and later generation scripts contain original handwritten notations reflecting changes made in the course of producing the film.

There are numerous businesses that deal in motion picture prints, still prints, scripts, and other film memorabilia. Those businesses dealing in still prints, scripts and other film memorabilia are sometimes referred to as "dealers". Some such dealers operate retail stores.

Pressbooks of the type conveyed by UA to the University are bought and sold by private collectors and dealers. Some pressbooks are copyrighted and others are not. The market value of pressbooks is not affected, however, by whether they are or are not copyrighted. Scripts are generally copyrighted. Legally acquired scripts are uncommon, although dealers sometimes sell scripts.

## UA Business

During the period 1919–50, UA directly engaged in distributing films produced by others. Generally the producers were independent of UA. Except for some TV production between 1960 and 1966 by ZIV–United Artists, Inc., UA has never engaged in the production of motion pictures in the United States. In the period 1936–41, it owned a 50 percent interest in Walter Wanger Productions, Inc., which produced 17 films, and owned a corporation that produced one film in 1941–42. Subsequent to 1951, UA has had subsidiaries that produced a limited number of motion pictures abroad.

In 1951, UA purchased the stock of Eagle Lion Classics, Inc., the company that was then distributing Eagle Lion and Film Classics feature motion picture films. In 1957 and 1960, UA acquired all of the assets of Associated Artists Production Corporation. These assets included Warner Bros.' entire film library going back to 1913 when that studio first commenced the production of films. That library consisted of the following principal elements: 806 Warner Bros. sound features, 54 Warner Bros. silent features, 1,507 Warner Bros. short subjects, and 337 Warner Bros. cartoons. Associated Artists Production Corporation also owned a complete collection of 229 Popeye cartoons and 187 Monogram sound features.

In 1960, UA acquired the ZIV Television Library, consisting of over 2,200 television episodes comprising virtually the entire production of the ZIV Television Studio during the period of 1948 to 1960. At the same time, UA acquired domestic television rights to 707 feature motion picture films produced by RKO.

UA purchased the Warner Brothers, ZIV Television and RKO film libraries solely for the purpose of exploiting them commercially. At the time they were purchased, UA

did not consider these libraries or the tangible materials contained therein to have any present or future non-commercial purpose or value. UA considered that when it acquired these libraries (and paid their respective purchase prices), it was acquiring the right to exploit the films in these libraries commercially and the tangible materials necessary for such exploitation. However, most of the tangible materials acquired by UA when it purchased these libraries (such as the original nitrate negatives and most of the non-film material) were not essential (notwithstanding their possible usefulness) for UA's continuing commercial exploitation of the libraries, and the purchase price paid by UA for the libraries would not have been reduced had such non-essential tangible materials not been included in the sale. At the time of their acquisition, UA had no plans, nor did it expect, to market or otherwise convey any of the tangible materials contained in these libraries to archives, collectors or scholars.

UA acquired the Warner Brothers Library at what it considered to be an extremely favorable purchase price, which was well below what it considered to be the fair market value of the commercial rights to such film library. The amounts payable to UA under licensing contracts entered into by UA's predecessor in title and to which UA succeeded when it acquired the Warner Brothers Library covered UA's purchase price for such library, and UA expected to enter into many more additional contracts licensing the films in such library. For the purposes for which UA acquired and used the Warner Brothers and ZIV Television film libraries, copies of the original tangible materials included in such libraries would have been at least as useful to UA as the originals.

At the time of purchase, UA did not perceive any present or future artifactual, archival or scholarly use or value for any of the items of tangible material separate and apart from their utility in exploiting the libraries commercially so as to warrant the allocation of a portion of the purchase price to such items, either as nondepreciable basis or as nondepreciable salvage val-

ue. In those years, neither UA nor the film industry in general evidenced any recognition of archival value or any intention or practice of marketing or otherwise disposing of any of the foregoing items of material to archives, collectors or scholars. For this reason, UA allocated substantially the entire cost of purchasing each film library to the right and ability to exploit the library commercially and none of the purchase price to archival, historical or scholarly values.

*American Film Institute*

In 1965, Congress enacted the National Foundation on the Arts and the Humanities Act of 1965 (Pub.L. No. 89–209, 79 Stat. 845). Pursuant to the Act, the National Council on the Arts was established. In 1967, the National Council on the Arts established the American Film Institute (AFI) as a non-profit private organization to preserve the heritage and advance the art of film and television in America. It received initially $1.3 million in funding from the National Council on the Arts, and an equal amount each from the Ford Foundation and the Motion Picture Association. Its subsequent support has been from the National Endowment for the Arts and from the private sector. Arnold Picker was a founding trustee of the AFI.

AFI's basic purpose is the preservation and cataloguing of films. To this end, it attempts to bring attention to the necessity of preserving the nation's film heritage, to serve as a focal point for coordination and leadership with organizations and archivists in the field, and to coordinate and stimulate the archival activities of regional and private institutions.

One of AFI's earliest activities was an attempt to preserve American motion pictures that were on nitrate-base film. On June 13, 1968, the AFI entered into an agreement with the Library of Congress, under which the AFI undertook to arrange and provide funding for the acquisition of the best available copies of nitrate-base films that were in danger of decomposition. The films were to be acquired in the name of the Library and housed in the Library,

which would assume the responsibility for their storage and maintenance as well as the provision of reference services.

In 1968, AFI began to solicit donations of nitrate film from both the film industry and private collectors for either donations of film prints and film negatives or the loan thereof so that a copy could be made and the original returned to the owner. The AFI solicitation stated in part:

> Individuals and corporations donating nitrate film materials receive tax benefits, based on the physical value of the print or negative, while retaining all rights of reproduction and exhibition. The Library assumes transport and storage costs for films selected for the National Collection. An acetate preservation copy of the original nitrate material is made at the Library's expense. The owner is thus relieved of the cost of transferral and nitrate storage and is assured that his film will be preserved by the best methods available.

> Owners may also lend nitrate films to the Library. Acetate prints are made with AFI funds and the original material is returned to the owner. In this case, however, no tax benefits are available.

A copy of AFI's solicitation was sent to UA. There is no documentary evidence that UA responded to this solicitation. On May 20, 1968, at the suggestion of AFI, the Library wrote UA and requested a donation of a safety-stock preservation master for a single movie, *The Third Degree* (Warner Bros. 1927), that was on its special "Rescue List". UA declined to make the gift. Instead, it would only agree to loan the original negative to the AFI so that the latter could make the requested safety master at its own expense for the Library and then return the negative to UA. Prior to its conveyances of property to the University and the Library, UA had never donated film to any public, charitable and/or educational institution.

By 1982, the AFI had solicited the acquisition of and had arranged for donations to the Library of some 17,000 films (sometimes referred to as "titles"). Material received by the Library through the efforts of AFI is referred to as the "AFI Collection". More than 95 percent of the titles were made prior to 1951 and were on nitrate stock. Copyright owners who conveyed film material pursuant to the AFI–Library acquisition program retained all commercial rights to the films.

*Library of Congress*

Prior to 1965, the Library of Congress did not have an extensive collection of pre–1913 film materials. This was a result of the copyright deposit system that was in place prior to 1913. Under this system, the maker of a film deposited a paper strip negative, which constituted the entire movie at the time it copyrighted the moving picture. This method of copyright deposits stopped in 1913, and the Library had almost no film material between the period 1913 to 1942.

The Library began to collect nitrate film for preservation purposes in the early 1940's. By 1965, the collection consisted of over 25,000 titles. The program was designed to preserve in perpetuity the motion picture that is initially recorded on nitrate film. The Library's policy and practice is to gain access to the original nitrate negatives, or the best available later generation film, so that the motion picture can be copied and thereby converted to, and preserved on, safety (acetate) film. For safety and storage reasons, it has been the policy of the Library to destroy nitrate film once safety copies have been made. The Library considers its nitrate film to be a liability. To reduce the amount of nitrate film in storage and to thereby minimize the costs and hazards associated with its retention, the Library has consistently maintained the policy that such film is to be destroyed as soon after it is copied as is possible. Adequate space and staff to maintain its nitrate film has been a chronic problem for the Library. The Library staff's practice is not to destroy nitrate negatives until necessary; where feasible, preservation of original nitrate negatives remains a priority to the Library staff.

It was the Library's policy and practice to accept either gifts or deposits of nitrate film. The Library treats nitrate film the

same way whether it is deposited or gifted. The number of film deposits accepted by the Library increased substantially beginning in the mid–1960's. In late 1968 or early 1969, the Library received a large deposit of nitrate film of RKO movies. The receipt of this film absorbed all of the Library's available storage space and caused it to search for additional vault facilities.

The Library's permanent record of a motion picture is called its "preservation master". It is made on acetate-base safety stock film and is typically a fine-grain composite master positive. The picture and sound quality of a fine-grain is almost as good as that recorded on the original negative. Movie companies generally regard a fine-grain as their "master" also. The Library treats its fine-grains as preservation masters and, therefore, they generally are not physically used but are instead held as archival objects. It eventually will cost the Library well over $1 million to make preservation masters for UA's motion pictures. UA will pay nothing towards this cost, although it will have the right in perpetuity to use these articles.

*University of Wisconsin*

In 1960, the University established the Wisconsin Center of Film and Theater Research in conjunction with the State Historical Society of Wisconsin. The purpose of the Wisconsin Center was to acquire and preserve materials that document the performing arts in 20th century America, and make them available for research. Professor Agatino Balio became the Director of the Wisconsin Center in 1966 and expanded its focus to include motion picture materials.

In the late 1960's, the University was one of just a few educational institutions that had a motion picture archive. Since it had no regular source of funds with which to make purchases, it relied almost exclusively on donations for additions to its archives. This situation generally applied to the other universities that also maintain film archives.

The University does not have an established fund from which to make purchases of films or related materials. However, in two instances, one in the late 1960's and the other in the late 1970's, the University had purchased such items. In the first instance, the University paid $10,000 for various items of memorabilia from an estate; the articles acquired in the Daniel Blum Collection on stage and screen personalities included several hundred scrapbooks, and between 50,000 and 100,000 photographs, many of which were autographed. The second transaction involved payment by the University of $25,000 to a private film collector, David Shepard, for 16mm exhibition prints of various feature-length, documentary and cartoon motion pictures. Most of these films were in the public domain. Professor Balio testified that he "literally had to beg" for money to acquire motion pictures for the University and that "obtaining an appreciably larger sum in 1969 would have been impossible."

*Negotiations for Conveyances*

In February 1968, Professor Balio wrote to UA's president, Arthur Krim, soliciting a donation of his noncurrent personal papers to establish the Arthur Krim collection of manuscripts as a part of the Center's archives. Mr. Krim referred the request to UA's then Chief Operating Officer, Arnold Picker.

In April 1968, Mr. Picker and Professor Balio met to discuss the scope of the latter's request. At this time the Professor proposed that the gift include UA's corporate records for the period 1919 to 1951. During this period, UA had been under the control of its original owner-management team of Mary Pickford, Charlie Chaplin, Douglas Fairbanks, Sr., and D.W. Griffith. Professor Balio advised UA that if it would contribute its old corporate records, the University would catalog them and make them available to UA upon request.

Mr. Picker enlisted the aid of Robert Schwartz, U.A.'s Director of Administrative Services, and Herbert Schottenfeld, Vice President of UA's legal department, to deal with Professor Balio. Mr. Picker asked Mr. Schottenfeld to determine whether the gift could create any legal problems, and he asked Mr. Schwartz to ascertain

whether the proposed conveyance would impede UA's continuing operations.

All of the pre–1951 corporate records which Professor Balio sought from UA were stored at the Long Island City warehouse. These records were no longer used for commercial operations, occupied too much space and UA was inclined to destroy them. Professor Balio first visited the warehouse in or about the summer of 1968. During the course of visits to the warehouse, Professor Balio noticed movie memorabilia and asked if still photographs, scripts, pressbooks, and other promotional materials could be included.

Professor Balio's expression of interest in the acquisition of additional materials from UA stimulated consideration of including more than only the corporate records. For several months in 1969, Mr. Schottenfeld and Professor Balio discussed other materials to enhance the gift to the Center's collection. The gift thus grew to include still photographs, still negatives, pressbooks, scripts and other materials.

For various reasons, including the huge volume of documents in the warehouse, consisting of literally millions of papers taking up 4,000 cubic feet of space, it was not feasible for Professor Balio to review the documents in the warehouse for purposes of selecting those which he wanted for the University's collection. Accordingly, it was agreed that Professor Balio would designate all of the files that he thought possibly could be of any interest to the University, that these files would be shipped, at UA's expense, to Madison, Wisconsin, where they would be examined, and that whatever was not wanted would either be returned to UA or destroyed.

In 1968, Professor Balio advised UA that an appraisal of its corporate records would be needed, and he suggested that UA contact Milton Luboviski for this purpose. UA contacted Mr. Luboviski in the summer 1968. At this time, UA did not believe its corporate records had any significant value and, therefore, expected that Mr. Luboviski's fee would be small. Before he examined the corporate records, Mr. Luboviski informed UA that he was prepared to value the materials at between $200,000 to $250,000. After Mr. Luboviski had disclosed his preliminary valuation of the corporate records, UA began to consider the potential tax consequences of its donation. Mr. Picker consulted with UA's in-house tax specialist.

After UA decided to include additional materials, it initiated a search of its warehouse and other facilities to determine what items might be suitable. In this effort, UA ascertained that much of the non-film materials for its old movies was seldom used or needed and that their inclusion would not interfere with its commercial operations.

Mr. Picker was the individual within the UA organization who made the final decisions on the conveyances both to the Library and the University. He believed that he did not have the authority to give away the company's property where it could be used for commercial purposes. In deciding what articles to include, Mr. Picker made it clear from the outset that he would not authorize any conveyance which would in any way hamper UA's ongoing operations. He was assured that, whatever property was involved, it would be well maintained.

In conveying the film to the Library and the University, UA's personnel were confident that UA would have reasonable access at its own expense to the property conveyed (and/or their replacements) whenever the need arose, so long as such property existed, and that their physical relocation would pose no serious problems.

Mr. Picker believed that it made no difference, from a practical standpoint, where the negatives were stored as long as the company had access to them. Mr. Picker advised his subordinates that UA's right to access was an important feature of any agreement. He testified that he approved the conveyances because he was convinced that the company's commercial interests would not be impaired and that the transfers would not cause UA to lose any money or reduce the value of the company's assets.

During the summer of 1969, Mr. Schottenfeld also conceived the idea of giving all

of UA's movie and television productions to the University. After consulting with other personnel at UA, Mr. Schottenfeld offered Professor Balio its 16mm positives and original 35mm negatives for both the movie and television titles. When Professor Balio learned that the negatives for the movies were all on nitrate film, he had to decline the offer because the University lacked the facilities and resources to store them. He eagerly accepted the negatives for the ZIV television productions, which were on acetate (safety) stock.

On August 22, 1969, Professor Balio forwarded to Mr. Schwartz at UA copies of the University's model deed of gift and a copy of the section of the House Report on the Tax Reform Act of 1969, dealing with charitable contributions. The letter requested comments on the model deed of gift.

UA's officials did not learn of the proposed changes to the tax laws regarding charitable contributions until the late summer or early fall of 1969. By this time, one change, the amendment to IRC § 1221(3), had become operative, and other restrictive provisions were scheduled to take effect as of January 1, 1970. UA had already determined to make the conveyances and Mr. Picker directed Mr. Schwartz and Mr. Schottenfeld to make every effort possible to complete the conveyances to the Library and the University before the end of the

year. Many people in the organization devoted long hours to the project, giving it the highest priority.

On September 5, 1969, Mr. Schwartz wrote to Mr. Luboviski to recapitulate the material which to date had been turned over to the University and inventoried, and to identify additional material UA wanted to add to the depository. The new material was described as representative of United Artists Product prior to 1950 and as "one of a kind". Mr. Schwartz noted the inventory of items enclosed was voluminous, and requested Mr. Luboviski to maintain the inventory in a permanent safe place until a determination is made "when and if we shall turn it over to the University." The letter indicated there was a great urgency on UA's knowing some approximate appraisal figures, and that UA "would appreciate your contacting me no later than Tuesday, September 9th".

A memorandum to Mr. Picker, dated September 9, 1969, prepared by Mr. Schottenfeld for the "Archives Committee" summarized the present status of the corporate donation to the University. The memorandum included a preliminary appraisal received by telephone from Mr. Luboviski. The preliminary appraisal was said to represent the minimum values based upon a limited examination of the lists of the materials which UA had supplied. The memorandum included the following chart:

| | RANGE OF APPRAISED VALUATIONS (in thousands) | |
| --- | --- | --- |
| TYPE OF MATERIAL | Minimum Value | Probable Value |
| United Artists Corp. (pre–1950 material) | | |
| UA corporate business records (per formal written appraisal) | $ 318 | $ 318 |
| 777 UA key stillbooks (including 560 pressbooks) | 249 | 249 |
| 35,000 UA still negatives | 180 | 250 |
| 130,000 Eagle Lion still negatives | 450 | 650 |
| Total UAC pre–1950 material | 1,197 | 1,467 |
| United Artists Television, Inc. (UAA pre–1950 materials) | | |
| Warner sound features: | | |
| 800 original picture negatives | 2,500 | 4,000 |
| 400 shooting scripts | 30 | 30 |
| Production legal files | 80 | 200 |

| TYPE OF MATERIAL | RANGE OF APPRAISED VALUATIONS | |
| --- | --- | --- |
| | (in thousands) | |
| | Minimum Value | Probable Value |
| 10,500 still negatives | $ 40 | $ 50 |
| 50 Warner silent features-negative material | 375 | 625 |
| 1,500 Warner short subjects-original picture negatives | 750 | 1,125 |
| 360 Warner cartoons-original picture negatives | 360 | 360 |
| Monogram sound features: | | |
| 162 original picture negatives | 162 | 243 |
| 1,600 still negatives | 8 | 8 |
| 200 Humphrey Bogart stills and still negatives | 2 | 2 |
| Total UAA pre–150 materials | 4,307 | 6,643 |
| ZIV division of UAC (ZIV pre–1960 material) | | |
| 2,000 episodes of TV series | | |
| —original picture negatives | 1,000 | 1,200 |
| —shooting scripts and stills | 100 | 120 |
| | 1,100 | 1,320 |
| GRAND TOTAL OF ALL MATERIAL | $6,604 | $9,430 |

The memorandum noted that under the terms of the proposed donation, the University would be granted only the physical possession of the listed material, for the sole purpose of making the material available to scholars and for the pursuit of an active program of research under the Center. The memorandum included the following:

If only nitrate negatives are available on certain films, we will try to arrange to deliver them to the Library of Congress, and thereby achieve the same result. In such event, we will also consider the possibility of manufacturing safety-stock dupe negatives to give to the University of Wisconsin in lieu of the nitrate negatives. In such event, the evaluation of our gift will be increased by at least the amount of our out-of-pocket cost for the manufacture of the safety-stock dupe negatives.

We will retain ownership of all copyrights in the material (to the extent now owned by us, and as subsequently renewed by us), as well as all commercial exploitation rights in the material. In addition, we will retain rights of access to the material granted to the University (or the Library of Congress), in the event we require the duplication of any or all such material.

The valuation figures obtained by telephone from Mr. Luboviski, made it evident to UA's management that a large portion of the total appraisal would be attributable to the nitrate negatives. When Mr. Schottenfeld was apprised that the University could not accept the nitrate film, he remembered that donations of these types of materials had previously been solicited by the AFI from all the motion picture companies. He contacted the AFI and it referred him to the Library.

Shortly thereafter, Messrs. Schottenfeld and Schwartz met with the Library's General Counsel, John Kominski, and a Dr. Kuiper, who was then Chief of the Library's Motion Picture Division. The UA representatives indicated that they were interested in giving the Library the company's nitrate negatives.

Dr. Kuiper knew that UA had little need for nitrate film stock. He also understood that a collection as large as UA's would be expensive to store and maintain. He recognized that it would be advantageous to a business in UA's circumstances to relieve itself of those costs. Dr. Kuiper told the

UA officials that while the Library was interested in the company's proposal, it currently had insufficient space for UA's negatives and was in the process of trying to secure additional facilities. The Library personnel did not represent that the Library had any commitment from Congress for the funds necessary to obtain and provide suitable facilities for the film. The UA representatives indicated that they were willing to hold the negatives as long as the Library wanted them and would delay their physical delivery until such time as the Library was in a position to accept them.

The Library, to allow the company to decide which form it preferred, sent to UA sample agreements for either a gift or a deposit. Since Mr. Schottenfeld wanted legal title to the negatives to pass the Library, he chose the gift format.

The Library prefers unconditional gifts of film, but it has granted access rights to donors where a specific request is made. The Library has found that servicing donors' requests for certain film has proved burdensome and, therefore, in recent years it has began to make such provisions more limited. The access provisions that were included in the Library Agreement were added at UA's behest. They were as broad as any that the Library has ever extended. The access privileges secured by UA were valuable rights. The Library's General Counsel considered the grant of access rights to UA to be the "price" the Library had to pay for the rights it obtained in the Library Property.

*Gift Instruments*

By a document titled "Instrument of Gift", dated November 20, 1969, and accepted for the United States by the Librarian of Congress, signed November 24, 1969, (Library Agreement) UA conveyed to the United States, for inclusion in the Library, the original 35mm nitrate motion picture negatives (or, where such negatives no longer existed, the earliest available later generation preprint material) relating to (i) substantially the entire sound motion picture output of Warner Brothers through 1951 and substantially the entire extant silent motion picture output of that studio; (ii) the entire motion picture output of "Popeye" cartoons produced by Paramount Pictures through 1957; (iii) sound feature film motion pictures made by Monogram Pictures prior to 1947; and (iv) the feature motion picture "Algiers".

The conveyance by UA to the Library consisted of the following property (the Library Property):

"Algiers"—comprising 8,640 (35mm) feet of black-and-white film;

54 Warner Brothers silent feature films—comprising 345,575 (35mm) feet of black-and-white film;

806 Warner Brothers sound features—comprising 5,562,990 (35mm) feet of black-and-white film, and 223,110 (35mm) feet of color film;

1,507 Warner Brothers short subjects—comprising 1,315,380 (35mm) feet of black-and-white film, and 193,615 (35mm) feet of color film;

337 Warner Brothers cartoons—comprising 23,743 (35mm) feet of black-and-white film, and 203,985 (35mm) feet of color film;

229 Popeye cartoons—comprising 72,960 (35mm) feet of black-and-white film and 71,110 (35mm) feet of color film;

187 Monogram features—comprising 1,074,150 (35mm) feet.

Under the terms of the Instrument of Gift, UA agreed to convey legal title to only the "physical property" scheduled in the agreement, with UA reserving all right, title and interest in all property described in the schedules of commercial exploitation, reproduction, publication, exhibition, television broadcasting, or transmission by any other existing or future means of transmission or exhibition, or any other intangible rights to which UA is or may be entitled. The agreement further provided that the preprint materials would remain in the possession of UA as a gratuitous bailee and would not be physically transferred to the Library until it obtained suitable storage facilities. The agreement also provided inter alia that:

(1) the Library was authorized to convert the image (and sound) recorded on the nitrate base film onto safety stock

(acetate) film, which preservation copies would become the Library's property;

(2) UA reserved and the University was provided the right of access upon demand, to direct the Library to process orders for positive safety prints to be made either from the nitrate negatives or preservation safety preprint materials and ship such articles to designated laboratories. UA or the University would reimburse the Library for whatever costs or expenses it might incur to process such orders;

(3) use of the collection would be limited to private study by researchers on the Library's premises except that, with UA's prior written consent not to be unreasonably withheld, the Library could transfer a limited number of the components of the collection to other institutions in exchange for their motion picture materials, but only if the other archive agreed in writing to all the terms and conditions imposed on the Library;

(4) the Library could not sell or otherwise commercially exploit the Library Property or any of the copies thereof that it was allowed to make; and

(5) upon physical delivery of the nitrate film to the Library, it was obliged to bear all expenses involved in storing, caring for, and maintaining such property.

The University property was conveyed by documents titled "Deed of Gift" and a contemporaneous "Supplemental Agreement" (University Agreement). The documents respectively were dated November 6 and 26, 1969. The acceptances by the University Regents were dated November 17 and December 12, 1969, respectively. The documents identified the materials conveyed by reference to 28 schedules. The documents conveyed the right to physical possession of the following:

(i) UA pre–1951 corporate records as selected by University representatives, including UA corporate and financial records and the files of the law firm O'Brien, Driscoll & Rafferty relating to its representation of UA.

(ii) such pressbooks, music cue sheets and negatives and positives of still photographs as UA possessed relating to pre–1951 motion pictures distributed by UA;

(iii) 16mm exhibition prints of the films conveyed to the Library;

(iv) such scripts, still photograph negatives, pressbooks and production legal files as UA possessed relating to the motion pictures described in (iii);

(v) such corporate files as it possessed relating to Eagle Lion Classics, Inc.;

(vi) such still photograph negatives as it possessed relating to films distributed by Eagle Lion and Film Classics;

(vii) original 35mm acetate negatives and 16mm exhibition prints of 2,229 motion picture television episodes produced by ZIV Television Programs, Inc.;

(viii) such still photograph negatives, prints and scripts as it possessed relating to the motion pictures described in (vii);

(ix) 16mm exhibition prints of 707 sound motion picture feature films produced by RKO and the right to show such films on the Madison, Wisconsin television station operated by the University; and

(x) the right to obtain replacements of the items included in (iii) and (ix) above, at cost, from the Library or UA.

In the University Agreement, UA agreed to transfer legal title to the physical materials and, as in the Library Agreement, retained all of the rights for commercial exploitation of such property. The University Agreement provided that the materials would be kept by UA as a "gratuitous bailee" until the University could obtain available space (which term was limited to one year), and that when the latter took possession of the property it would "maintain the materials in good condition at all times in fireproof, clean storage space, with temperature and humidity controls appropriate for the storage of such materials." The University Agreement also provided inter alia that:

(1) The University could not copy (or allow anyone else to copy) any of the materials conveyed without UA's written consent;

(2) Use of the materials would be limited to study on the University's premises by researchers and students, except that the RKO motion picture prints co30d be broadcast for educational purposes on the University's television station; and

(3) UA would have the perpetual rights of access to all the materials so as to permit it to duplicate such articles as its sole cost and expense.

The gift to the University ultimately included a 16mm positive print of each of the motion pictures of which the preprint material was given to the Library, the ZIV television library negatives, which were on an acetate rather than a nitrate base, 16mm prints of the ZIV television library, and 16mm prints of the RKO library with the exclusive, perpetual right to broadcast the RKO library on the University's Madison, Wisconsin television station.

"Algiers" was the only pre–1951 motion picture owned by UA in 1951 and still owned by UA in 1969. UA considered it to be an example of the motion pictures that were the subject of the business covered by the UA corporate records and other non-film material donated to the University. UA decided to donate a 16mm print of "Algiers" to the University, and offered the original nitrate preprint material of "Algiers" to the Library. This offer was accepted by the Library.

UA paid for all costs of shipping the donated material to the University. UA also donated $150,000 to the University to help complete the inventorying and cataloguing of the material that would be appropriate for an archival research center. Through 1980, the University spent $344,-500 to catalog the University Property. Of this amount, $122,900 was paid out of the UA grant and the balance, $221,600, came from University funds. A substantial part of these costs were for salaries for individuals who also performed services in connection with the operation of the film archive.

*Delivery*

Because the Library was unable to assume immediate physical possession of the donated materials, UA held the materials as gratuitous bailee of the Library until the Library was able to assume physical possession thereof. The materials conveyed by UA to the Library were physically transferred to the Library during the period February 10, 1970, through June 7, 1973, and in May 1978. The Library determined when such physical transfers were to take place and the approximate quantity of materials to be transferred on each occasion. The material relating to the 12 Monogram feature films that was physically transferred to the Library in May 1978 was sent by UA when the Library notified it that in the course of its inventorying of the material previously received by it, it could not locate material relating to those films.

A similar gratuitous bailee arrangement existed with respect to materials that were not in the possession of the University at the time of acceptance of the Deeds of Gift. The materials conveyed by UA to the University were physically received during the period August 27, 1968, through November 3, 1976. There were two shipments in 1968, 25 shipments in 1969, 11 shipments in 1970, and one in each of the years 1971, 1972 and 1976. Such items were delivered either to the Wisconsin Center for Theater Research or the State Historical Society of Wisconsin, both of which are located in Madison, Wisconsin.

UA did not possess suitable exhibition prints for certain of the motion pictures listed in the schedules attached to the Deeds of the Gift to the University. Accordingly, to comply with the terms of the Deeds, in late 1969 and in 1970, it ordered 16mm prints for all 54 silent features (Schedule C–2), 53 episodes of television series (Schedule B–2), "Algiers" (Schedule A–6), 785 shorts (Schedule C–6), ten cartoon reels (Schedules C–8 and C–10), and 94 feature-length sound motion pictures (Schedules C–4, C–13 and D–1). The cost of making these prints and, in a number of instances, the manufacture of preprint material and additional 35mm prints that UA kept, totalled $120,063, which UA deducted as a miscellaneous business expense for federal income tax purposes for the year 1970. The deduction was reclassified as a charitable contribution deduction by the Internal Revenue Service and then was disallowed. The preprint material which was

made in the course of the production of the prints was kept by UA.

The 16mm positive prints that were produced especially for delivery to the University were shipped to the University on various dates, primarily in February and March 1970, but also on later dates in 1970 and, in a few isolated instances, in 1971. Of the 16mm positive prints produced especially for delivery to the University, 688,636 feet of black-and-white and 8,244 feet of color film were shipped to the University on or before March 15, 1970, and 199,549 feet of black-and-white and 3,816 feet of color film were shipped between March 16 and December 31, 1970. All of these prints were delivered promptly after they were manufactured.

*Valuations*

1. Milton Luboviski

In summer 1968, UA retained Milton Luboviski to appraise corporate records. Subsequently, in summer and fall 1969, the assignment was enlarged to include the film materials and memorabilia included in the conveyances to both the Library and the University. Milton Luboviski's appraisal of the fair market value of the Library Property was $11,038,850 at the time of the conveyance. His appraisal of the fair market value of the University Property was $16,705,478 at the time of the conveyances. These appraisals were in final form in November 1969. The combined appraised fair market values total $27,744,328.

Mr. Luboviski received a fee from UA for his work in the amount of $163,000. This fee was fixed prior and without regard to Mr. Luboviski's assessment of the fair market value of the property appraised by him.

2. Library of Congress

In 1969, at the time of UA's conveyance to the Library, the Library had in effect regulations entitled "Evaluations of Library Materials", LCR–315, dated November 15, 1966, as revised. Pursuant to LCR–315, an Evaluations Committee of the Library undertook to evaluate UA's conveyance and prepared a written evaluation dated November 24, 1969. The total amount of the evaluation for the Library Property was $8,489,070. Pursuant to LCR–315, the evaluation was approved by the Chief of the Exchange and Gift Division and by the Assistant Librarian of Congress. Because of the amount of the evaluation, it also was approved by the Librarian of Congress. The Library's November 24, 1969, evaluation was concerned with the same property that had been appraised by Mr. Luboviski at $11,038,850.

The Committee's November 24, 1969, evaluation mainly was based on an average value per foot ranging from 50¢ per foot to $1 per foot, with an average length of 7,560 feet per 84 minute feature. The per foot fair market value, and valuation per schedule, of the 35mm original nitrate negatives in the Library Property were as follows:

| | | |
|---|---|---|
| (a) "Algiers" (Schedule A–5) | $1.00/ft; | $ 8,640 |
| (b) 54 Warner Bros. Silent Features (Schedule C–1) | $8,000/title; | 432,000 |
| (c) 828 Warner Bros. Sound Features (Schedule C–3) | $1.00/ft; | 6,259,680 |
| (d) 1510 Warner Bros. Short Subjects (Schedule C–5) (a) 900 ft; (b) 1080 ft; (c) 1620 ft | $.50/ft; | |
| 1003(a) | | 451,350 |
| 26(b) | | 14,040 |
| 481(c) | | 389,610 |
| (e) 339 Warner Bros. Cartoons (Schedule C–7) | $.75/ft; | 228,825 |
| (f) 234 Popeye Cartoons (Schedule C–9) | $.75/ft; | 157,950 |
| (g) 187 Monogram Sound Features (Schedule C–11) | $.50/ft. | 546,975 |
| TOTAL RECOMMENDED VALUATION | | $8,489,070 |

In March 1970, the Evaluations Committee of the Library undertook a review of its theory, methodology and practice in the valuation of films and promulgated a memorandum entitled "Review of Evaluation Method for Motion Picture Film". The memorandum dated March 19, 1970, contains the following recommendation:

The Committee reviewed its present practices in the evaluation of film, the theories on which these practices are based, and their relationship to methods used with other forms of material. Alternative methods were explored. All members of the Committee agreed that, in the absence of an actual documented market, the method of evaluation combining both qualitative and quantitative elements cannot be avoided. * * * The method outlined below, while clearer in its logical structure and formulation, represents no departure from past practice as applied to manuscripts, recordings, prints and photographs, and other materials. The Committee further recommends that future evaluation memoranda more fully record the qualitative aspects of the evaluation process, describing in greater detail the relative significance of the film in terms of its physical characteristics, its place in cinema history, its possible contribution to sociological or other related research, its relationship to the film program of the Library of Congress, with full comparisons to other films previously evaluated.

After UA received the November 24, 1969, LOC evaluation report, it requested, on March 10, 1970, the Library to reconsider and to raise its appraisal because it believed the Library's evaluation failed to give weight to certain relevant factors. On April 8, 1970, the Evaluations Committee of the Library met and prepared a revised written evaluation, dated April 9, 1970, of UA's gift, which placed the value of the property donated to the Library at $9,282,415. By this revision to the evaluation, the Evaluations Committee accorded a 10 percent premium in value for completeness to the following schedules: the 54 Warner Bros. silent features (Sch. C–1); the 806 Warner Bros. sound features (Sch. C–3); the 1507 Warner Bros short subjects (Sch. C–5); the 337 Warner Bros. cartoons (Sch. C–7); and the 229 Popeye cartoons (Sch. C–9). The revised evaluation was approved by the Chief of the Exchange and Gift Division, and by the Librarian of Congress.

The Library's evaluation was based on assumed total footages in each category. Those footages were later determined to a greater degree of accuracy than was possible at the time of the Library's evaluation. The parties stipulate the value, applying the Library's method and conclusions to the more accurate footages in the various film categories, is $8,394,338.

### 3. Malcolm Willits

Malcolm Willits, a dealer since 1965 in movie memorabilia, operates the Collector's Bookstore in Hollywood, California. Mr. Willits was retained by the IRS in 1973 to appraise all the non-film memorabilia given to the University by UA. For this appraisal he traveled to Madison, Wisconsin, and during the period April 23 to May 2, 1973, examined the donated materials. His report submitted to the IRS is dated June 22, 1973. The report states that the non-film memorabilia in the University Property had a total value of $63,027.60. The report contains the following descriptive comment:

The United Artists donation definitely has value; the question is, how much value. It is, of course, not a collection but an accumulation, an accumulation of what they happened to have left, plus what they have acquired, over the past fifty years. It is certainly not complete from a research point of view. For instance, with the exception of six small boxes of scripts filed with the corporate papers, there are no United Artists scripts in the donation. Nor are there any United Artists films. Since the scripts and films are the end-product and reason for the corporation's existence, this is a serious deficiency. The Warner

Brothers section of the donation is completely lacking in company records and still photographs, although it is excellent in films, scripts, and negatives. Much of value is missing, so any researcher must be content with using as source material whatever United Artists happened to have available for donation.

The Willits report valued the various schedules as follows:

| | | |
|---|---|---:|
| Schedule C–18 | Monogram 8×10 Still Negatives | |
| | 6,203 negatives at 10¢ each = | $ 620.30 |
| Schedule C–16 | Warner Bros. Sound Pressbooks | |
| | 772 pressbooks at $4.00 each = | 3,088.00 |
| Schedule A–1 | United Artists Corporate Papers | |
| | Unit appraisal value = | 5,000.00 |
| Schedule C–19 | Humphrey Bogart Still Negatives | |
| | 895 still negatives, 8×10's & 4×5's at 25¢ each = | 223.75 |
| Schedule C–15 | Warner Bros. Pressbooks—Silent Features | |
| | 151 Warner Silent Pressbooks at $4.00 each = | 604.00 |
| Schedule C–13 | Warner Bros. Production Files | |
| | 829 files of Sound Scripts | 8,145.00 |
| | 582 files of Silent Scripts at $1.50 each = | 873.00 |
| | 731 files of Short Subjects Scripts at $1.00 each = | 731.00 |
| Schedule C–17 | Monogram Sound Pressbooks | |
| | 79 Monogram Sound Pressbooks at $2.50 each = | 197.50 |
| Schedule B–4 | Television Still Negatives | |
| | 39,247 Still Negatives at 5¢ each = | 1,912.35 |
| Schedule C–22 | Starhead Still Negatives | |
| | 41,611 Starhead Negatives at 10¢ each = | 4,161.10 |
| Schedule C–21 | Starhead Still Negatives | |
| | 9,474 Starhead Negatives at 15¢ each = | 1,421.10 |
| Schedule A–3 | United Artists Pre–1951 Still Negatives | |
| | 48,854 United Artists negatives at 10¢ each = | 4,885.40 |
| | 37,293 Eagle Lion negatives at 5¢ each = | 1,864.65 |
| | 12,857 Film Classics negatives at 10¢ each = | 1,285.70 |
| | 12,431 miscellaneous negatives at 10¢ each = | 1,243.10 |
| Schedule A–7 | Algiers Production File | |
| | Legal file and original shooting script = | 65.00 |
| Schedule A–8 | Additional United Artists Pressbooks | |
| | 20 pre–1951 pressbooks = | 53.00 |
| Schedule A–4 | United Artists Music Cue Sheets | |
| | 457 Music Cue Sheets at 25¢ each = | 114.25 |
| Schedule C–20 | John Wayne Still Negatives | |
| | 16 negatives at $4.00 each = | 64.00 |
| Schedule A–2 | United Artists Pressbooks and Stills | |
| | 88,800 UA stills at 15¢ each = | 13,320.00 |
| | 560 UA pressbooks at $6.00 each = | 3,360.00 |
| | supplemental list (assuming 600 stills in the 6 stillbooks) = | 246.00 |
| Schedule C–14 | Warner Bros. Still Negatives | |
| | 18,456 negatives at 20¢ each = | 3,765.40 |
| Schedule B–3 | Television Shooting Scripts | |
| | 1,928 scripts at $3.00 each title = | 5,784.00 |
| | TOTAL | $63,027.60 |

4. Raymond Fielding

Dr. Raymond Fielding was retained by UA to appraise the Library Property and the University Property. Dr. Fielding is Professor of Communications, and Director of the School of Communications, University of Houston, Texas. He has been associated with motion picture archives and libraries for more than 25 years and has had a distinguished academic career in the motion picture field. He has served as a trustee of the AFI, and of the University Film and Video Foundation. His experience includes 64 appraisals of film negatives, film prints, and other film materials. His appraisal of the Library Property and the University Property is considered as a single appraisal.

Dr. Fielding's assessment of the fair market value of the UA collections in his report dated April 1981, as updated November 1984, is recapitulated as follows:

A. Nitrate Negatives at the Library of Congress

| | | | |
|---|---|---|---:|
| Schedule A–5: | "Algiers" | $ | 10,714.00 |
| Schedule C–1: | Silent Warner Bros. features | | 428,513.00 |
| Schedule C–3: | Sound Warner Bros. features | | 7,313,092.00 |
| Schedule C–5: | Warner Bros. short subjects | | 995,598.00 |
| Schedule C–7: | Warner Bros. cartoons | | 408,855.00 |
| Schedule C–9: | Popeye cartoons | | 222,735.00 |
| Schedule C–11: | Monogram sound features | | 665,973.00 |
| | | Sub–Total | $10,045,480.00 |

B. Materials at the University of Wisconsin

| | | | |
|---|---|---|---:|
| Schedule A–1: | United Artists corporate papers | $ | 215,792.00 |
| Schedule A–2(B) & A–8: | United Artists pressbooks | | 6,684.00 |
| Schedule A–4: | United Artists music cue sheets | | 2,285.00 |
| Schedule A–7: | Production file for "Algiers" | | 338.00 |
| Schedule B–1: | Television series 35mm negatives | | 3,036,915.00 |
| Schedule B–2: | Television series 16mm prints | | 122,457.00 |
| Schedule B–3: | Television series scripts and production files | | 71,566.00 |
| Schedule C–13: | Warner Bros. scripts and production files | | 484,688.00 |
| Schedule C–15: | Warner Bros. pressbooks/silent films | | 2,925.00 |
| Schedule C–16: | Warner Bros. pressbooks/sound films | | 10,984.00 |
| Schedule C–17: | Monogram features pressbooks | | 296.00 |
| Series 5.2: | United Artists feature scripts | | 1,440.00 |
| | | Sub–Total: | $ 3,956,370.00 |

| | |
|---|---:|
| At Library of Congress: | $10,045,480.00 |
| At University of Wisconsin: | 3,956,370.00 |
| | $14,001,850.00 |

5. Erwin H. Ezzes

UA retained Erwin H. Ezzes to appraise the fair market value of a license to broadcast 16mm prints of 707 RKO sound feature motion pictures in the University Property (Schedule D–1). UA gave the University the right to broadcast the RKO features for educational purposes over the University's television station.

Mr. Ezzes had 32 years experience in marketing motion pictures for television. He had been chairman and chief executive officer of United Artists Television, Inc. with responsibility for marketing feature films to television. After retirement, he was a consultant to Twentieth Century-Fox Film Corporation to appraise and market feature films in television markets.

In a report, dated March 22, 1982, Mr. Ezzes determined that in October 1969, Madison, Wisconsin, with 119,500 television homes, ranked 114th in market size among

the total 204 markets in the United States. The report states that the 707 RKO feature motion pictures licensed for unlimited runs in perpetuity to any station in Madison, Wisconsin is appraised at $183,820.

6. David H. Shepard

David H. Shepard was retained by UA to appraise certain 16mm safety film prints of feature motion pictures included in the University Property. Mr. Shepard's background includes many activities in the motion picture field. Since 1952, he has been a private collector of 16mm sound and silent features; he owns copyrights to 40 vintage films and actively licenses them; he has served on the faculties of U.C.L.A. and U.S.C., has been an archivist at AFI and a Special Projects Officer for the Directors Guild of America. In his report, dated May 31, 1983, Mr. Shepard stated his assignment was to consider the following film subjects:

Schedule A-6 (*Algiers*), Schedule C-2 (54 silent Warner Bros. features), Schedule C-4 (806 Warner Bros. sound features), Schedule C-6 (1507 Warner Bros. Vitaphone shorts), Schedule C-8 (337 Warner cartoons), Schedule C-10 (229 Popeye cartoons) and Schedule C-12 (187 Monogram features).

His appraisals were as follows:

| Schedule A-6 | Algiers | $ 350.00 |
|---|---|---|
| Schedule C-2 | 54 Warner Bros. silent features | 16,870.00 |
| Schedule C-4 | 806 Warner Bros. sound features | 289,412.00 |
| Schedule C-6 | 1,507 Warner Bros. Vitaphone shorts | 50,155.00 |
| Schedule C-8 | 337 Warner Bros. cartoons | 9,530.00 |
| Schedule C-10 | 229 Popeye cartoons | 5,430.00 |
| Schedule C-12 | 187 Monogram features | 27,609.00 |
| | TOTAL | $399,356.00 |

7. Robert Cushman

Robert Cushman was retained by UA to appraise the still photographic prints and the still film negatives included in the University Property. Mr. Cushman served as Photograph Curator and Coordinator of Photographic Services at the Herrick Library of the Academy of Motion Picture Arts and Sciences. He has served as consultant to the Directors Guild of America and as a research fellow with the AFI.

In his report dated July 27, 1983, Mr. Cushman stated that the UA collection of stills and negatives consisted of a total number of 139,994 still photographs and 212,954 still negatives, a total of 352,948 individual items. The report stated that probably less than one percent of the negatives are copy negatives and that at least 99 percent of the negatives were original negatives in fine condition.

His report contains the following summary of the appraisal of the fair market values of the still photographic material:

Schedule 1: 87,081 linen-backed still photograph prints from United Artists feature films (consisting of 472 individual production entries)

Appraised value................$ 363,954
(average $4.18 per item)

Schedule 2: 104,677 safety film still negatives from United Artists and other feature films (consisting of 756 individual production entries)

Appraised value................$ 485,509
(average $4.64 per item)

Schedule 3: 48,218 still photograph prints and 21,244 safety film still negatives from ZIV television production series episodes (consisting of 306 individual entries for 48 different TV series in stills, and 61 individual entries for 33 different TV series in negatives)

Appraised value................$ 162,092
(average $2.33 per item)

Schedule 4: 17,518 safety film still negatives from Warner Brothers feature films (consisting of 557 individual production entries)

 Appraised value.................$ 98,586
 (average $5.75 per item)

Schedule 5: 880 nitrate film still negatives from Warner Brothers feature films (consisting of 38 individual production entries)

 Appraised value.................$ 5,699
 (average $6.48 per item)

Schedule 6: 6,321 safety and nitrate film still negatives from Monogram feature films (consisting of 133 individual production entries)

 Appraised value.................$ 25,284
 (average $4.00 per item)

Schedule 7: 895 safety film still negatives of Humphrey Bogart

 Appraised value.................$ 8,950
 (average $10.00 per item)

Schedule 8: 16 safety film still negatives of John Wayne

 Appraised value.................$ 112
 (average $7.00 per item)

Schedule 9: 7,742 safety film still negatives of Warner Brothers stars (consisting of 11 individual biography entries)

 Appraised value.................$ 53,082
 (average $6.86 per item)

Schedule 10: 41,611 safety film still negatives of Warner Brothers stars (consisting of 70 individual biography entries)

 Appraised value.................$ 154,563
 (average $3.71 per item)

Schedule 11: 161 safety and nitrate film still negatives from Warner Brothers animated cartoon shorts (consisting of 73 individual production entries and four individual biography entries)

 Appraised value.................$ 805
 (average $5.00 per item)

Schedule 12: 11,833 nitrate film still negatives and 416 safety film still negatives from United Artists and other feature films (consisting of 112 individual production entries)

 Appraised value.................$ 73,479
 (average $6.00 per item)

Schedule 13: 4,695 linen-backed still photographs prints of the United Artists stars (consisting of 62 individual biography entries).

 Appraised value.................$ 18,868
 (average $4.02 per item)

---

TOTAL VALUE OF ABOVE (352,948 Total Items) $1,450,983
(average $4.11 per item)

---

*Depreciation Recapture*

The parties have stipulated as to the amounts of depreciation that UA has been allowed during the years 1962–1969 that is subject to recapture pursuant to IRC § 170(e). The amounts of depreciation recapture are:

| | | |
|---|---|---|
| Library Property | | $ 326,666 |
| University Property | | |
| ZIV still prints | $ 46,392 | |
| ZIV still negatives | 31,642 | |
| Warner Bros. still negatives | 41,652 | |
| Warner Bros. Script Files and Pressbooks | 3,481 | |
| Music cue sheets | 0 | |
| Warner Bros. Library & Algiers | 57,172 | |
| ZIV scripts | 10,360 | |

| | |
|---|---:|
| ZIV production files | $ 24,209 |
| Orig. 35mm ZIV negatives | 505,603 |
| 16mm ZIV prints | 78,546 |
| 16mm prints—707 RKO sound features | 5,756 |

| | | |
|---|---:|---:|
| | 804,813 | |
| TOTAL DEPRECIATION RECAPTURE | | $1,131,479 |

## DISPOSITION

*Final Positions*

In the final statement of its claims, plaintiff uses Dr. Fielding's valuation of $10,045,480 for the Library Property. The claim for the University Property incorporates some of the elements in Dr. Fielding's valuations, for a total of $3,793,882, and the balance of the $5,828,041 total claimed for University Property is made up of the valuations made by Messrs. Ezzes, Shepard and Cushman. Plaintiff's final values for its claimed contributions, totaling $15,873,521, are summarized in the following table:

## PLAINTIFF'S FINAL VALUATION OF CONTRIBUTIONS

| | | | |
|---|---|---:|---:|
| LIBRARY PROPERTY (Dr. Fielding) | | | $10,045,480 |
| UNIVERSITY PROPERTY | | | |
| Dr. Fielding's valuations | | | |
| Schedule A–1 | Eagle Lion Corp. Files only | $ 54,744 | |
| Schedule A–2(B) and A–8 | 547 UA and Eagle Lion Pressbooks | 6,684 | |
| Schedule C–15 | 136 Warner Bros. Pressbooks | 2,925 | |
| Schedule C–16 | 792 Warner Bros. Pressbooks—sound features | 10,984 | |
| Schedule C–17 | 75 Monogram Pressbooks | 296 | |
| Schedule A–4 | UA Music Cue Sheets | 2,285 | |
| Schedule A–7 | "Algiers" Production File | 338 | |
| Schedule C–13 | Warner Bros. Files | 484,688 | |
| Schedule B–3 | ZIV TV scripts | 21,384 | |
| | ZIV contract and Production Files | 50,182 | |
| Schedule B–1 | ZIV 35mm acetate negatives for 2,229 TV episodes | 3,036,915 | |
| Schedule B–2 | 16mm positive projection print for each 2,229 TV episodes | 122,457 | |
| | subtotal | $3,793,882 | |
| Mr. Erwin Ezzes' valuations | | 183,820 | |
| Mr. David Shepard's valuations | | 399,356 | |
| Mr. Robert Cushman's valuations | | 1,450,983 | |
| | Total | | $ 5,828,041 |
| | TOTAL CLAIM | | $15,873,521 |

Plaintiff's final claimed contributions are reduced by a total of $1,131,479 for depreciation recapture. Accordingly, plaintiff's final claim is for a charitable contributions deduction in the amount of $14,742,042.

Defendant's final position is that the conveyance of nitrate negatives to the Library was not a gift and that plaintiff is not entitled to a charitable contribution deduction for the Library Property. Defendant further contends that the physical property and the property rights conveyed to the Library, even if treated as a donation, has a fair market value that is less than the amount of the $326,666 depreciation recap-

ture that is allocable to the Library Property.

Defendant contends that, after depreciation recapture, the charitable deduction allowable for the University Property amounts to a total of $56,451. Defendant's allowances recognize only the 16mm prints that were delivered to the University in 1969, and five items of movie and TV memorabilia delivered in 1969, consisting of various still negatives, Warner Bros. library script files and pressbooks, the production file for "Algiers", and the Eagle Lion records.

Defendant's final statement of the allowable charitable contributions is summarized in the following table:

### DEFENDANT'S FINAL POSITION

| | | No Deduction |
|---|---:|---:|
| LIBRARY PROPERTY | | |
| UNIVERSITY PROPERTY | | |
| 16mm prints donated in 1969 | | |
| Fair Market Value | $99,918 | |
| less Depreciation Recapture | 57,172 | |
| | | $42,746 |
| Various still negatives | | |
| Fair Market Value | | 4,394 |
| Warner Bros. Library Script Files | | |
| Fair Market Value | 8,581 | |
| less Depreciation Recapture | 3,481 | |
| | | 5,100 |
| Warner Bros. Library Pressbooks | | |
| Fair Market Value | | 3,796 |
| "Algiers" Production File | | |
| Fair Market Value | | 65 |
| Eagle Lion Records | | |
| Fair Market Value | | 350 |
| TOTAL ALLOWABLE DEDUCTION | | $56,451 |

■ The Internal Revenue Code allows as a deduction from taxable income any charitable contribution, as defined, payment of which is "made within the taxable year." A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary of the Treasury. 26 U.S.C. § 170(a) (1982). The deduction is authorized to encourage contributions to charitable organizations, and to reward donors for their benevolence. As long as there is a bona fide gift, the taxpayer's motivation essentially is immaterial. Even where the donation is made solely for the purpose of obtaining a tax benefit, the taxpayer is entitled to the deduction to the extent of the fair market value of the property given. *Sheppard v. United States*, 176 Ct.Cl. 244, 361 F.2d 972, 981–982 (1966).

■ No deduction is permissible, however, unless the contribution or gift is made with no expectation of a financial return commensurate with the amount of the gift. H.R.Rep. No. 1337, 83rd Cong., 2d Sess. 44, *reprinted in* 1954 U.S.Code Cong. & Admin.News 4017, 4180; S.Rep. No. 1622, 83rd Cong., 2d Sess. 196, *reprinted in* 1954 U.S.Code Cong. Admin. News 4621, 4830–4831. When a donation is made with an expectation of receiving something in return as a *quid pro quo* for the transfer, no charitable contribution is allowed. Not all benefit to the donor is disqualifying; it is only when the benefits are substantial enough to provide a *quid pro quo* for the transfer that the deduction is not allowed. *Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1132 (Fed.Cir. 1983); *Singer Co. v. United States*, 196 Ct.Cl. 90, 449 F.2d 413, 423 (1971).

■ For purposes of the deduction allowable by I.R.C. § 170(a), the term "chari-

table contribution" means a contribution or gift to the United States, if made exclusively for public purposes, and a contribution or gift to a qualified corporation, trust, or community chest fund or foundation. 26 U.S.C. § 170(c) (1982). There is no dispute that the Library qualifies as a donee under I.R.C. § 170. The parties have stipulated that the University is, and at the time of the conveyance was, an organization described in I.R.C. § 170(c)(2), and that the conveyances by UA to the University were for a purpose or function that constitutes the basis for exemption under I.R.C. § 501. During trial, defendant conceded that there was a gift to the University within the meaning of I.R.C. § 170.

▆▆▆▆ Treasury Regulations provide that any charitable contribution actually paid during the taxable year is allowable as a deduction. Under certain circumstances contributions by corporations may be deductible even if not paid during the taxable year. 26 C.F.R. § 1.170–1(a)(1) (1987). Ordinarily, a contribution is considered to have been made at the time delivery is effected. 26 C.F.R. § 1.170–1(b) (1987). If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. 26 C.F.R. § 1.170–1(c). Delivery occurs when title in the property vests in the donee so as to provide the donee with the power to exercise dominion and control.

▆▆▆▆ In order for the gift to be complete, the delivery or terms of the gift must be such that the donor transfers all dominion and control over the property given. Dominion and control, the retention of which will render a gift incomplete for purposes of the tax deduction, is dominion and control exercisable against the donee: the retention by the donor of a power to direct the disposition or manner of enjoyment of

the subject of the gift. *Pauley v. United States,* 459 F.2d 624, 627 (9th Cir.1972).

▆▆▆▆ In appropriate circumstances, "delivery" can be made by means of a duly executed deed of gift, with physical possession of the property to be transferred subsequently. Where the instrument clearly and unmistakably announces a present transfer of the gift and places the property beyond the power of the donor so as to divest dominion and control over the property, delivery of the instrument can satisfy the "delivery" requirement. *Greer v. Commissioner,* 70 T.C. 294, 304 (1978), *aff'd* 634 F.2d 1044 (6th Cir.1980). The instruments involved in the Library Agreement and in the University Agreement were executed by persons authorized to so act. The terms and conditions contained in the instruments were binding on the parties.

I.R.C. § 170(e) provides in pertinent part that, as to any depreciable property that is donated to a qualified charity, the amount of the charitable contribution deduction must be reduced by the amount that would have represented "depreciation recapture" had the donated property been sold by the taxpayer. For donations made in the tax year 1969, the amount of the depreciation recapture is equal to the amount of the depreciation allowed or allowable after December 31, 1961, as long as it does not exceed the excess of the property's fair market value over its adjusted basis. Some of the UA property is not subject to depreciation recapture because it was not depreciable, or because it was fully depreciated prior to 1962. The stipulations include in this category: Eagle Lion corporate records, Eagle Lion and Film Classics still negatives, original negative and production file for the film "Algiers," and pressbooks, music cue sheets, still photographs and still negatives relating to pre–1951 films distributed by UA. The parties have stipulated the amounts recovered through depreciation deductions during the years 1962 through 1969 on the Library property ($326,666), and relevant items of University property ($804,813).

The Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487, amended I.R.C. § 1221(3). Section 1221 defines a capital asset for determining capital gains and losses under the Code. The purpose of I.R.C. § 1221(3) is to deny capital gain treatment to a seller of property described therein. Prior to the 1969 amendment, the section covered a copyright, a literary, musical, or artistic composition, or similar property. The 1969 Act added the phrase "letter, memorandum, or similar property" to assure that collections of papers, such as correspondence, personal and business records, and documents reflecting governmental deliberations, would not be treated as a capital asset if held by the person that created the property. *See* generally, Bittker, *Federal Taxation of Income, Estates and Gifts*, ¶ 51.4 (1981). The 1969 amendment explicitly includes letters, memoranda, and similar property created by or produced for the taxpayer. At the same time section 170(e) was amended to prevent a charitable deduction for the contribution of such items after July 25, 1969. 26 U.S.C. § 170(e)(3) (1982). The regulations provide that, in the case of sales and other dispositions occurring after July 25, 1969, a letter, memorandum, or similar property is excluded from the term "capital asset" when held by a taxpayer (i) whose personal efforts created the property, (ii) for whom the property was prepared or produced, or (iii) in whose hands the basis of the property is determined by reference to the basis of such property in the hands of a previous owner described in (i) and (ii). 26 C.F.R. § 1/1221–1(c)(2) (1987).

The I.R.S. specifically has recognized, and the legislative history of the 1969 Act makes clear, that the words "letter or memorandum or similar property" do not include "a copyright, a literary, musical, or artistic composition or similar property." *See* Rev.Rul. 74–584, 1974–2 C.B. 81 (holding that because an "artistic composition" was not a "letter, memorandum, or property similar to a letter or memorandum," the 1969 Act did not apply with respect to an artistic composition donated between July 26 and December 31, 1969, and so was deductible at fair market value); *see also* H.R.Rep. No. 91–413, *reprinted in* 1969 U.S.Code Cong. & Admin.News 1800; S.Rep. No. 91–552, *reprinted in* 1969 U.S. Code Cong. & Admin.News 2027, 2233–34.

Plaintiff has conceded that the UA corporate records constitute a letter or memorandum or similar property described in I.R.C. § 1221(3), and that no deduction is allowable for the donation of those documents.

LIBRARY PROPERTY

The deduction claimed for the Library Property, $10,045,480, is the major part of plaintiff's total claim. Defendant challenges this claim on the ground that plaintiff has not shown entitlement to any deduction for the Library Property. In addition, defendant challenges plaintiff's valuation methodology. Although the volume of tangible property given to the University vastly exceeds that given to the Library, and the time expended by UA in negotiations with the Library was a minor part of the total effort UA expended on its charitable contributions, it is appropriate to resolve the legal issues involved in the Library Property before addressing the valuation issues in the University Property.

The gift to the Library is unique in many respects. The physical property involved was limited to the preprint material of certain motion pictures described in schedules. For the most part, the Library Property was original negatives on nitrate-base plastic, to which was bonded a motion picture image and sound track by a photosensitive emulsion.

The Library in 1969, got only the legal title and a right to take possession in the future, with additional rights and obligations to take effect after delivery. Plaintiff emphasizes that UA made a gift of the physical property only, and retained all other rights associated with such property, including the rights of commercial exploitation and reproduction, and other intangible rights. In 1969, the Library was unable to assume immediate possession of the tangible property conveyed, and did not acquire physical control until the property was de-

livered during the period February 10, 1970, through June 7, 1973.

The issue is whether UA's donation of this tangible property qualifies for an income tax deduction under statutory and regulatory standards.

The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration. At a minimum, UA must demonstrate that it purposely contributed property in excess of the value of any benefit it received in return. *United States v. American Bar Endowment*, 477 U.S. 105, 118, 106 S.Ct. 2426, 2434, 91 L.Ed.2d 89 (1985). Where the benefits clearly are unequal, a deduction may be in order for the excess of the gift over the market value of the benefit received in return. The I.R.S. has established a two-part test for determining when a deduction is permissible where a donor receives a benefit in return for a contribution. First, the contribution is deductible only if, and to the extent, it exceeds the market value of the benefit received. Second, the excess must be contributed with the intention of making a gift. Rev.Rul. 67–246, 1967–2 C.B. 104, 105. *American Bar Endowment*, 477 U.S. at 117, 106 S.Ct. at 2433–2434.

I.R.C. § 170(a) requires that the contribution to the Library be made exclusively for public purposes. A contribution made to a charity is not made exclusively for public purposes if the donor receives, or anticipates receiving, a substantial benefit in return. *Singer Co. v. United States*, 196 Ct.Cl. 90, 449 F.2d 413, 423 (1971); *United States v. Transamerica Corp.*, 392 F.2d 522, 524 (9th Cir.1968). A substantial benefit is one that is greater than the benefit that inures to the general public from the transfer. Benefits that inure to the general public from a charitable contribution are incidental to the contribution, and the donor, as a member of the general public, may receive such incidental benefits without jeopardizing eligibility for the deduction. Where the donor in fact receives, or expects to receive, benefits that exceed the incidental benefits flowing to the general public, a *quid pro quo* for the transfer

may exist that would defeat any claim for a charitable deduction. *Ottawa Silica Co. v. United States*, 699 F.2d at 1132; *Singer Co. v. United States*, 449 F.2d at 423. Accordingly, the benefits realized by the parties from the contribution of UA's preprint materials must be examined.

The benefits the parties respectively realized, and the donative intent of UA are illuminated by examination of the sequence of events in UA's consideration and decision to make charitable contributions in 1969. The decision to make a donation to the Library was an afterthought in the negotiations with the University, which had been under way since February 1968. UA's gifts to charity originated from a request from the University for a donation of the personal papers of Arthur Krim, UA's President. Negotiations and internal discussions caused the gift to grow to include UA's corporate records, still photographs, still negatives, pressbooks, scripts, and other promotional materials. UA in 1969 offered to include the 16mm positives and original 35 negatives for its movie and television titles. In addition to the film property, the documentary materials alone involved a huge volume that consisted of literally millions of papers and required 4,000 cubic feet of storage space. The volume of property involved in the contributions was such that UA could not physically examine and appraise it prior to execution of the November 1969 documents.

When the University learned that the original 35mm negatives for the movie titles all were on nitrate film, it had to decline the offer because it had neither the facilities nor resources to store such material. At about that time, UA learned that the Tax Reform Act of 1969 scheduled restrictions on charitable contributions to take effect as of January 1, 1970. UA's need for a donee that would be able to accept a gift of the film negatives was urgent. In its search for an eligible charitable donee, UA recalled AFI's previous solicitation to all motion picture companies for nitrate film materials, UA contacted the AFI and was referred to the Library. UA's first meeting with Library personnel,

to express an interest in giving to the Library the nitrate negatives, did not occur until September 1969.

After UA determined that the documentary materials could be given to the University and that the nitrate film materials could be given to the Library, UA directed its personnel to make every effort possible to complete the conveyances before year-end. The project was given the highest priority. In its haste to complete the project, formal documents were executed before UA knew whether the materials listed on the schedules actually existed, and in what condition, and before either the Library or the University were in a position to accept physical delivery of the bulk of the property.

UA's decision to make the 1969 contributions was in sharp contrast with its previous dealings with AFI and Library requests. UA had not responded to the 1968 AFI letter that solicited donations of nitrate film. Prior to its conveyances to the University and to the Library, UA had never donated film to any public, charitable, or educational institution. On May 20, 1968, at the suggestion of AFI, the Library had written UA and requested a donation of a safety stock preservation master of a movie that was on its special rescue list. UA declined to make a gift. At that time, UA would only agree to lend the original negative to the AFI. The latter then could make for the Library the requested safety preservation master at its own expense, and then return the negative to UA.

Nitrate-base film in the Library Property is highly flammable, potentially explosive, and, with the passage of time, decomposes. Ultimately, nitrate-base film self-destructs and ceases to exist.

In keeping with industry practice, after 1951 UA had the motion pictures recorded in its original nitrate negatives copied onto acetate-base safety stock film. By November 1969 UA possessed, or believed it possessed, one or more safety film duplicate negatives for each of the motion pictures involved in the Library Property. In addition, for movies UA expected to exploit commercially, it had fine-grain master posi-

tives, from which replacement duplicate negatives could be made. Because of the availability of these articles, recourse to any of UA's original nitrate negatives was rare. Such use occurred, in the aggregate, approximately ten or twelve times per year.

During the period UA was acquiring the motion picture nitrate negatives, there was no concept in the industry that such film had value as an historical artifact or for archival or scholarly use. The negatives' value and utility to UA was solely for commercial exploitation.

The UA officials responsible for the conveyances to the Library and the University would not have authorized any gift that in any way would hamper UA's commercial operations. UA agreed to convey the physical property to the Library and to the University because its responsible officials were convinced that (1) the company's commercial interests would not be impaired, (2) the transfers would not cause UA to lose any money, (3) the transfers would not reduce the value of UA's assets, and (4) UA would continue to have access to the property it might need in its commercial operations.

In November 1969, UA could not have sold in a commercial market only the physical property in its nitrate film. Nor could the physical property in its nitrate film be sold for scholarly, archival, or artifact uses. In 1969, only three archives had even collected nitrate film for an extended period of time: The Museum of Modern Art (MOMA), the Eastman House, and the Library of Congress. Only the Eastman House and the Library made any purchases of nitrate film. In 1969 there was no charitable institution, archive, or museum that had vault facilities adequate to store and preserve the entire collection of UA's original nitrate negatives conveyed to the Library. Further, no such institution had available funding that would have permitted a purchase of UA's nitrate negatives. In November 1969, the Library Property, as a component of UA's commercial operations, had no fair market value.

In structure, the Library agreement was more than a simple instrument of gift. It

involved reciprocal undertakings. The agreement authorized the Library to convert the image and sound recorded on nitrate-base film onto safety stock to make preservation preprint material and prints, which preservation preprint material and prints would become the physical property of the Library. UA's reservation of commercial exploitation, reproduction, and other intangible rights applied to the use of the safety stock preprint material and preservation prints that the Library converted from the nitrate negatives. Upon physical delivery of the nitrate film, the Library was obliged to store, care for and maintain the property at its sole expense. UA reserved, and the University was given, the right of access on demand to have the Library process orders for positive safety prints to be made from either the nitrate negatives or from the Library's preservation safety preprint materials. With UA's prior written consent, the Library could trade a limited number of the components of the collection to other institutions in exchange for other motion picture materials, but only if the other archive agreed in writing to assume all the terms and conditions imposed on the Library.

The access provisions incorporated in the Library agreement were negotiated at UA's request and were as broad as any ever extended by the Library. During trial, Library officials explained that UA's right of access was the "price" the Library had to pay for the rights it obtained in the Library Property, and that the concessions made to UA during the negotiations were part of the "give and take" between the parties and a "trade-off" of rights and obligations.

Plaintiff points out that the Instrument of Gift transferred title to the original negatives, that title unconditionally and irrevocably was vested, and that the Library legally was free to destroy the negatives at such times as it saw fit. The Instrument of Gift does not by its terms commit the Library to make preservation copies. The Library representatives testified, however, that the Library had an obligation to maintain the nitrate negatives until preservation copies were made. Any unnecessary destruction of the nitrate film prior to copying would have been contrary to the Library and AFI film acquisition programs and would have exposed the Library to the contention that UA had been misled. In practice, the Library has followed its original intent and has made preservation copies as soon as possible.

Each party created an analogy to illustrate its argument as to the extent of the legal relationship that arose from the Library Agreement. Plaintiff likens UA's relationship to the Library to a situation where the owner of an oil painting, to obtain a charitable contribution deduction, donates the picture to a museum. In such event, dominion and control are shifted to the donee, and the donee becomes liable for the costs of storage and insurance. Such costs, however, are "merely incidental to the transfer" and are not "substantial enough to serve as a *quid pro quo*" for the transfer. Defendant argues that more was involved than merely shifting insurance and storage costs, and suggests that the Library transaction is more comparable to a situation where a taxpayer gives a charity a suit of clothes that is used only on rainy days. The gift is made with a proviso that the charity store the suit, keep it clean, and lend it to the donor, and to no one else, whenever it storms, and with the further condition that, in the event the suit wears out and the charity replaces it, the new garment also must be made available to the donor.

The original picture negatives have characteristics that limit their utility. In addition to the physical properties that cause them ultimately to self-destruct, the original picture negatives, in and of themselves, do not represent a usable end-product. The production of the original picture negative itself involves a complicated sequence of mechanical and chemical technologies and personnel organization. Thereafter, before commercial exploitation, scholarly research, or archival use can be realized, additional processing, equipment, distribution, and exhibition facilities require an extended sequence of activities from numerous sources. For investment tax credit, a

master negative has been likened to a machine which stamps out patented products for sale. *Walt Disney Productions v. United States*, 549 F.2d 576, 578 (9th Cir. 1976). In connection with its argument that the Library as an owner had a separate right to make safety prints, plaintiff noted that "a negative is unusable other than to strike a positive print therefrom."

During the trial, plaintiff's witnesses sometimes would compare the Library Property to the Gutenberg Bible or a Rembrandt painting. These characterizations imply that the nitrate picture negatives themselves were end-products available for use in scholarly research. Even the simplest examination of a picture negative, however, requires some form of viewing or projection equipment. Original picture negatives by themselves cannot be viewed and analyzed by a scholar independently, as can a Rembrandt. They cannot be read and analyzed through the direct observation of the researcher, as can the Gutenberg Bible. The original picture negatives as source material for historical and scholarly research are not end-objects with independent significance. Alone, they are not artifacts which through archival preservation embody the cultural heritage. Their function and characteristics are more similar to the canvas, brushes, and paints of the artist and the ink, type, binding, and paper of the Gutenberg Bible.

It is clear that legal title to and physical possession of a nitrate film negative is of little utility until it is used in combination with other tangible and intangible property. UA retained all rights to commercial use. The Library acquired only a privilege of using the original nitrate negatives to make, at its own expense, a safety stock preservation negative.

The unique characteristics of the nitrate picture negatives have caused problems for the Library. Officials responsible for Library administration consider the nitrate film to be a liability, and, to reduce storage costs and minimize hazards inherent in its retention, consistently have maintained the policy that the nitrate-base film stock is to be destroyed as soon as possible after copying. Adequate space and staff to maintain the nitrate film has been a chronic administrative problem and expense.

In 1969, UA was able to have a 35mm fine-grain master positive manufactured at a cost of about 9 cents per foot. The Library's cost, in 1969, is estimated to range from 17 cents to 25 cents per foot to make a fine-grain master positive. The full cost in 1969 of going from an original nitrate negative to an exhibition print, which entails the additional manufacture of an intermediate duplicate negative, amounted to 35 cents per foot. The Library's additional cost was caused by its procedures, which were far more elaborate and were designed to produce the highest quality product.

It eventually will cost the Library well over $1,000,000 to make preservation masters for UA's original nitrate picture negatives. UA will pay nothing towards this cost, although it will have a continuing right to have copies of the Library's preservation masters.

In 1969 UA's nitrate negatives were stored in 26.5 vaults in New Jersey and an undetermined number of vaults in New York City. Defendant assumes that the prevailing annual rental rate was $540 per vault and contends that the storage expense for the New Jersey vaults alone was at least $14,300 per year. Plaintiff contends that only four of the vaults were subject to this charge and that UA's total cost was only $2,160 per annum. Resolution of this conflict is unnecessary. Direct storage costs, indirect costs imposed by film processing laboratories which stored the nitrate film without separate charge in return for the film processing business, property insurance costs, and liability insurance costs are part of the cost to store and maintain nitrate picture film. These costs clearly are substantial.

*Library Appraisal*

The Library's ad hoc Evaluation Committee, on November 24, 1969, placed a value of $8,489,070 for the Library Property. At UA's request this amount was reconsidered, and on April 8, 1970, the Evaluation Committee increased the value of the Li-

brary Property to $9,282,415. These initial valuations were made in the absence of a physical examination of the original negatives involved, and were based on assumed total footages in each category. Later the footages involved in the contribution were determined with a greater degree of accuracy and the parties have stipulated that the Library evaluations, applying the Library's method and conclusions to the more accurate footages, is $8,394,338.

Neither party accepts the Library's evaluation. Plaintiff, however, argues that the Library's appraisal must serve as a floor in determining the value of the property donated to the Library. Defendant contends the Library's evaluation literally was a figure picked out of the air, and that it should be given no weight whatever.

Plaintiff contends that the Library appraisal is an admission by the United States, citing Fed.R.Evid. 801(d)(2)(D) and *Mauldin v. Commissioner*, 60 T.C. 749 (1973). (Library's appraisal was not a "casual statement by an unauthorized Government official" but was a "formal appraisal made by a duly authorized committee" that "may be considered as an admission on behalf of the Government and may be taken into account in making our Findings." *Mauldin*, 60 T.C. at 762.) In *Mauldin*, the court reached its own independent conclusion as to the value of the property there involved on the basis of all of the evidence and assigned a higher value than that of the Library's Evaluation Committee.

■■■ Fed.R.Evid. 801(d)(2)(D) excludes from the category of hearsay an admission by a party opponent that is a statement made by an agent or servant concerning a matter within the scope of the agency and made during the existence of the relationship. The definition in the Rule goes to the admissibility of the statement as substantive evidence. It reflects the theory that admissibility of the statement in evidence is a result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guaranty of trustworthiness is required in the case of an admission. Fed.R.Evid. 801, advisory committee note. In this case, the question of admissi-

bility has no significance; the Library personnel involved in the appraisals testified at length and were cross-examined with vigor. Fed.R.Evid. 806 makes it clear that a statement defined in Rule 801(d)(2)(D) opens the declarant to attacks on his credibility.

■■■ The appraisal made by the Library Evaluation Committee was pursuant to an internal regulation promulgated by the Librarian of Congress, who is an officer of the United States, in charge of an agency of the United States. 2 U.S.C. § 136 (1982). The appraisal was within the scope of the authority granted to the Librarian by Congress. It may be taken into account and it is entitled to consideration on its merits in this case. No statute or decision, however, makes an appraisal of the fair market value of a charitable contribution by the Librarian of Congress legally binding on the I.R.S. or the Department of Justice in the discharge of their executive responsibilities, or on the Tax Court or on this Court in decisions that apply to the provisions of I.R.C. § 170.

The defendant in this tax refund case is the United States. There is only one United States for purposes of the Tucker Act. 28 U.S.C. § 1491(a)(1) (1982). The Federal Government, however, is composed of agencies that exercise various responsibilities as authorized by Congress. Contrary to plaintiff's contention, the Librarian of Congress is not an agent of the Executive Branch. As an officer of the United States, in the administration of the Library of Congress, the Librarian performs functions which may be classified as executive, functions which may be classified in legislative, and even some functions comparable to those of a judicial officer. See *Eltra Corp. v. Ringer*, 579 F.2d 294, 301 (4th Cir.1978). The adoption by the Librarian of the Evaluation Committee's recommended appraisal is not a determination that would preclude other administrative agencies from reaching different values or, in the exercise of those agencies' separate responsibilities, from challenging the Evaluation Committee's methodology.

Congress, in I.R.C. § 170, has authorized deductions to encourage contributions to Governmental and charitable agencies. The Librarian has promulgated rules to facilitate acquisitions of gifts and other contributions by the Library. Congress, however, has made the I.R.S. responsible for the collection of taxes and for determinations of fair market value as that term is used in the Treasury Regulations. 26 U.S. C. § 170(a) (1982), 26 C.F.R. § 1.170–1(c)(1) (1987). Congress has authorized the Attorney General to represent the I.R.S. in contests with taxpayers.

The Commissioner and the Librarian recognize there is a tension between their respective responsibilities on evaluations of materials contributed to charities. On October 17, 1966, the Commissioner and representatives of the I.R.S. met with the Librarian and Library representatives concerned with valuations pursuant to LOC Reg. 315. In this meeting, the Commissioner explained that competition between institutions for gifts of art, manuscripts, business archives, etc., had accelerated with the growing recognition that such gifts can have a value in the donation sense. The I.R.S. explained it had developed procedures which generally provided that institutions receiving donations do not evaluate them for tax deduction purposes; the donor, instead, was advised to get an outside appraisal. The outside appraisal helped to avoid the problem of competition between institutions for gifts. The Commissioner explained that it was difficult for the I.R.S. to ask other institutions not to appraise if a Government agency does appraise, and pointed to the difficult situation that confronted the I.R.S. if it discouraged all other institutions from giving evaluations and they come back with the statement that the Library of Congress makes evaluations and is in competition with them.

The Librarian, during the meeting, emphasized that the Library staff made a constant effort to be objective in appraisals, that the appraisals were only advisory and a guideline, that the Library did not attempt to appraise in advance of a gift, and that no element of competition was involved in a Library appraisal. The product of this meeting essentially was an exchange of views. The Commissioner was unable to convince the Librarian that the appropriate procedure for valuations was one in which only outside appraisals were obtained by donors. The Library continued to appraise materials for donors pursuant to LOC Reg. 315.

The Library's evaluation of the Library Property is flawed in several respects. The Library apparently made its appraisal in advance of or concurrently with the gift. UA signed the Instrument of Gift on November 22, 1969, and the Librarian accepted on November 24, 1969. The Evaluation Committee met on November 12, 1969, and its report is dated November 24, 1969.

The valuation was made on the basis of descriptions on seven schedules. It was made without an examination of the property involved.

The appraisal does not purport to estimate the fair market value of the nitrate picture negatives. The Evaluation Committee believed there was no documented market that could give relative prices of materials analogous to original film negatives. It proceeded on the basis of a constructive price for acquisition of the next most desirable form of the film, an archivally acceptable positive print.

The evaluation attempted to quantify, in terms of dollars, such characteristics as the film's place in cinema history, its possible contribution to sociological and other related research, and its rarity. Values placed on these characteristics inherently are subjective and arbitrary.

The Library evaluation was based upon a variation of the cost method of appraisal. The Evaluation Committee made an estimate of the replacement cost of the original negatives, i.e., the cost of manufacturing fine-grain preservation master positive prints. This cost was estimated at 35 cents per foot, which was increased to 50 cents. per foot on the theory that a negative would be worth more than a print. An additional premium was added on the basis of rarity, historical significance, and artis-

tic quality, to produce calculations in values from 50 cents per foot to $1 per foot. These values were later increased by an additional 10 percent on the basis of completeness in some of the schedules. These additions to the actual costs to make a fine-grain preservation master were completely subjective and arbitrary.

It is clear that the Library evaluation did not appraise the fair market value of the property which UA transferred. The Library's appraisal actually was an estimation of the worth to the Library of its permanent preservation copies. In this case, the deduction under I.R.C. § 170 is concerned with the fair market value of the nitrate negatives, not with the Evaluation Committee's concept of the value of the Library's preservation masters.

*Date of Conveyance*

Defendant argues that UA's donation of the Library Property was not made in 1969, the tax year in suit, and in support contends delivery to the Library was conditioned on the availability of suitable storage facilities. Defendant misconstrues paragraph 4 of the Library Agreement.

The numbered paragraphs of the Library Agreement are preceded by the clause: "Use of said materials shall be subject to the conditions hereinafter enumerated:" The Library could not "use" the property until it was physically transferred. Paragraph 4 provides a time-frame for such transfer.

Paragraph 4 states the property shall be physically transferred from UA's facilities as suitable space becomes available. It specifically provides that, until transferred to the Library facilities, the Library shall, nevertheless, be deemed to be the owner of the property, and that UA shall be deemed to be a gratuitous bailee. The provisions in paragraph 4 that permit transfer of property over a period of time were specifically requested by the Library negotiators.

The donation to the Library was not conditioned on the ability of the Library to obtain storage facilities suitable to UA. The term "gratuitous bailee" was specifically selected by counsel. It reflects the concept that title would shift to the Library

in 1969, and the gift would be completed, at that time, with physical delivery to be delayed pending availability of storage facilities. On November 24, 1969, on the Librarian's execution of the Instrument of Gift, the Library became the owner of the property, subject to the bailment.

*Conclusion*

The tangible property involved in UA's contribution to the Library was a strip of plastic and a photosensitive emulsion that contained the image and sound of a motion picture. The plastic strip and the chemicals in the emulsion are of minimal value. The value and utility of the nitrate negatives are in the intangible rights to the motion picture, not in the physical property of the gift.

UA reserved all of the intangible rights, "including, but not limited to, the rights of commercial exploitation." Nothing that had a commercial value in the motion picture business was included in the gift. The gift to the Library was not made until UA's management was convinced that it did not hamper UA's ongoing operations, did not cause it to lose money, and did not reduce the value of its assets.

■ I.R.C. § 170(a) provides that a charitable contribution deduction may be allowed only if verified under regulations prescribed by the Secretary. The regulations provide that, when a contribution is made in property other than money, the amount of the deduction is the fair market value of the property at the time of the contribution. The term "fair market value" has significance only in the context of commercial activities. It is oriented to commercial markets. If the contribution consists of tangible property that has no recognized value in commercial markets, there can be no deduction under I.R.C. § 170 for its contribution. In November 1969, there was no commercial market in the motion picture business for the physical property, stripped of all intangible rights in the motion picture, in nitrate-stock motion picture negatives.

■ The term "fair market value" in the regulations does not apply to property

in which the values cannot be identified with actual commercial market activity. Values which are not amenable to separate measurement in a commercial market, such as values for archival and historical uses and scholarly research, do not have a "fair market value" for the purpose of a charitable deduction. There was no market in November 1969 in which UA could have sold its nitrate picture negatives, stripped of all intangible rights in the motion picture, for scholarly or archival uses or as historical artifacts. Where no one is willing or able to pay anything for property, its fair market value is zero. Even though a number of archives, museums, or libraries may have prized the nitrate negatives as historical artifacts and for archival and scholarly uses, the Library Property had no fair market value in November 1969.

UA cites case law to the effect that, where unique property is involved, the lack of a market does not bar a determination of value, and a fair market value can be established even in the absence of any comparable marketplace sales. *Paul W. Adams,* 50 T.C.M. (CCH) 48 (1985) (original prototype for Norden Bombsight World War II aviation equipment, donated to National Air and Space Museum—estimated cost method, related to actual market demand for collector's items, used to value); *Nord W. Krauskopf,* 48 T.C.M. (CCH) 620 (1984) (reconditioned, record-holding 1969 Dodge Charger Daytona race car donated to National Motor Sports Hall of Fame—condition after restoration, related to actual transactions in market for collector and antique cars, major element in determination of value). Valuations may be made for unique property or when there is no market that contains comparable sales. The cases cited by UA, however, demonstrate that actual commercial market activity must be present with respect to the property related to the donation so as to permit a reasonable estimate of value. The Norden Bombsight prototype and the racing car were separate and distinct items of property, and were complete objects in themselves. Factually, the characteristics of these items are not analogous to the characteristics of the nitrate picture negatives transferred to the Library.

▇ Of the archives, museums, universities, and libraries that possibly could be active in a market for preprint materials, only the Library and Eastman House purchased nitrate film. In November 1969, neither of these organizations had the facilities to store or the money to purchase the volume of nitrate film that was in UA's inventories.

UA's management made the contribution to the Library (1) with the intention of realizing a tax benefit for a charitable contribution, (2) with the intention that nothing be given that would impact on UA's commercial exploitation of motion pictures, and (3) with the intention of retaining for the future the right of access to the negatives and to the Library's preservation copies. There was no intention to transfer to the Library any physical property that had a value to UA in its commercial operations.

In the transfer of the Library property, the benefit received by the Library was the right to make preservation copies of the nitrate negatives. This benefit brought with it substantial expense to the Library for care and maintenance, and in the costs of copying. The benefits received by UA were (1) continued access for its commercial interests to both the physical property in the nitrate negatives given and access to the Library's preservation copies, (2) relief from the costs and potential liability for the storage, maintenance, and care of nitrate negatives. Benefits to UA were substantial, and were sufficient to provide UA with a *quid pro quo* for the transfer. These benefits to UA, accordingly, effectively destroyed the charitable nature of the transfer.

UNIVERSITY PROPERTY

UA's gift of the University Property was initiated and was well underway before the formal documents were completed. Negotiations with the University started in February 1968 and deliveries commenced on August 27, 1968. By the time the University Regents formally accepted the Deeds of Gift, on December 12, 1969, the University

had received eleven shipments that contained more than 864 cartons of materials.

The November 6, 1969, Deed of Gift conveyed title to materials described in 25 specified schedules. The November 26, 1969, Deed of Gift added materials described in three specified schedules. The schedules that were attached to the Deeds of Gift for the most part were not prepared by UA for the purposes of the conveyances. Such schedules had been prepared by UA, or a predecessor in title, in the regular course of UA's business. The parties stipulate that all of the schedules respecting films basically were accurate except for Schedules C–5 and C–6 (Warner Brothers short subjects), and there inaccuracy primarily was attributable to changes in the names of short subjects after Warner Brothers had prepared its original inventory records. With respect to materials that were listed but not delivered, or delivered but not listed, UA and the University intended the Deeds of Gift would cover all materials that actually were delivered by UA.

The physical quantities involved in the various categories of materials conveyed to the University are exceedingly large. At the time the conveyances were executed, neither UA nor the University was aware of the exact quantities involved, and no item-by-item appraisal had been made, nor, in the time available, could be made.

The University Property consisted of materials from United Artists; Ziv Television Programs, Inc. (Ziv–TV); Associated Artists Productions Corp., consisting of Warner Brothers Film Library (WB), the Monogram Film Library, and the Popeye Cartoon Film Library; and RKO Radio Pictures, Inc., consisting of (1) television distribution rights in the RKO Library in the United States (excluding certain named markets), and (2) positive prints of the films in the RKO Library. The University Property, organized by source company, according to the stipulation of the parties which was based on the schedules attached to the Deeds of Gift and the University's subsequent inventory, is set forth below.

*United Artists*

Schedule A–1:

Corporate and financial records of UA and Eagle Lion Classics, Inc., and legal files of the law firm of O'Brien, Driscoll & Rafferty, relating to its representation of UA from 1919–1950. The materials included records dealing with the financing, construction, copyright, production, distribution, and exhibition of 582 UA films and 164 Eagle Lion films; substantially complete financial records of all domestic and foreign gross and net receipts for individual films, and for particular years of UA operation, a set of UA financial journals and ledgers and consolidated balance sheets for the period 1919–1951. Approximately 9 percent of the materials consist of the records of the Eagle Lion company, and 36 percent consist of the legal files of O'Brien, Driscoll & Rafferty. The 164 Eagle Lion films are approximately 22 percent of the total 746 films involved.

Schedule A–2(A):

Linen-backed still photographic prints relating to UA films—87,081.

Linen-backed still photographic prints of UA stars (unscheduled)—4,695.

Schedule A–2(B) and A–8:

Pressbooks of UA, Eagle Lion and Film Classics films—547.

Schedule A–3:

Still negatives relating to UA films—104,677; still photographic prints—434; plus still negatives for UA and other feature films (unscheduled)—12,249.

Schedule A–4:

Music cue sheets relating to UA feature films—457.

Schedule A–6:

"Algiers" 16mm acetate print (black and white).

Schedule A–7:

"Algiers" production file.

(Unscheduled):

36 scripts and related materials for 33 feature film releases.

*Ziv–TV*

Schedule B–1:

Original 35mm acetate negatives of 2,229 Ziv television series episodes.

Schedule B–2:

Positive prints on 16mm acetate film of 2,229 Ziv television series episodes.

Schedule B–3:

Scripts for approximately 3,300 Ziv television episodes, from 67 different series. Also scripts from unproduced episodes, outlines, and dialogues, and 23 boxes, containing approximately 300 separate files of contracts and production files for Ziv television episodes.

Schedule B–4:

Still photograph prints relating to Ziv television episodes—48,218.

Still negatives relating to Ziv television episodes—21,244.

*Warner Brothers Film Library*

Schedule C–2:

Exhibition prints on 16mm acetate film of 54 WB silent feature films.

Schedule C–4:

Exhibition prints on 16mm acetate film of 806 WB sound feature films—782 titles in black and white and 24 titles in color.

Schedule C–6:

Exhibition prints on 16mm acetate film of 1,507 WB short subjects—603,598 feet in black and white and 5,086 feet in color.

Schedule C–8:

Exhibition prints on 16mm acetate film of 337 WB cartoons—34 titles in black and white and 303 titles in color.

Schedule C–13: Written materials relating to WB:

(i) Script material relating to 803 WB sound feature films, consisting of 194 novels, 168 plays, 1 playscript, 127 short stories, 63 comments, 51 plot summaries, 40 research items, 1 story idea, 155 story outlines, 612 treatments, 4 revised treatments, 651 screenplays, 653 temporary scripts, 301 revised temporary scripts, 781 final scripts, 294 revised final scripts, 32 reader synopses, and 15 post-production items.

(ii) 784 dialogues, 511 feature film title lists, 415 trailer title lists and 205 spotting sheets relating to 792 WB sound feature films.

(iii) 799 contracts as well as copyright records and related materials relating to 1,308 WB sound and silent feature films.

(iv) Script material relating to 327 WB short subjects, containing on average more than two items per title.

(v) 590 dialogues and 478 title lists relating to 611 WB short subjects, as included in University series 8.3.

(viii) Music licenses for features, short subjects, and cartoons in the Warner Brothers Library.

(ix) More than 800 folders of original, signed personal service contracts and related materials relating to WB short subjects.

Schedule C–14:

Still negatives re WB feature films—18,038.

Still negatives re WB cartoons (unscheduled)—161.

Schedule C–15:

Publicity material re 271 WB silent feature films, including pressbooks for 136 films and miscellaneous material for 198 films.

Schedule C–16:

Pressbooks for WB sound feature films —792.

Schedule C–19:

Still negatives of Humphrey Bogart—895.

Schedule C–20:

Still negatives of John Wayne—16.

Schedule C–21:

Still negatives of WB stars—7,742.

Schedule C–22:

Still negatives of WB stars—41,611.

*Popeye Cartoon Film Library*

Schedule C–10:

Exhibition prints on 16mm acetate film of 229 Popeye cartoons—29,076 feet in black and white and 28,444 feet in color.

Schedule C-13(vii):

460 dialogues relating to WB and Popeye cartoons.

### Monogram Film Library

Schedule C-12:

Exhibition prints on 16mm acetate film of 187 Monogram sound features—429,-660 feet in black and white.

Schedule C-13(vi):

Dialogues relating to 149 Monogram feature films.

Schedule C-17:

Pressbooks re Monogram feature films—75.

Schedule C-18:

Still negatives re Monogram feature films—6,321.

### RKO Library

Schedule D-1:

Exhibition prints on 16mm acetate film of 707 RKO sound feature films, with use limited to television broadcasting for educational purposes over the facilities of the University's television station, WHA Channel 21, and to study on the University's premises by researchers engaged in serious research.

Conveyance of the materials to the University did not deprive UA of any item useful in its commercial business. UA retained duplicates, microfilm copies, or the ability to duplicate all items. UA did not convey the original UA corporate minutes included in Schedule A-1; a microfilm was given to the University. UA retained (a) a microfilm copy of UA, Warner Brothers, and Monogram pressbooks (Schedules A-2(B), A-8, C-15, C-16, C-17), (b) a microfilm copy of the Warner Brothers production file (Schedule C-13), (c) a duplicate copy (if one existed) of certain Warner Brothers dialogue continuities and synopses (Schedule C-13), and (d) a duplicate copy (if one existed) of television series scripts (Schedule B-3).

As with the Library Property, UA's management intended and believed that the conveyance of the University Property would not result in any material diminution of the value of the company's assets or adversely affect UA's contemplated future commercial exploitation of the motion pictures involved. Following the physical delivery of the University Property, UA continued to exploit commercially the motion pictures to which the property related, using retained preprinted material and retained or new prints for the same movies. UA's subsequent parent (Metro-Goldwyn-Mayer Film Company) continued to exploit the commercial rights to the motion pictures.

 The value of a charitable contribution made in property other than money is determined by its fair market value at the time of the contribution. The lack of value to the donor, or the value to the donee, is not determinative as to the deduction allowable. These values, however, are factors to be considered in the overall assessment when fair market values are illusive or inconclusive.

 Plaintiff's assessment of the University Property accords additional values based on completeness. The magnitude and diversity of the University Property makes it susceptible to division into smaller components, based on time intervals or subject matters. Dr. Fielding doubled the value of the Eagle Lion files over a "comparable" on the ground that they represented a full corporate picture of a motion picture company during a short three-year period in which it released 164 films. With respect to the 139,994 still prints (positive photographs) and the 212,954 still negatives included in the University Property, plaintiff supports a $1,450,893 valuation by its expert's contention that the collection of still photographs is "one of the most complete and comprehensive collections known to exist," and that its overall scope gives the collection "an integrity" matched by very few other corporate collections of motion picture studios. Similar arguments are made as to completeness of the WB sound feature pressbooks, scripts, and pro-

duction files. Plaintiff argues that a premium for completeness is justified because Dr. Fielding was not merely evaluating a large quantity, he was valuing a complete set.

A premium for completeness in the University Property fails to recognize the circumstances under which most of the materials were accumulated and the reasons they were stored and retained. Although the vastness of the body of material conceivably is a lode from which a number of collections integrated as to subject matter could be selected, such organization had not been done in November 1969, nor when plaintiff's experts made their appraisals.

All of the donated items constituted items that had been used in UA's trade or business, or the trade or business of a predecessor in title. The preprint materials, promotional materials, legal files, scripts, music cue sheets, and other production records all were tools used to produce or promote exhibition prints. Once the exhibition print was completed, released, and exploitation exhausted, these working files were sent to storage. Further use was contingent on uncertain future needs. Storage conditions were those suitable for materials in which for commercial purposes little present or future value was perceived. In short, the University Property was made up of the residue that is the natural accumulation of items for which retention no longer has a business justification.

The Warner Brothers Library files were acquired in 1956. At that time they contained the preprint materials, production and legal files, scripts, pressbooks, stills, still negatives, and other nonfilm materials with respect to films that then remained in the possession of Warner Brothers. Between its acquisition in 1956 and the donation in 1969, materials in the Warner Brothers Film Library were subject to such transfer and cannibalization as the conduct of UA's business found convenient. Inventory forms used in record keeping were subject to change. At the time of the donation, the inventory forms were inaccurate and incomplete. The inventories in the schedules attached to the deeds of gift did not accord with the property the University in fact received, and these deficiencies remained to be corrected after delivery was made to the University.

The University Property involved materials subject to haphazard storage from 1913 through 1969 by the variety of separate companies that UA acquired over the years. Different filing systems were used and the filing systems were subject to change over the course of years. As a result, in 1969, the schedules selected for the deeds of gift did not represent an itemization of materials that were preserved because they represented complete coverage of the subjects involved.

Any premium for completeness must be rejected. The University Property did not represent a collection of selected materials deliberately acquired and organized for the purpose of completeness, or for their historical value, importance as an artifact, or for scholarly research.

Plaintiff also contends that additional amounts should be allowed on the basis of "synergistic value." This premium for "synergistic value" is different and separate from a premium for a complete collection. In his appraisal of the 16mm exhibition prints of Warner Brothers sound features, David Shephard, plaintiff's expert did not add a value for completeness. He applied a value-added factor to give effect to an alleged extra value that accrued to each Warner sound feature at Wisconsin due to the availability of related documentation. This "synergistic value" was derived from the concept that the University possessed a unique resource in the availability of Warner Brothers sound films side by side with related treatments such as screenplay drafts, finished scripts, contracts, stills, and other documents. The value-added factors (2.21594 for classics and 1.33 for lessers) were derived from comparisons of catalogue prices of five producers of 16mm educational films. Two producers sold only a package of materials, one of which was a print; the three other producers only sold separate prints. The higher price for the package was con-

sidered to be measure of the synergistic value of the non-film materials in the package.

On the facts, application of a value-added factor for the WB sound films in the University Property is not reasonable. Any items in the University Property that might relate to the WB sound films were not donated or assembled as a package designed to provide an integrated study vehicle. Any such relationship is fortuitous and at best haphazard. Application of a value-added factor to the sound films for the related material, and at the same time to independently value the related items with a premium for completeness, results in an impermissible massaging of the numbers.

### Ziv Original 35mm Negatives

■ Defendant concedes that there was a gift to the University within the meaning of I.R.C. § 170 as to all of the University Property, except the original 35mm acetate negatives of the 2,229 television episodes produced by Ziv–TV and listed in Schedule B–1. Defendant's challenge to the gift character of these negatives is based upon UA's retention of all rights for commercial exploitation of the films, together with the retained right of access to the negatives for printing purposes. Retention of these rights, when considered with the University's obligation to store and maintain with appropriate temperature and humidity controls, and UA's conclusion that their conveyance would not reduce the value of its assets or hamper future operations, is the basis for defendant's conclusion there was no gift, but merely an agreement respecting use and disposition of the negatives.

The retention of rights for commercial exploitation and for access to the 16mm exhibition prints, scripts, still photographs, and the other items of the University Property were identical to the reservation applicable to the original 35mm negatives. As to the other items, however, defendant concedes that the reservations qualify as minimal restrictions within the standards of *Lawrence v. United States*, 75–1 U.S.T.C. (CCH) ¶ 9230 (1974). The television 35mm negatives have no characteristics that

would distinguish them from other items of University Property in the application of the "minimal restrictions" standard.

The Ziv–TV original 35mm negatives, moreover, have qualities that enforce their eligibility as a gift. Unlike the nitrate negatives given to the Library, the television negatives were on acetate film, would not self-destruct over time, and did not require explosion-proof storage facilities. Properly stored, the physical film and the motion picture image thereon would last indefinitely. The University obtained materials that contributed to its establishment as a national archive in the entertainment field. For the foregoing reasons, defendant's contention that there was no gift within the meaning of I.R.S. § 170 as to the Ziv original 35mm negatives is rejected. Plaintiff's expert valued the Ziv 35mm negatives at $3,036,915. Defendant did not present an appraisal of these items. The parties agree that depreciation recapture on the Ziv 35mm negatives would be $505,603.

### Date of Completion

■ When UA discovered in late 1969 and in 1970 that it did not possess suitable used copies for all of the 16mm exhibition prints of its movies that were listed in the schedules, it had new prints copied. Deliveries of the new prints were completed in 1970 and 1971. Defendant apparently concedes that the gift was completed in 1969 as to all other items of the University Property.

Defendant contends, however, that the new copies of 16mm exhibition prints printed and shipped after 1969 were not part of the 1969 gift. Defendant views the making of copies as the manufacture of new property and argues that a taxpayer cannot be considered to have delivered a property, either constructively or actually, if the property did not even exist during the tax year. Defendant states that, in 1969, UA did not possess the actual property embodied in the new prints and that the gift must be claimed in the tax year in which the prints came into existence and the donation was actually made. Defendant also attacks, on both substantive and procedural grounds, plaintiff's alternative contention

that, under I.R.C. § 170(a)(2), it is entitled to a deduction for 16mm print footage actually delivered by March 15, 1970.

The parties have stipulated the items that were copied and shipped after December 31, 1969. There are no facts available, however, from which to determine which of the items were delivered by March 15, 1970, and which were delivered thereafter. Nor does the record specifically identify the titles for each of the 16mm prints that were copied after December 31, 1969. Defendant calculates that the fair market value of the 16mm prints that were delivered after 1969 was approximately $45,405.

Defendant's objection ignores the facts. In the negotiations, and in the deeds of gift, UA and the University intended the gift to include 16mm exhibition prints of all of the movies in UA's library (Schedules A–6, C–2, C–4, C–6, C–8, C–10, and C–12). In 1969 UA owned preprint material or prints for every motion picture included in the gift. All production had been completed years before 1969. The making of copies was not the manufacture of new prints that UA was not obligated to provide. The gift was completed, for purposes of I.R.C. § 170, on execution and acceptance of the Deeds of Gift. The instruments, by their terms, clearly and unmistakenly announce a present transfer of the materials that comprise the University Property, and were effective to give the University the rights to possession. *Greer, supra.*

The fact that the University, at the time the gift was completed, was unable to take possession in no way diminishes its right to possession, the transfer of title, or the completeness of the gift. UA held the materials that were shipped subsequently merely as a gratuitous bailee.

For purposes of determining eligibility for a charitable contribution deduction for the 16mm prints, the donation was completed in 1969 with the transfer of title of the 16mm prints to the University. The fact that UA had some on hand in print form and others only in preprint form during 1969 does not determine when the gift was completed. The controlling facts are that the product existed in 1969, that the gift

was completed in 1969, and that in 1969 title had passed and UA was obligated to physically deliver prints as soon as the University wanted them. *See Speelman v. Pascal,* 10 N.Y.2d 313, 222 N.Y.S.2d 324, 178 N.E.2d 723 (1961).

VALUATION WITNESSES

Plaintiff's evidence includes the reports and testimony of four experts in the motion picture field and the testimony of two experts on valuation generally. Defendant's valuation evidence included the testimony of two experts, the report of one of these experts, and the testimony of two fact witnesses on the marketing of motion picture memorabilia.

Plaintiff's motion picture experts had been associated with AFI or with UA. They were:

1. Dr. Raymond Fielding: Professor of Communication and Director of the School of Communication, University of Houston. His career includes Trustee, AFI; Trustee, University Film and Video Foundation; and principal organizer of the U.C.L.A. motion picture archive.

2. Robert Cushman: Career includes Photograph Curator and Coordinator of Photographic Services at Herrick Library of the Academy of Motion Picture Arts and Sciences, consultant to Directors Guild of America, research fellow at AFI.

3. David Shephard: Career includes business experience in sale and rental of feature films and shorts with Contemporary Film and Brandon Films, and Vice President of Black Hawk Films, a distributor of vintage films to individual customers; academic experience on faculties of U.C.L.A. and U.S.C.; service as an archivist at AFI and Special Projects Officer for Directors Guild of America.

4. Erwin Ezzes: Formerly Chairman and CEO of United Artists Television, Inc.

Plaintiff's experts on general valuation matters possessed well recognized qualifications. These experts were:

1. Roger J. Grabowski: National Director of Valuation Services, Price Waterhouse. He was recognized by the court as an expert on valuation procedures and evaluation of media and entertainment properties.

2. Patrick J. Rohan: Dean of St. John's University School of Law. He was recognized by the court as an expert on valuation methodology, in condemnation procedures, and in the field of gifts and donative transfers.

Defendant's experts each had long term associations with the I.R.S.:

1. Malcolm Willits: Business experience as a dealer in film memorabilia and partner in Collector's Book Store, Inc., a retail store in Hollywood. He was retained by the I.R.S. to appraise all nonfilm materials in the University Property. Accepted as an expert appraiser in the field of motion picture memorabilia without voir dire.

2. Michael Weinberg: An experienced appraiser employed by the I.R.S. since 1976. He was recognized as an expert in the field of valuation methodology and in the valuation of motion picture film.

Defendant's fact witnesses, in addition to the testimony of Malcolm Willits, were:

1. Edward Brandt: Dealer in motion picture memorabilia, operates Eddie Brandt's Saturday Matinee, a small retail memorabilia store that has been active in North Hollywood, California, since 1968.

2. Jerry Ohlinger: Collector and since 1970 a dealer in motion picture memorabilia. President of Jerry Ohlinger's Movie Materials Store, Inc., a small retail store in the Greenwich Village area of New York, New York, selling principally to collectors.

Each of defendant's fact witnesses testified he had been engaged on a daily basis in the process of buying and selling the same type of movie memorabilia that UA gave the University. Some materials, i.e., original still prints, scripts, and pressbooks, contained items that were identical to those in the University Property.

As is typical in litigation that involves battles by experts in analysis of complex matters, the information provided by the motion picture industry valuation witnesses of both parties was skewed to advance the objectives of their respective clients. Plaintiff's expert witnesses resolved valuation issues so as to maximize the dollar value of the contribution; defendant's witnesses, on the other hand, attempted to satisfy I.R.S. and Department of Justice interests to deny or at least minimize the allowable deduction. These recognized but seldom articulated characteristics repeatedly are made manifest in the record of this case.

Each party vigorously attacked the credibility of the opponent's experts and their opinion analyses. Both have reasonable support for the challenges. As a result, although each of the valuation witnesses testified forthrightly and provided information and analysis well within the scope of discretionary bounds on valuation issues, their recommendations as to dollar values must be adjusted substantially to correct for pro-client bias.

Dr. Fielding initially was retained by UA to value all of the Library Property and all of the University Property. Information on market data was developed during the extended period the charitable contributions issue was in trial, however, that caused plaintiff to substitute and proffer appraisals of other experts as to the values of 16mm motion picture exhibition prints, still photograph positive prints, and still photograph negatives. These materials were deleted from Dr. Fielding's appraisal report and his testimony was so limited.

Plaintiff proffered Dr. Fielding's valuation for the following categories of University Property:

—Corporate and financial records and legal files (Schedule A–1)

—Pressbooks and promotional materials (Schedule A–2(B), A–8, C–15, C–16, C–17)

—UA music cue sheets (Schedule A–4)

—"Algiers" production file (Schedule A–7), Warner Brothers Library files

(Schedule C–13), and Ziv–TV scripts (Schedule B–3)

—Ziv–TV original 35mm negatives and 16mm projection prints of television episodes (Schedules B–1 and B–2).

Defendant points out that the valuation of the Ziv–TV 16mm prints was not an appraisal of fair market value by Dr. Fielding. Instead, the television prints were valued at one-half the fair market value that had been established by Mr. Shephard for Warner Brothers movie prints. Admittedly this procedure was done on instructions from plaintiff's counsel.

Dr. Fielding used market information from catalogues of two retail dealers to appraise the script files of WB sound features, Larry Edmonds Bookshop (Los Angeles) and Cinemabilia Bookshop (New York, New York). Defendant criticizes the appraisal on the ground that Dr. Fielding "blindly relied on" asking prices rather than actual sales prices, and that he disregarded the fact that the WB script files contained drafts, treatments, and screenplays (of 3,302 scripts only 787 were final scripts) and were not comparable to the final scripts listed in the catalogues.

Defendant's heaviest criticism is leveled at Dr. Fielding's opinions, described as "the most fanciful," on the value of nonscript materials in the WB files. These WB related records in the University Property consist primarily of story acquisition agreements, correspondence, and personal service contracts that came from WB's story purchase department. They are preproduction records; they do not include any documents that relate to actual production of the motion pictures. The production files for the same WB motion pictures were donated to, and are located at, the University of Southern California (U.S.C.). The distribution records for the WB motion pictures were given to, and are located at, Princeton University. Research on production and distribution of old WB motion pictures must be done at U.S.C. and Princeton.

Dr. Fielding's appraisal of the WB related records was an estimate projected from the purchase for $4,125 by the University of Iowa in 1966 of the Cohen Collection. The Cohen Collection consisted of a large group of materials that included: (1) preproduction records relating to story acquisitions and negotiations with talent for 27 Universal Studio motion pictures, (2) complete production files for each of these 27 motion pictures, (3) sets of scripts, final and draft, for each of the 27 motion pictures, (4) scripts for many additional motion pictures and television programs, plus additional story outlines and synopses, (5) still photographs, and (6) personal business correspondence. The contents of the Cohen Collection is listed in a 32–page inventory that is considered to be generally correct. It was prepared by the Iowa Library staff after Dr. Fielding left.

Dr. Fielding's analysis for the value of records related to 1,308 script files for WB features was premised on the following: (a) the $4,125 purchase price of the Cohen Collection was allocable entirely to the production records for the 27 Universal Studio features, (b) the related records in each of the 1,308 script files for the WB features were comparable in quality and value to the content of each of the 27 production files in the Cohen Collection, and (c) since the 1,308 WB files were 48 times the 27 Cohen Collection files, the WB script-related files, adjusted for 1969 inflation over 1966, would be worth $218,976.

This analysis does not take into account, or assign any value to, materials in the Cohen Collection in addition to the 27 production files. More importantly, the related records in the WB files did not contain a counterpart to the 27 production files in the Cohen Collection. A research of that kind of information about the WB features could not be done at Madison, the researcher would have to go to U.S.C.

Plaintiff's appraisal of the value of the still photograph prints and still negatives in the University Property was done by Robert Cushman. Defendant contends that Mr. Cushman demonstrated an "unbelievable lack of familiarity" with this property,

and that "One can only wonder where in the world Mr. Cushman acquired his information" concerning the prevailing retail prices for still prints of a popular star. Mr. Cushman was instructed by plaintiff's attorneys not to consider any market transactions except sales in the retail market made to ultimate consumers. Mr. Cushman hypothesized a market in which UA still prints would be sold out of a retail store at a good location over a period of approximately three years. It is extremely doubtful that all of the 139,994 still prints in the University Property could be marketed at retail in three years.

Plaintiff's criticism of defendant's valuation evidence is scathing. Plaintiff points out that Messrs. Brandt and Ohlinger were shopkeepers in the "lowest portion" of the 1969 market for stills, their wares were "junk stills," and that all of defendant's fact witnesses had great concern that they did not have "good legal title" to the stills, posters, scripts, and other material they acquired and resold. Plaintiff emphasizes that defendant never offered Messrs. Brandt and Ohlinger as expert witnesses, although defendant contends they have "specialized knowledge," and that they were not recognized as qualified to render opinion evidence on values. Neither of these fact witnesses had ever examined any of the donated University Property.

Plaintiff requests that the report and testimony of defendant's expert on nonfilm University Property, Malcolm Willits, be disregarded completely. First, it is alleged that Mr. Willits had a "predisposition to find low values" for the I.R.S. even before he examined the property, and that he has a "hostility" to charitable deductions that is documented and has caused other courts to refuse to follow his evaluations. Second, plaintiff contends Mr. Willits' testimony reflects a "lack of candor" and was "demonstrably false" regarding an offering in 1971 of scripts to a number of universities. Plaintiff also points out that Mr. Willits gave incorrect or incomplete testimony regarding pornography offerings in his store, and he has specifically admitted he "in fact" is willing to find different fair market values on the same piece of proper-

ty depending on the purpose of the appraisal—i.e., for insurance purposes or for tax benefits (ten times higher).

Defendant presented the testimony of Michael Weinberg, an appraiser employed by the I.R.S., to calculate the fair market value of the copies of 16mm exhibition prints included in the University Property. Mr. Weinberg's testimony was based upon analysis of the report and deposition transcript of David H. Shephard, plaintiff's expert, examination of the records of Dominant Pictures Corp. (Dominant), a UA subsidiary, and the transcripts of Stanley Stark, a UA employee at Dominant at deposition and trial. Mr. Shephard appraised the 16mm exhibition prints at $399,356; Mr. Weinberg appraised them at $145,323. Plaintiff contends that Mr. Weinberg's appraisal "should be accorded no weight whatsoever."

Plaintiff points out that Mr. Weinberg, in fact, did not actually perform an appraisal, but merely performed a mathematical analysis of a limited and flawed data base. Mr. Weinberg's report was never reduced to coherent form and was not offered into evidence. Plaintiff further emphasizes that Mr. Weinberg has no personal experience in marketing motion picture prints, has no independent knowledge of the market, and did no independent investigation of the market. The Stark transactions on which Mr. Weinberg relied, according to plaintiff, included irregular and inconsistent price variations. Plaintiff points out that Mr. Stark was not authorized to set prices for film leases and that his primary function at Dominant was in accounting. Mr. Stark's sale or lease of 16mm prints required less than one hour per day. The entire business involved in the Stark transactions had a gross income of less than $50,000 per year.

*Valuation Categories*

For valuation purposes, each party organized the University Property into categories that contained one or more of the schedules that had been attached to the Deeds of Gift. In their final presentations, neither provided a separate valuation for

each schedule individually, and, in each, the categories of property were differently arranged. Plaintiff organized the appraised materials into eight categories, as follows:

(1) Corporate files and records (Schedule A–1).

(2) Still photographic prints and negatives (Schedules A–2(A), A–3, B–4, C–14, C–18, C–19, C–20, C–21, and C–22).

(3) Pressbooks and promotional materials (Schedules A–2(B), A–8, C–15, C–16, and C–17).

(4) UA music cue sheets (Schedule A–4).

(5) WB 16mm prints and "Algiers" 16mm print (Schedules A–6, C–2, C–4, C–6, C–8, C–10, and C–12).

(6) "Algiers" production file, WB Library files, and Ziv–TV scripts (Schedules A–7, C–13, and B–3).

(7) Ziv–TV original 35mm negatives and 16mm exhibition prints (Schedules B–1 and B–2).

(8) Broadcast rights in Madison, Wisconsin, to 707 RKO sound feature films (Schedule D–1).

Defendant organized the appraised materials of the University Property into six categories, as follows:

(1) Ziv–TV original 35mm negatives (Schedule B–1).

(2) WB 16mm prints and "Algiers" 16mm print (Schedules A–6, C–2, C–4, C–6, C–8, C–10, and C–12).

(3) Ziv–TV 16mm exhibition prints (Schedule B–2).

(4) I.R.C. § 1221(3) property (Schedule A–1, A–2(A), A–2(B), A–3, A–4, and A–8).

(5) Nonfilm memorabilia:

(a) Still prints (Schedule A–2(A) and B–4).

(b) Still negatives (Schedules A–3, B–4, C–14, C–18, C–19, C–20, C–21, and C–22).

(c) Movie script materials and related records (Schedules A–7, B–3, and C–13).

(d) Television scripts and production files (Schedule B–3).

(e) Pressbooks (Schedule A–2(B), C–15, C–16, and C–17).

(f) Music cue sheets (Schedule A–4).

(g) Corporate records (Schedule A–1).

(6) Broadcast rights in Madison, Wisconsin, to 707 RKO sound feature films (Schedule D–1).

Defendant concluded that the fair market value of certain categories did not exceed the amount of depreciation recapture allowable to that property, and, for that reason, no deduction is allowable. On this basis, defendant would deny a deduction to the following:

(1) Ziv–TV 16mm exhibition prints.

(2) Ziv–TV still prints.

(3) Ziv–TV still negatives.

(4) Ziv–TV scripts.

(5) Ziv–TV production files.

 The parties agree that UA's corporate records and the legal files of O'Brien, Driscoll & Rafferty constitute property described in I.R.C. § 1221(3), and that no deduction for those items is allowed. The corporate files of Eagle Lion are not Section 1221(3) property, and the parties agree that the Eagle Lion records comprise approximately 9 percent of all of the records in Schedule A–1. Neither party separately appraised the Eagle Lion files. Dr. Fielding assigned a value of $252,096 to all of the records in Schedule A–1, and allocated 22 percent to the Eagle Lion films involved. An allocation on the basis of volume (9 percent) is more reasonable in view of the substantial questions as to the content and coverage of the files in Schedule A–1. Such an allocation produces a value of $22,689 for the Eagle Lion files.

Defendant contends that some of the UA still photographs, both prints and negatives, UA pressbooks, and UA music cue sheets are disqualified because they are "self created" property. Defendant concedes that none of the scripts UA donated were produced by or for UA. Plaintiff argues that the still negatives, still positives, music cue sheets, and pressbooks are artistic compositions and, therefore, are eligible for deduction. Starheads and key books (scene photographs) are said to be artistic compositions in themselves, and

pressbooks and music cue sheets are said to be compilations of artistic compositions.

Defendant acknowledges that some of the photographs qualify as artistic compositions. Defendant's principal argument is that material regularly used to promote and advertise motion pictures, such as the pressbooks, or tools for effective exploitation, such as music cue sheets and key book pictures, are business records and are not artistic compositions. The use of artistic property for such purposes does not strip them of their artistic qualities. Accordingly, defendant's contention as to the I.R.C. § 1221(3) property is rejected.

*Markets*

The major cause of the wide disparity between defendant's total allowable deduction of $56,451 for the University Property, and plaintiff's final claimed deduction (after allowing for depreciation recapture) of $5,023,228, is the market each party used to estimate the fair market value as of November 1969 of the scheduled materials. What the fair market value of property is at a given time is a question of fact to be resolved from a consideration of all of the relevant evidence in the record. Where there is a demonstrated market for an item, the proper market for valuation purposes is a question of fact. *Anselmo v. Commissioner*, 757 F.2d 1208, 1213 (11th Cir.1985). I.R.C. § 170 and the regulations thereunder are silent as to the market to be used to determine the value of donated property. Plaintiff contends that the relevant market for the University Property is retail sales to ultimate consumers. Defendant argues that the proper market for 16mm exhibition prints is found in sales by UA's subsidiary, Dominant, and for non-film memorabilia in sales to dealers, some of whom operate retail stores.

Plaintiff cites federal estate and gift tax regulations for guidance to a definition of an appropriate market and relies upon the decision in *Anselmo* as support for its contention. As the court in *Anselmo* opined, the same classic standard for measuring fair market value applies in both estate and gift tax and the charitable contribution contexts—a price struck by a willing buyer and a willing seller, neither being under a compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. *Anselmo*, 757 F.2d at 1214.

On its facts, *Anselmo* does not hold that the appropriate market for the items at issue there were retail sales to consumers. That case involved the donation of 461 large, low quality, unset Bolivian gems to the Smithsonian Institution. The taxpayer claimed a charitable contribution deduction based on a fair market value for finished pieces of jewelry sold in a retail jewelry store. The I.R.S. experts valued the gems on the assumption that the 461 gems would be sold together to a single jewelry manufacturer or retailer who would use them in the manufacture of finished pieces of jewelry. The Tax Court concluded that the I.R.S. experts were correct in assuming that the gems would be marketed to retailers and jewelers for further manufacture into finished pieces, and that the stones should be valued with reference to the price paid by jewelry manufacturers. The court rejected the contention that the gems would be sold as a group, at a substantial discount, rather than individually. The Eleventh Circuit affirmed.

With respect to the donor's argument that the estate tax test that fair market value is to be determined in a market "in which such item is most commonly sold to the public," the court stated (*Anselmo*, 757 F.2d at 1214):

> ... The major flaw in this argument, as the Tax Court pointed out, is that the "public" refers to the customary purchasers of an item. The most appropriate purchaser of an item is not invariably the individual consumer.

*Anselmo* does not support plaintiff's contention that retail sales to ultimate consumers constitute the appropriate market for the University Property. As to the question in this case of whether the proper market would be sales of individual items, or package sales to dealers or institutions, *Anselmo* provides no guidance because the facts are substantially different. There is little comparison between sales of 461 low quality, unset gems, that require extensive

further distribution and manufacture, and the sale of the multitude of 16mm motion picture prints, still photographs, and other records that have been retrieved from dead storage and make up the University Property.

In the motion picture industry, there are markets in which the film and nonfilm materials that constitute the University Property are bought and sold. Collections of motion pictures on 16mm film are assembled by private collectors through purchases from other collectors or from the retail outlets of dealers. Private collectors sell 16mm motion picture films to other collectors, to dealers, and to colleges or other institutions interested in motion picture history.

Until mid–1966, UA's subsidiary, Dominant, leased, on unsolicited orders placed by the general public, used 16mm prints of its motion pictures for the "Life of Print" which meant that the recipient of the print could keep in indefinitely. UA also made new 16mm exhibition prints available to certain film distributors for the "Life of Print," or on seven-year leases. The distributor was permitted to rent the print to noncommercial parties (schools, colleges, film societies) that did not charge for exhibition of the motion picture.

The standard price at Dominant of a used print of a feature length motion picture was $125. UA normally charged its distributors who rented to noncommercial parties from $225 to $500 for a black and white print, $540 to $800 for full length color features, and from $18 to $60 for cartoons (some in color).

Dominant on occasion also would accept unsolicited orders from the general public for new exhibition prints. The prices of these new exhibition prints ranged from $150 to $400 per feature length black and white print, and up to $500 for a feature length color print.

During the 1960's, there were approximately 15 to 20 business organizations that dealt in nonfilm motion picture items like those in the University Property—still prints and negatives, scripts, screenplays, pressbooks, key books, music cue sheets, production files, and other documentary memorabilia. These dealers, some of whom operated retail stores and solicited business through catalogues, in the main were located in the New York or Los Angeles areas. Many of these businesses typically were small in size and located in transitional, low-rent areas. Such dealers filled a niche in the motion picture business in which the major producers and studios were not interested.

Sales of individual items of 16mm prints and nonfilm memorabilia to ultimate consumers normally would be through the retail outlets of dealers. Some individual sales could occur in direct transactions between private collectors. In either case, the number of items involved in any particular transaction would be very small. Plaintiff's expert for appraisal of still photographs documented separate transactions with dealers in the magnitude of:

10 copy negatives of Greta Garbo,

8 original 8 × 10 negatives of scenes of Mary Pickford,

3 portrait negatives of Carol Lombard,

206 8 × 10 negatives of film stars.

Sales of motion picture materials comparable to the categories of the University Property in large quantities almost invariably would be dealers. A market also existed for small collections that had a particular subject matter focus or historical value in sales to colleges, archives, and other institutions interested in motion picture research or preservation.

The outstanding characteristic of all of these transactions, and the most significant factor in a determination of fair market value, is that markets for potential sellers were extremely thin. Potential purchasers of volumes of any magnitude of a particular item in the University Property are few in number. The dollar magnitude of any particular transaction in these markets typically is modest, and capital available to the small business operators was limited. Colleges and archives, in 1969, did not have funding that could be made available to purchase large segments of the University Property.

Plaintiff complains that defendant's fact witnesses represented the "low end" of the market and scarcely a level ahead of fly-by-night operations. Plaintiff has not shown that operators in the "high end" of these markets are in any substantial numbers or are appreciably more heavily structured financially than defendant's fact witnesses. There is little doubt that, in fact, no market existed in 1969 that could finance sales of the magnitude plaintiff projects for the University Property.

Another characteristic of sales in these markets is the limited number of actual transactions as to any particular item. There is no regular flow of similar transactions that would define a relatively stable price for any particular item.

In *Anselmo*, the court found that the fair market value was the price a buyer would have to pay the supplier who had sold the gemstones to the donor. *See Anselmo* 757 F.2d at 1213 and n. 5. UA asserts that the relevant market in this case cannot be ascertained by looking at the manner in which UA obtained the property it eventually donated. The property was acquired for commercial exploitation, and the rights to commercial exploitation were not donated. Further, UA states that the value of this donated property lies in its historical and archival significance, which were not recognized by UA when it first acquired the materials. Accordingly, plaintiff argues, the market in which the materials were acquired no longer exists. This contention, seemingly, would make purchases by colleges, archives, and other like institutions have greater significance in any market in which the University Property could be sold. In 1969, UA did not have direct access to markets in which sales were made to ultimate consumers of motion picture memorabilia.

The record contains information about sales of collections that contained items comparable to some of the items in the University Property. These transactions illustrate the limited size of actual market transactions in number of items and capital requirements:

1. Shephard collection: In the mid-1960's, David Shephard accumulated a collection of more than 1,000 16mm motion picture prints. Most were of features made before 1950. Generally, Mr. Shephard paid less than $200 for each print. The collection was in fine condition, was diverse, and was quite rare. On November 3, 1976, he offered to sell his collection to the University, and sent an inventory that had hand-written prices to the left of the titles. These prices were not quotations but were given to provide an approximate indication of the value of each item and to permit a rough idea of the costs associated with various packages that might be selected. These prices generally represented Mr. Shephard's costs. Following negotiations, the University selected approximately 180 prints, for which it paid $25,000. The prices agreed upon ranged from $125 to $300 for black and white prints and $500 to $650 for color prints. One title, "The Maltese Falcon," was priced at $200 on the inventory. This same title was included in Mr. Shephard's valuation as a Warner Brothers "classic" and, with a value-added factor of 2.21594, valued at $775.

2. Cohen collection: This collection is described *supra*. Its contents are listed in a 32-page inventory. It contained all significant records related to 27 Universal Studio motion pictures. The University of Iowa in 1966 purchased the collection for $4,125.

3. Ringold collection: In the early 1970's, Malcolm Willits acquired this collection for $11,200. The collection consisted of approximately 250,000 still prints, 10,000 still negatives, several hundred pressbooks, scripts, posters, lobby cards, books, and magazines. Mr. Ringold was a collector of movie memorabilia and also operated a mail order business. His print collection covered a panoply of Hollywood history, the output of different studios and a variety of different stars.

4. Nelson collection: In 1969, Malcolm Willits attempted to sell the Nelson collection. It consisted of 33,262 still

prints assembled by a private collector. It was offered to Mr. Willits at a price of approximately 15 cents per print. Mr. Willits prepared a brochure that described the collection in detail, which was circulated to a number of universities and libraries. The offering price was $8,750 (approximately 25 cents per still). No offers were received.

 In determining fair market value, all factors bearing on value are relevant, including, when pertinent, the cost or selling price of the item, sales of comparable properties, cost of reproduction, expert-opinion evidence, and expert appraisals. Absence of a readily available market price does not preclude a valuation; uniqueness of the property does not preclude a valuation if the property can be identified with actual commercial market activity. *See, Guggenheim v. Rasquin,* 312 U.S. 254, 258, 61 S.Ct. 507, 509, 85 L.Ed. 813 (1941), *Nord W. Krauskopf,* 48 T.C.M. (CCH) 620, 628 (1984). In this case, the experts' reports, the testimony, and documentary evidence establish that the University Property had a fair market value in 1969 in some amount.

Plaintiff's expert, Mr. Cushman, assumed orderly marketing for sales to consumers reasonably would require a three-year period to move the still photographs he appraised. Defendant's expert, Mr. Willits, estimated that a reasonable period for retail sales disposition of pressbooks would be a five to ten-year period. In a purchase in 1969 of a package as large and diverse as the University Property, any dealer would be concerned about the period needed to recover costs and realize profit in relation to inventory maintenance expense. A five to ten-year period would be needed to provide an adequate incentive.

In order to dispose of the University Property, the materials would have to be identified and organized in a manner appropriate to extremely large scale transactions. Review of the record indicates that a grouping by source company would conform to industry practice. Accordingly, such an organization has been adopted for the valuations that follow.

### Conclusions

All of the materials conveyed to the University qualified as a gift within the meaning of I.R.C. § 170. UA's management made the contribution to the University (1) with the intention of realizing a tax benefit for a charitable contribution, (2) with the intention that nothing be given that would impact on UA's commercial exploitation of motion pictures, and (3) with the intention, except for the right to broadcast the RKO films over the University's television station for educational purposes, to make a gift of the physical property contained in the materials only. There was no intention to transfer to the University any physical property that had a value to UA in its commercial operations.

 Commercial markets existed in 1969 which involved purchases and sales of items comparable to the materials in the University Property. The fair market value of the University Property is to be found in sales made to dealers of motion picture films and memorabilia, and in similar sales made to such organizations as universities, libraries, archives, or museums.

Transactions with dealers would have the following characteristics:

(1) Sale would be of a bulk package.

(2) The price of the package would reflect the following considerations:

(a) Some of the individual items in the package, over a period of time, reasonably could be expected to be sold to collectors or other ultimate consumers at such prices and in such quantities that the whole transaction would be commercially viable.

(b) Some of the items in the package were susceptible to reassembly into smaller packages that would qualify as an integrated collection of interest to universities, archives, libraries, or museums for historical preservation, research, or archival purposes. Such re-packaged sales would be at such prices and in such amounts that would be within the means of the institution and at the same time would be commercially viable.

Transactions with institutions that would acquire the University Property for historical preservation, research, or archival purposes would have the following characteristics:

(1) Sale would be of a bulk package.

(2) The price of the package would reflect the following considerations:

(a) Institutions interested in such a purchase have limited funding available for such purposes.

(b) Susceptibility of the package to reassembly for the purpose of creating collections of sufficient subject matter integrity and completeness to be useful for research, classroom educational needs, or historical preservation.

The conditions under which the University Property was developed and maintained were such that the schedules attached to the deeds of gift were inadequate to identify the quantity or condition of the items listed. The University Property in 1969 was an accumulation of the residue of prior commercial activities for which there was little present need and any future business use was problematic. It was not an integrated collection of materials selected and organized for sale either (1) to a dealer or to an ultimate consumer, nor (2) to an institution for historical preservation, research, or archival uses. The most reasonable package to offer for sale, either to dealers or to institutions, were packages identified and organized by source of the materials.

A dealer who purchased a package of University Property would allow for maintenance of the inventory for from five to ten years. During that period, some items would not be sold, but sales that did occur would be sufficient, from a commercial standpoint, to warrant and sustain the transaction.

The reports and opinion evidence of plaintiff's expert witnesses are not acceptable, in part, because the experts were artificially restricted by requirements from counsel to concentrate on markets limited to ultimate consumers. The reports and opinion evidence of all expert witnesses from the motion picture industry are distorted by client orientation. As a result, values recommended by plaintiff's expert witnesses must be downgraded, and values recommended by defendant's expert witnesses are unacceptably low.

The fair market values in 1969 of the various items in the quantities that a dealer could be expected to resell during a five to ten-year period are:

| | |
|---|---|
| 16mm feature length motion picture print:—Used | $125.00 |
| 16mm feature length motion picture print:—New, black and white | 200.00 |
| 16mm feature length motion picture print:—New, color | 500.00 |
| 16mm shorts | 50.00 |
| 16mm cartoons | 25.00 |
| Still photograph negatives | 2.00 |
| Still photograph negatives major stars | 2.50 |
| Still photograph prints | 2.50–3.00 |
| Pressbooks | 2.00 |
| Scripts | 5.00–15.00 |
| Final scripts | 15.00–40.00 |
| Shorts | 3.00 |
| Monogram Dialogues | 2.50 |
| Ziv–TV Scripts | 3.00 |
| Pressbooks, Warner Brothers | 6.00 |
| Pressbooks, Monogram | 4.00 |
| Music cue sheets | 1.00 |

The fair market value of the University Property, in packages organized by source company, as described above, pp '93–97, on the basis of information in the record of this case and the foregoing conclusions, is:

| | | |
|---|---|---|
| 1. | United Artists: Schedules A–1, A–2(A), A–2(B), A–8, A–3, A–4, A–6, and A–7 | $313,709. |
| 2. | Ziv–TV: Schedules B–1, B–2, B–3, B–4 | 508,731. |
| 3. | Warner Brothers Film Library: Schedules C–1, C–4, C–6, C–8, C–13, C–14, C–15, C–16, C–19, C–20, C–21, and C–22 | 990,423. |
| 4. | Popeye Cartoon Film Library: Schedules C–10 and C–13(vii) | 110,837. |
| 5. | Monogram Film Library: Schedules C–12, C–13(vi), C–17, and C–18 | 134,839. |
| | Total | $2,058,539. |

No fair market value is found for the RKO Library package. In 1969, UA held television distribution rights in the United States in the RKO Library. UA gave the University 16mm exhibition prints of 707 RKO sound features, limited to educational uses in broadcasts over the University's Madison, Wisconsin, station and study on the University's premises. No evidence was presented as to the fair market value of the 707 exhibition prints as items separate from the television broadcast rights. The license to broadcast is not specifically

stated to be exclusive or to be in perpetuity. The license clearly is less than UA's entire interest in its license of distribution rights to the United States, including the Madison, Wisconsin, market. 26 U.S.C. § 170(f)(3)(A) (1982). The Madison market is less than one-quarter of one percent of UA's total market. Mr. Ezzes testified that industry practice creates an exclusive market even though the license agreement does not contain the word "exclusive." That may be accurate as to licenses in commercial television markets. It does not necessarily apply to the grant in a charitable gift context to an educational institution limited to educational uses. The circumstance that UA carried out its intent to make a gift and did not grant a license in the Madison market to another does not resolve the issue of whether the gift in fact was exclusive and in perpetuity.

The fair market value of $2,058,539 for the University Property is subject to reduction for depreciation recapture. With an allowance of $5,756 for the 707 RKO prints, the total depreciation recapture applicable to the University Property is $799,057. Accordingly, UA's charitable contributions deduction for the University Property is $1,259,482.

Summary: Charitable Contributions issue:

| | Allowable Deduction |
| --- | --- |
| Library Property | None |
| University Property | $1,259,482. |
| Total | $1,259,482. |

\* \* \* \* \* \* \*

### ORDER ON ALL CLAIMS

Liability on all claims in plaintiff's complaints is determined as follows:

| | |
| --- | --- |
| (1) I.R.C. § 51 Tax Surcharge Issue: | No liability. |
| (2) I.R.C. § 421(b) Deduction (Stock Option Issue): | No liability. |
| (3) Aircraft Leases Issue: | No liability. |
| (4) I.R.C. §§ 921, 922 Western Hemisphere Trade Corporation Deduction: | Plaintiff prevails on claim. |
| (5) Bad Debt Deduction (SCORE Issue): | Stipulation of the parties in settlement of this claim is accepted. |
| (6) Investment Tax Credit for Films: | Stipulation of the parties in settlement of this claim is accepted. |
| (7) Computational Issues: | To be resolved mutually by parties after this decision on underlying substantive issues. |
| 45(8) Title Plant Leases Issue: | Plaintiff prevails and is entitled to rental deductions taken for tax years 1968 and 1969. |
| (9) Charitable Contributions Issue: | Plaintiff prevails in part and is entitled to a charitable contribution deduction for 1969 in the amount of $1,259,482. |

Counsel are directed to attempt to resolve by mutual agreement (1) all adjustments to plaintiff's income tax for the tax years 1968 and 1969 that result from disposition of the liability issues herein ordered, and (2) the amount which plaintiff is entitled to receive on all claims in the complaints in the consolidated cases.

On the filing of a stipulation as to the amount plaintiff is entitled to recover on all claims, the clerk is directed to enter a final judgment without further order of the court. No costs. In the computation of the amount plaintiff is entitled to receive, if any matter arises that is not susceptible to resolution by mutual agreement, such matter shall be identified in a joint memorandum filed with the clerk on or before thirty days from the date of this opinion. Any such matter will be resolved in further proceedings before final judgment is entered.

It is so ORDERED.